# TAB 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HENRY ESPEJO, individually and on behalf of all others similarly situated, | |
| *Plaintiff,* | Case No.: 1:11-cv-08987 |
| *v.* | Honorable Charles P. Kocoras |
| SANTANDER CONSUMER USA, INC., an Illinois corporation, | |
| *Defendant.* | |
| ARICA BONNER, *et al.*, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | Case No.: 12-cv-09431 |
| v. | Honorable Charles P. Kocoras |
| SANTANDER CONSUMER USA, INC., | |
| *Defendant.* | |

## DECLARATION OF WAYNE NIGHTENGALE
## IN SUPPORT OF SANTANDER CONSUMER USA, INC.'S
## MOTION FOR SUMMARY JUDGMENT

I, Wayne Nightengale, declare under oath as follows:

1.     I am currently employed by Santander Consumer USA, Inc. ("Santander") as Executive Vice President of Servicing and have held that position since November 2014. Prior to that time, I was employed by Santander as Assistant Vice President of Servicing from July 2005 until 2008, as Vice President of Servicing from 2008 to 2010, and as Senior Vice President of Servicing from 2010 until November 2014. I have personal knowledge of the facts stated in this Declaration and I could and would competently testify to them in a court of law.

2.    In my roles as Assistant Vice President, Vice President, Senior Vice President and Executive Vice President of Servicing for Santander, my primary responsibilities have included all aspects of customer interaction from customer service through collection activity.  In that capacity, I have access to Santander's business records, including the Activity Notes used by Santander's agents and the financing documents for customer's automobile loan transactions. The business records referred to in this Declaration were made and kept in the ordinary course of Santander's business and were prepared in the normal course of business at or near the time of the events to which they refer or relate.

**Activity Notes**

3.    Santander maintains customer information on the "My Supervisor" or "My Sup" host system – a graphic interface that sits on top of a commercially available customer account management system.

4.    Anytime the company attempts to dial a customer-related telephone number, receives a customer call, or otherwise communicates with a customer, it documents that contact at the account level in My Sup. The information collected includes: the date and time of the call; whether the call is inbound to, or outbound from, Santander; if outbound, the calling mode used (*e.g,* manual or dialer) and how the call was handled (*e.g.,* by an agent, dialer, the system or some other person); and if answered, how the Santander agent "dispositioned" the call (*i.e.,* events that occurred on the phone call such as the customer service provided, customer payment promised or message left). The Activity Notes also allow agents to make free form notes.

5.    Santander's telephone system identifies the number from which its customers or other persons related to customer accounts call Santander. The company trains its agents to confirm in each in-bound call related to a customer account whether the number on which the

person is calling is a good number to contact him or her regarding the customer account. Additionally, Santander employs software that prompts agents to verify contact information, again confirming the telephone numbers are good numbers on which to contact the person associated with the telephone number.

6.    Santander's policies also require agents to record "do not call" requests made by those with whom they are speaking. Santander takes customer requests to end telephone communications seriously. The company trains agents to identify this material information in the Activity Notes via a drop down button that inserts the "do not call" request in the notes. Once recorded, the My Sup software disables the number such that neither agents nor the dialer can contact that number.

7.    Santander personnel refer to the customer-related information recorded for each account in My Sup as the "Activity Notes" for the customer account. In the normal course of Santander's business, personnel with a duty to accurately record information regarding customer accounts electronically access the Activity Notes and contemporaneously update these records with customer-related information when generated or received. Additionally, Santander employs computer hardware and software that automatically updates the Activity Notes with phone numbers and call dates and times when a customer-related call is made to, or received by, Santander through its Aspect Telephone System. Santander relies on the information contained in these Activity Notes during the normal course of its daily business activity.

8.    Santander employed the Aspect Telephone System when making outbound calls to, or receiving inbound calls from, telephone numbers related to the Maria Espejo and Levins accounts (*i.e.* to telephone numbers ended 1411, 6954, 9678 and 6074).

**Henry and Maria Espejo**

9.     Attached as Exhibit A, is a true and correct copy of a credit application Maria Espejo submitted to obtain financing from Sovereign Bank for a Toyota Corolla she purchased from Kendall Toyota in Miami, Florida. Santander, a specialized consumer finance company, acted as the third-party servicer on this loan.

10.     Attached as Exhibit B hereto, is a printout from the Activity Notes related to Maria Espejo's account. The six columns in this Activity Notes printout can generally be explained as follows:

>    a.   The first column contains the date each particular entry was dispositioned;
>
>    b.   The second column contains the time each particular entry was dispositioned.
>
>    c.   The third column contains a disposition code consisting of four letters. Each disposition code has an independent meaning within Santander's records, and is not limited to phone communications with the customer.
>
>    d.   The fourth column indicates whether the call or other activity was ultimately "handled by" the dialer, an agent, the My Supervisor computer system, or some other person or system.
>
>    e.   The fifth column contains a four-digit letter code that indicates who performed the function. Sometimes this can be a particular agent's identification code; other times it refers to a system related abbreviation.
>
>    f.   The sixth column is the notes field in which agents can type a "free form" message using their own unique words or choose from certain drop-down menus or categories. This field also sometimes contains system generated notes depending on the purpose of each particular entry.

11.     The "handled by" column in Santander's Activity Notes, which uses terms such as "Agent" and "Dialer," does not necessarily indicate the dialing method that Santander used to initiate a phone call. The reader of the Activity Notes must also consult the notes field to see what type of calls were made (*i.e.*, those initiated by a dialer versus manually dialed by an agent).

12. The Activity Notes for the Maria Espejo Account record that on June 26, 2009, Mrs. Espejo contacted Santander on a telephone number ending in 1411 to indicate that she would keep an earlier promise to make a payment by that date.

13. The Activity Notes for the Maria Espejo Account record that on September 9, 2009, Mrs. Espejo called Santander using the 1411 telephone number to ask for additional time to make the next payment as a result of her need to pay medical expenses. The notes further reflect that during this call, Mrs. Espejo identified the 1411 telephone number as her "home" number. When an agent records a telephone number in the Activity Notes as a "home" number, it signifies that the customer has identified the telephone number as her home phone number and the agent has verified the number as an appropriate number on which to contact her regarding her loan.

14. The Activity Notes for the Maria Espejo Account record that Mrs. Espejo used the 1411 telephone number to contact Santander on October 27, 2009, when she indicated that a family emergency caused her to not make a timely loan payment.

15. The Activity Notes for the Maria Espejo Account record that on November 4, 2009, Mr. and Mrs. Espejo together made a call to Santander using the 1411 telephone number to explain that Mr. Espejo's bank had not yet made a payment that Mrs. Espejo had said Mr. Espejo would make on her behalf. The notes further reflect that during that call, Mrs. Espejo agreed that Santander could talk to Mr. Espejo about her debt.

16. The Activity Notes for the Maria Espejo Account record that on November 4, 2009, Santander updated its records to record the 1411 telephone number as a cell number. Under Santander's procedures, the agent recording that information would have confirmed with

Mr. Espejo that the 1411 cell phone number was a good number on which to contact Mr. Espejo regarding his wife's debt.

17. The Activity Notes for the Maria Espejo Account record that at no point prior to the call with Mr. and Mrs. Espejo on November 4, 2009, did Santander make an outbound call to the 1411 telephone number.

18. The Activity Notes for the Maria Espejo Account reflect that Mr. Espejo answered a call to the 1411 telephone number 4 times (on November 12, 2009, March 8, 2010, August 30, 2010 and December 6, 2010), with the remaining calls either not reaching the number, receiving a busy signal or connecting to an answering machine.

19. The Activity Notes for the Maria Espejo Account record that with regard to the four calls answered by Mr. Espejo, the following occurred:

- On November 12, 2009, Mr. Espejo said Maria Espejo could not pay until November 21 because of a large medical bill;

- On March 8, 2010, Mr. Espejo said he had mailed a payment for Maria Espejo's account of unknown amount;

- On August 30, 2010, Mr. Espejo promised to make a payment for Maria Espejo's account the next day; and

- On December 6, 2010, Mr. Espejo said Maria Espejo had not made a payment because of car repairs and would have Maria Espejo call Santander to seek a deferment.

All other conversations with Mr. Espejo (both before and after these four calls) took place on inbound calls to Santander where he sought accommodations for his wife.

20. The Activity Notes for the Maria Espejo Account do not record any request from Mr. Espejo to stop calling the 1411 telephone number in the November 12, 2009, March 8, 2010, August 30, 2010 and December 6, 2010 calls.

21.     The Activity Notes for the Maria Espejo Account record that Mr. Espejo or his wife used the 1411 telephone number to call Santander 25 times, with Mr. Espejo speaking on behalf of his wife in 23 of those calls, to discuss payment accommodations for Mrs. Espejo's debt. The records do not reflect Mr. Espejo asking Santander to stop calling the 1411 telephone number.

**Faye Levins**

22.     Attached as Exhibit C hereto, is a printout from the Activity Notes related to Faye Levins' account. The six columns in this Activity Notes printout can generally be explained in the same way as the notes in the Maria Espejo Activity Notes printout.

23.     The Activity Notes for the Faye Levins Account record that Santander contacted Levins at three cell phone numbers ending in 6954, 9678 and 6074.

24.     Attached as Exhibit D hereto, is a true and correct copy of a January 31, 2009 credit application completed by Faye Levins. Santander is the successor in interest by merger to the lender, Drive Financial Services, LP. This credit application identifies Levins' 6954-ended telephone number as her "home" and "cell" phone number.

25.     The credit application states:

By providing my cell phone number, I give my prior express consent to receive calls and text messages from the creditor or its third party debt collector at that number, including calls and messages made by using an autodialer or prerecorded message.

26.     Attached as Exhibit E is a disk that contains a true and accurate copy of a recording made of a May 14, 2012 call to the telephone number ending in 9678. This recording was made and kept in the ordinary course of Santander's business and it is Santander's regular business practice to maintain such call recordings. On this recording, a person who identifies

herself as Faye Levins confirms that the 9678 telephone number is a current cell phone number that Santander could use to contact her.

27.     The Activity Notes for the Faye Levins Account record that before May 14, 2012, Santander had made three manually dialed calls to the 9678 telephone number, on May 4, 7 and 10, 2012.  Those notes do not record Santander using the dialer feature of the Aspect Telephone System to call the 9678 telephone number prior to May 14, 2012.

28.     The Activity Notes for the Faye Levins Account indicate that Levins submitted a number of MoneyGram and Western Union payments to Santander between May 2010 to January 2011, which identified the 6074 telephone number as a contact number for Levins. These MoneyGram and Western Union payments are reflected by the codes "MGUP" and "WUUP" in the Activity Notes.

29.     The Activity Notes for the Faye Levins Account record that a Santander agent identified Levins' 6074 number as "IVR1 Home."  The Activity Notes do not record Santander using the dialer feature of the Aspect Telephone System to call the 6074 telephone number prior to the identification of this number as "IVR1 Home."

30.     The Activity Notes for the Faye Levins Account do not record any request from Levins to stop calling the cell phone numbers ending in 6954, 9678 and 6074.


FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _21st_ day of April 2016 in Dallas, Texas.

Wayne Nightengale

# TAB 2

## EXHIBIT A TO THE DECLARATION OF WAYNE NIGHTENGALE

**KENDALL TOYOTA**     305 – 665 – 6581     305 – 669 – 7381

# APPLICANT'S CREDIT STATEMENT

⊗ Individual Credit    Check Appropriate Box

○ Joint Credit    ☒ If you are applying for individual credit in your name and relying on your own income or assets and not the income or assets of another person as the basis for repayment of the credit requested, complete only Section A.

⊗ Community Property State    ☐ If you are applying for joint credit with another person, complete sections A and B.

○ Business Application    We intend to apply for joint credit

_____    _____
Applicant        Co-Applicant

If you are married and live in a community property state, please complete Section A about yourself and Section B about your spouse. You must sign this application. Your spouse must sign this application only if s/he wishes to be a Co-Applicant.

## A. Applicant's Personal Credit Information

MARIA      C    ESPEJO

SOCIAL SECURITY NUMBER or (TAX ID)     FIRST NAME OR BUSINESS NAME    MI    LAST NAME

EMAIL ADDRESS      DRIVER'S LICENSE #      DRIVER'S LICENSE STATE

0537    –    2 YRS 6 MOS    **Homeowner**

DATE OF BIRTH (MM/DD/YYYY )   HOME PHONE #    OTHER PHONE #    TIME AT ADDRESS    HOUSING STATUS

PO BOX #      RURAL ROUTE

CITY      STATE    ZIP CODE    MTG PYM'T OR RENT

PREVIOUS STREET # AND NAME    APT/SUITE #    PO BOX #    RURAL ROUTE

CITY      STATE    ZIP CODE    YRS ___ MOS
     TIME AT ADDRESS

J C PENNY      Employed    SALES DEP

EMPLOYED BY / TYPE OF BUSINESS (if business application)    EMPLOYMENT STATUS    OCCUPATION

1786      2 YRS 3 MOS

BUSINESS PHONE #    TIME EMPLOYED      SALARY TYPE

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

OTHER INCOME      SOURCE OF OTHER INCOME

PREVIOUS EMPLOYMENT (if less than 2 yrs at current)    EMPLOYMENT STATUS    BUSINESS PHONE #    –    ___YRS ___MOS    TIME EMPLOYED

BANK NAME      CHECKING/SAVINGS ACCOUNT (BANK ACCOUNT #)

CONTACT NAME AT BANK (IF BUSINESS APPLICATION)    CONTACT PHONE #    OCCUPATION
NEAREST RELATIVE OR FRIEND NOT LIVING WITH YOU

NAME      ADDRESS      PHONE

SCUSA/E 0004
CONFIDENTIAL

# FOR DEALER USE ONLY

- (X) A/C
- ( ) Cruise
- ( ) Man. Trans.
- ( ) Sunroof
- ( ) Stereo
- ( ) Pwr. Windows
- ( ) Pwr. Seats
- ( ) 4WD
- ( ) T-Top
- ( ) Alum./Wire Wheel
- ( ) Leather Seats
- ( ) Pwr. Door Locks

VEHICLE OPTIONS

| KENDALL TOYOTA | | 134664 | Used | Retail | 75 | 12323P |
|---|---|---|---|---|---|---|
| DEALER NAME | | DEALER # | VEHICLE TYPE | PRODUCT TYPE | TERM | STOCK# |

| 2T1BR32E67C771961 | | 2007 toyota | corolla | | ce 4d sedan | |
|---|---|---|---|---|---|---|
| VIN # | | YEAR MAKE | MODEL DESCRIPTION | | TRIM | |

**Black Book**

VEHICLE SOURCE

☐ CERTIFIED PREOWNED

| 15659 | 989 | 1 | 2695 | | | 13954 |
|---|---|---|---|---|---|---|
| CASH SELLING PRICE | SALES TAX | T&L | CASH DOWN | FRONT-END FEES REBATE | NET TRADE | GROSS CAP/ UNPAID BALANCE |

| ACCIDENT/HEALTH INS | CREDIT LIFE | GAP | WARRANTY | BACK-END FEES |
|---|---|---|---|---|
| | 14235 | | **Black Book** | |

| MSRP | INVOICE/WHOLESALE VALUE | WHOLESALE SOURCE | RETAIL VALUE | RETAIL SOURCE |
|---|---|---|---|---|

| 4119 | 267 | | | |
|---|---|---|---|---|
| MILEAGE | EST PAYMENT | APR | | |

| [X] VEHICLE BOOKOUT | 06/26/2007 | | |
|---|---|---|---|
| | VEHICLE BOOKOUT DATE | EST AMT FINANCED | |

VEHICLE BOOKOUT OPTIONS

AUTO TRANS

LENDER PROGRAM

TRADE IN

| YEAR | MAKE | MODEL DESCRIPTION | TRIM |
|---|---|---|---|

| TRADE FINANCED BY | TRADE MONTHLY PYMT |
|---|---|

# TAB 3

## EXHIBIT B TO THE DECLARATION
## OF WAYNE NIGHTENGALE

# FILED UNDER SEAL

**Pursuant to the Stipulated
Protective Order filed
October 22, 2014**

# TAB 4

## EXHIBIT C TO THE DECLARATION OF WAYNE NIGHTENGALE

# FILED UNDER SEAL

**Pursuant to the Stipulated
Protective Order filed
October 22, 2014**

# TAB 5

**EXHIBIT D TO THE DECLARATION
OF WAYNE NIGHTENGALE**

## AGREEMENT

The words "you", "your" and "yours" mean each person submitting this application. The words "we", "us", "our" and "ours" as used below refer to us, the dealer, and to the financial institution(s) selected to receive your application.

You authorize us to submit this application and any other application submitted in connection with the proposed transaction to the financial institutions disclosed to you by us the dealers. This application will be reviewed by such financial institutions on behalf of themselves and us the dealer. In addition, in accordance with the Fair Credit Reporting Act, you authorize that such financial institutions may submit your applications to other financial institutions.

You agree that we may obtain a consumer credit report periodically from one or more consumer reporting agencies (credit bureaus) in connection with the proposed transaction and any update, renewal, refinancing, modification or extension of that transaction. You also agree that we or any affiliate of ours may obtain one or more consumer credit reports on you at any time whatsoever. If you ask, you will be told whether a credit report was requested, and if so, the name and address of any credit bureau from which we or our affiliate obtained your credit report.

You agree that we may verify your employment, pay, assets and debts, and that anyone receiving a copy of this is authorized to provide us with such information. You further authorize us to gather whatever credit and employment history we consider necessary and appropriate in evaluating this application and any other applications submitted in connection with the proposed transaction.

We may keep this application and any other application submitted to us and information about you whether or not the application is approved. You certify that the information on the application and in any other application submitted to us, is true and complete. You understand that false statements may subject you to criminal penalties.

## FEDERAL NOTICES

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## STATE NOTICES

**California Residents:** An applicant, if married, may apply for a separate account.

**Ohio Residents:** Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**New Hampshire Residents:** If this is an application for balloon financing, you are entitled to receive, upon request, a written estimate of the monthly payment amount that would be required to refinance the balloon payment at the time such payment is due based on the creditor's current refinancing programs.

**New York Residents:** In connection with your application for credit, we may request a consumer report which contains information on your credit worthiness, credit standing, personal characteristics and general reputation. If we grant you credit, we or our loan servicer may order additional consumer reports in connection with any update, renewal or extension of the credit. If you ask us, we will tell you whether we obtained a consumer report and if we did, we will tell you the name and address of the consumer reporting agency that gave us the report.

**Vermont Residents:** By signing below you authorize us and our employees or agents to obtain and verify information about you (including one or more credit reports, information about your employment and banking and credit relationships) that we may deem necessary or appropriate in evaluating your loan application. If your application is approved and the loan is made, you also authorize us, [and our] employees and agents, to obtain additional credit reports and other information about you in connection with reviewing the account, increasing the available credit on the account (if applicable), taking collection on the account, or for any other legitimate purpose.

**Married Wisconsin Residents:** Wisconsin law provides that no provision of any marital property agreement, or unilateral statement, or court order applied to marital property will adversely affect a creditor's interest unless, prior to the time that the credit is granted, the creditor is furnished with a copy of the agreement, statement or decree, or has actual knowledge of the adverse provision. If you are making this application individually, and not jointly with your spouse, the full name and current address of your spouse must be properly disclosed in the co-applicant section of this application.

This application may be submitted to the following financial institutions (Name(s) and Address(es)) _____

---

BY SIGNING BELOW, YOU CERTIFY THAT YOU HAVE READ AND AGREE TO THE TERMS AND DISCLOSURES ON THE THREE PAGES OF THIS APPLICATION.

X _____  1-31-09  X _____

APPLICANT'S SIGNATURE          DATE          CO-APPLICANT'S SIGNATURE          DATE

COPYRIGHT (C) 2007 DEALERTRACK, INC. ALL RIGHTS RESERVED.

Printed on 01/31/2009 at 05:17 PM


DEFENDANT'S EXHIBIT

6

**App. 126**

SCUSA/B 00053
CONFIDENTIAL

ADAMSON FORD          205 - 271 - 4855     205 - 271 - 4850

## APPLICANT'S CREDIT STATEMENT

(X) Individual Credit    Check Appropriate Box

○ Joint Credit

☒ If you are applying for individual credit in your name and relying on your own income or assets and not the income or assets of another personas the basis for repayment of the credit requested, complete only Section A.

☐ If you are applying for joint credit with another person, complete sections A and B. We intend to apply for joint credit

○ Community Property State

○ Business Application

                    Applicant                Co-Applicant

• If you are married and live in a community property state, please complete Section A about yourself and Section B about your spouse. You must sign this application. Your spouse must sign this application only if s/he wishes to be a Co-Applicant.

### A. Applicant's Personal Credit Information

SOCIAL SECURITY NUMBER or (TAX ID)     FAYE           LEVINS

                                  FIRST NAME OR BUSINESS NAME    MI    LAST NAME

EMAIL ADDRESS              DRIVER'S LICENSE #              DRIVER'S LICENSE STATE

                    -6954     -6954   14   YRS ___ MOS   Homeowner

DATE OF BIRTH (MM/DD/YYYY)   HOME PHONE #    CELL PHONE # (See below)   TIME AT ADDRESS   HOUSING STATUS

CURRENT STREET # AND NAME         APT/SUITE #       PO BOX #       RURAL ROUTE

CITY                STATE    ZIP CODE       MTG PYMT OR RENT

PREVIOUS STREET # AND NAME        APT/SUITE #       PO BOX #       RURAL ROUTE

CITY                STATE    ZIP CODE       ___ YRS ___ MOS   TIME AT ADDRESS

TMOBILE                  Employed       SALES

EMPLOYED BY or TYPE OF BUSINESS (if business application)   EMPLOYMENT STATUS   OCCUPATION

BUSINESS PHONE #             ___ YRS 8 MOS     SALARY             SALARY TYPE
                            TIME EMPLOYED

CITEL                    Employed            15 YRS ___ MOS

PREVIOUS EMPLOYMENT (if less than 2 yrs at current)   EMPLOYMENT STATUS   BUSINESS PHONE #   TIME EMPLOYED

WORKER

OCCUPATION

Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

OTHER INCOME             SOURCE OF OTHER INCOME

By providing my cell phone number, I give my prior express consent to receive calls and text messages from the creditor or its third party debt collector at that number, including calls and messages made by using an autodialer or prerecorded message.

Printed on 01/31/2009 at 05:17 PM

SCUSA/B 00054
CONFIDENTIAL

# TAB 6

## EXHIBIT E TO THE DECLARATION
## OF WAYNE NIGHTENGALE

# FILED UNDER SEAL

## Pursuant to the Stipulated
## Protective Order filed
## October 22, 2014



**ReedSmith**

The business of relationships.℠

Bonner v. Santander Consumer USA, Inc.
Case No. 1:12-cv-09431
SCUSA-B 00076
May 14, 2012
CONFIDENTIAL

# TAB 7

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    HENRY ESPEJO, individually
      and on behalf of all others
 4    similarly situated,
                                        Case No.: 1:11-cv-08987
 5            Plaintiff,
                                        Honorable Charles P. Kocoras
 6        v.

 7    SANTANDER CONSUMER USA, INC.,
      an Illinois corporation,
 8
              Defendant.
 9    _____

10    ARICA BONNER, et al,
      individually and on behalf
11    of all others similarly
      situated,
12                                      Case No.: 1:12-cv-9431
      Plaintiff,
13                                      Honorable Charles P. Kocoras
          v.
14
      SANTANDER CONSUMER USA, INC.,
15    an Illinois corporation,

16            Defendant.

17    _____

18    ************************************************************

19               ORAL DEPOSITION OF JOSEPH BURDA

20                        CONFIDENTIAL

21    ************************************************************

22        ANSWERS AND DEPOSITION OF JOSEPH BURDA, produced as a

23    witness at the instance of the Plaintiffs, Henry Espejo and

24    Faye Levins, individually and on behalf of all others

25    similarly situated, taken in the above-styled and -numbered
```



1  cause on the 21st day of July, 2015, A.D., beginning at

2  9:02 a.m., before Charlotte Haynsworth, a Certified

3  Shorthand Reporter in and for the State of Texas, in the

4  offices of Esquire Deposition Solutions, located at

5  1700 Pacific Avenue, Suite 1000, Dallas, Texas, in

6  accordance with the Federal Rules of Civil Procedure and

7  the agreement hereinafter set forth.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1          MR. PIETRKOWSKI:  Object to the form.

2      A.  On a recurring basis?  So --

3      Q.  (BY MR. LARRY) So I think -- my -- my

4  understanding -- and correct me if I'm wrong -- is that

5  there's a nightly batch process essentially that involves

6  uploading the list of accounts to be called.  Correct?

7          MR. PIETRKOWSKI:  Object to the form.

8      A.  We have a file that's generated each night --

9      Q.  (BY MR. LARRY) Okay.

10      A.  -- and provided to us.

11      Q.  Provided to your team?

12      A.  Yes.

13      Q.  Okay.  And so your team is involved in -- is there

14  an uploading process for that -- for that file?

15      A.  Yes.  We load it into the system.

16      Q.  Okay.  And you're -- are you involved at all in

17  the creation of the con- -- I think I misspoke there -- the

18  creation of the content of that file at --

19      A.  No, sir.

20      Q.  -- all?  Okay.

21          Can you describe for me the process of

22  uploading that file into the system?

23      A.  So basically we just get a file, put in a file

24  share location.  And then we have a -- within the Aspect

25  system we have a -- a process where we actually import the



1  file and it loads that file into a database.

2     Q.  Is that a -- how long does that process take?

3     A.  Off the top of my head, I couldn't say.  I mean --

4     Q.  When a -- is this something you do personally or

5  do people underneath you do it?

6     A.  People under me do it.

7     Q.  Okay.  Do you have any understanding of how long

8  it takes them to run that importing process?

9     A.  No.

10    Q.  Okay.

11    A.  Not right off the top.

12    Q.  And you -- just to be clear.  You don't have any

13  idea of how long it takes the system to do that.  Correct?

14  So you understand there would be a difference between --

15  there could be a difference, I would imagine, between the

16  person doing their portion of the process -- so clicking

17  the buttons that are necessary to make the importing

18  happen --

19    A.  Uh-huh.

20    Q.  -- and the system actually running the import,

21  which could take longer than that conceivably.  Right?

22           MR. PIETRKOWSKI:  Object to the form.

23    Q.  (BY MR. LARRY) You don't have any sense of how

24  long either part of that takes?

25    A.  I mean -- I -- I don't know how long it takes for



1    the file to import.

2        Q.  Okay.

3        A.  But the agent would go through a few steps to --

4    to make sure it happens.

5        Q.  Okay.  And --

6        A.  I've --

7        Q.  -- when does that typi- --

8        A.  -- I've never timed it.

9        Q.  Okay.  When does that typically happen?

10       A.  When my agents show up in the morning.  So around

11   5:30.

12       Q.  Okay.  And when is that typically done by?

13       A.  Our SLA is -- as long as it's before 7:00.

14       Q.  Okay.

15       A.  So --

16       Q.  So generally it takes less than an hour and a half

17   start to finish?

18       A.  Correct.

19       Q.  Okay.  So once it's -- once that file is uploaded

20   or imported into the Aspect system, are you -- are you

21   involved at all in the oversight -- or in overseeing the

22   execution of that file?  So what I mean by that is actually

23   ensuring that the numbers in that file get called.

24       A.  Yes.

25       Q.  Okay.  And what is your role in that process?



1    A.  So we -- we basically -- once a file's loaded and

2    we create our campaigns, we're responsible for connecting

3    those calls to agents.

4    Q.  Okay.  Now, you mentioned creating campaigns.  Is

5    that a process that you're involved in?

6    A.  Yes, we --

7    Q.  And what is your involvement in that?

8    A.  My involvement -- I don't physically touch it but

9    my department -- we create filters to filter the file and

10   create campaigns.

11   Q.  Okay.  And what -- what is involved in that

12   process?  What are some example of filters that you create?

13   A.  They're just -- they're just high-level filters

14   based off the information provided to my team.  So I don't

15   -- I'm trying to think how to word it.  We get pre-defined

16   values in the file and then we look for those values to

17   create the campaigns.

18   Q.  Can you explain what you mean by "pre-defined

19   values"?

20   A.  Like a -- like a value of -- I'm trying to think

21   how to say it.  So it's a -- the business defines a

22   strategy and within those strategies -- they give us a

23   value and say look for this value to create this strategy.

24   Q.  Okay.

25   A.  Does that make sense?  So --



1  wasn't you doing the hands-on.  It was your team.  Right?

2      A.  They -- yeah, they're running the --

3      Q.  Okay.  So they take what's essentially -- and

4  correct me if I'm wrong here -- a set of criteria and

5  program the dialer to make the calls based on those.

6  Correct?

7      A.  No, they take criteria to build a file.

8      Q.  Okay.  And then -- okay.

9      A.  Uh-huh.

10     Q.  To build the campaign file.

11     A.  Correct.

12     Q.  Okay.  But they aren't the ones determining the

13  criteria.

14     A.  Correct.

15     Q.  Okay.  Who is it that determines those criteria?

16     A.  That would come from Wayne Nightengale and his

17  team.

18     Q.  Okay.  Okay.  So once your team has built the

19  campaigns, what's the next step?

20     A.  Wait till people come to work.

21     Q.  Okay.  And -- and then what happens?

22     A.  We'll start -- we'll start those campaigns to a

23  specific target.

24     Q.  Okay.

25     A.  And then when agents log into the system and put



1  them in a -- put themselves in a status to be available to

2  take phone calls, Aspect will lau- -- launch phone calls.

3      Q.  Okay.  And now -- when you said specific target --

4  can you just clarify what you meant by that?

5      A.  Like a queue.

6      Q.  Okay.

7      A.  A group of agents.

8      Q.  Okay.  Okay.  So what you're going to do then --

9  and again, correct me if I'm wrong -- is -- the campaign's

10  built and you're going to assign -- is it a campaign to a

11  particular queue of calling agents?

12     A.  Yes.

13     Q.  Okay.  And then once those agents come in and

14  they've logged into the system and they've got, you know,

15  their workstation set up and everything and they're into --

16  they've put themselves on their systems into what,

17  available or some other status?

18     A.  Idle.

19     Q.  Okay.  As opposed to -- I'm sure there's an

20  unavailable one.  There's, you know --

21     A.  Not ready --

22     Q.  -- in the process of a call.

23     A.  Not ready for a phone call.

24     Q.  Okay.  So once they are -- is it once a single

25  person is in that -- in the right status -- then it's go



1  time and the calls start being made?

2          MR. PIETRKOWSKI:  Object to the form.

3      A.  Once an agent becomes available, the system would

4  dial for that agent.

5      Q.  (BY MR. LARRY) Sure.  So what -- it would start as

6  soon as an agent is available.

7      A.  Available, yes.

8      Q.  Okay.  Okay.  And then in terms of -- once that

9  process is actually up and running, how much involvement do

10  you have -- well, correction -- how much involvement does

11  your department have in determining the placement and

12  routing of calls made and execution of a given campaign?

13  Or would that be part of the campaign build itself?

14          MR. PIETRKOWSKI:  Object to the form.

15      A.  So -- trying to understand where you're going or

16  what you're -- what you're saying here.  So -- my team

17  isn't physically launching the phone calls.

18      Q.  (BY MR. LARRY) Correct.

19      A.  Is that what you're asking?  Yeah.

20      Q.  That wasn't what I was asking.

21      A.  Okay.

22      Q.  That's a good starting point.  So your team's not

23  physically launching the phone calls.  Do they have any

24  involvement in, say, the number of calls made at any given

25  time?



1       A.   Those are the forms that we use.

2       Q.   Okay.  So to your knowledge, Santander doesn't use

3  Blaster dialing mode.

4       A.   We do not use that.

5       Q.   Okay.  What about Precision dialing mode?

6       A.   No, sir.

7       Q.   Automatic dialing mode?

8       A.   We do not use that.

9       Q.   Okay.  And as far as predictive, preview, and

10 manual -- are you familiar with how -- how those modes work

11 from the Aspect side?  So how the dialer actually

12 effectuates each of those modes.

13      A.   Yes.

14      Q.   Okay.  So -- does the description there of

15 Predictive dialing mode -- is that consistent with your

16 understanding of how predictive dialing mode works in the

17 Aspect dialer?

18      A.   Yes, sir.

19      Q.   Okay.  And you said Santander does use that mode.

20 Correct?

21      A.   Yes, sir.

22      Q.   Do you know whether that mode was used to place

23 calls to Faye Levins?

24      A.   Yes.

25      Q.   Okay.  And, if necessary, you can consult



1      Q.  Do you know -- do you have any sense of how long

2  Santander has been using predictive dialer mode?

3      A.  Not -- not beyond the time that I've been there.

4      Q.  Okay.  Do you know whether Santander used

5  predictive dialing mode as early as 2009?

6      A.  Yes.

7      Q.  Okay.  Did Santander use predictive dialing mode

8  from 2009 through -- to the end of 2012?

9      A.  Yes.

10     Q.  Okay.  So when predictive dialing mode is used --

11 what happens -- do you know what happens if nobody answers

12 the phone?

13     A.  On a call if no one answers the phone?

14     Q.  In predictive mode.

15     A.  Okay.  If no one answers the phone, you would get

16 a -- no answer --

17     Q.  Okay.

18     A.  -- and the call would be dropped.

19     Q.  Can pre- -- do you know whether predictive mode

20 can be used to deliver a voicemail if voicemail picks up?

21     A.  If it can play -- if Aspect could play a message?

22     Q.  In predictive mode.  Correct.

23     A.  Yes, you could pass an answering machine to an

24 agent and the agent could leave a message.

25     Q.  Okay.  Could it be passed to a -- a prerecorded

1   message to deliver to the voicemail?

2        A.  Yes, Aspect can --

3        Q.  And it --

4        A.  -- play a message.

5        Q.  And it can do that in predictive mode?

6        A.  Yes.

7        Q.  Okay.  Now, looking at the other way.  If -- what

8   happens if somebody answers a call made in predictive mode?

9        A.  Then we would pass that person to an agent.

10       Q.  Okay.  Do you know if that person could be passed

11  -- or do you know if a -- a recorded message could be

12  delivered to that person upon answering by the Aspect

13  dialer operating in predictive mode?

14       A.  Could it, yes.

15       Q.  Is that something that happens?

16       A.  No, we do not do that.

17       Q.  Okay.  So it's -- it's capable of doing that.  But

18  in practice -- if somebody answers, Santander's practice is

19  to route them to a live call center agent.

20       A.  Yes, sir.

21       Q.  Okay.  Now -- we may have touched on this but --

22  when -- when your team is -- is building -- is -- is

23  implementing the campaign -- so entering them into or

24  building -- whatever the right terminology is -- within the

25  Aspect dialer -- the campaign that's been defined by



1          MR. LARRY:  Sure.

2      Q.  (BY MR. LARRY)  If there's a Faye Levins specific

3  way to determine it, that would be a good answer.  If

4  there's a general way, that would also --

5      A.  I do not know a way to determine how the call was

6  launched.

7      Q.  Okay.  So in preview mode -- do you know what

8  happens if the call is launched and nobody answers?

9      A.  The agent would hear the ringing phone and then

10  decide to hang up.

11      Q.  Okay.  Do you know if there is -- in preview mode

12  -- do you know if there is the functionality available to

13  have a recorded message delivered to the -- the recipient

14  of the call?

15      A.  No.

16      Q.  No, there's not?

17      A.  There's not.

18      Q.  Okay.  So if a recorded message were being

19  delivered to a voicemail or answering machine, that would

20  not have happened in preview mode.  Correct?

21      A.  Correct.

22      Q.  Okay.  Let's go on to manual mode.  We talked a

23  little bit earlier about -- well, actually -- can you just

24  go ahead and review -- review the bullet point entry here

25  on 202 regarding manual?



1     A.  I'm good.

2     Q.  Okay.  Does that seem accurate to you?

3     A.  Yes.

4     Q.  Okay.  We talked a little bit earlier about the

5  actual physical process an agent would go through in making

6  calls in dialer -- in manual mode.

7     A.  Okay.

8     Q.  Does this -- does this entry -- this bullet point

9  -- does that refresh your recollection at all or -- or

10 clarify anything for you?

11    A.  So clarify.  On manual dialing -- I wasn't --

12 I'm -- I mean, this is -- this is a good definition of

13 manual dialing and that mode so -- I guess -- maybe restate

14 the question.

15    Q.  Well, I -- I can just ask a different question.

16 So do you know what -- do you know what the speed dial

17 directory referred to there is?

18    A.  No.

19    Q.  Okay.  Do you know -- do you know whether

20 Santander -- Santander used manual mode during the time

21 period -- from 2009 to 2012?

22    A.  If we used the mode, yes.

23    Q.  Do you know if -- does Santander still use it?

24    A.  Yes.

25    Q.  Okay.  Do you know whether that mode was used to



1      A.  So the -- the call -- the dial is being placed

2   through the Aspect Unified IP system.

3      Q.  (BY MR. LARRY)  Okay.  So that's -- and all manual

4   mode calls -- to your knowledge, all manual mode calls

5   Santander made from 2009 to 2012 would have been made

6   through the Aspect Unified system.  Correct?

7      A.  My understanding, yes.

8      Q.  Okay.  All right.  Now we can move on to 219.

9   Now, if you look under -- look at Settings.  There's --

10  there's a list that goes 1 to 11.  It stretches from 219 to

11  220.  Do you see what I'm talking about?

12     A.  The 1 through 8?

13     Q.  Yeah.

14     A.  Oh, okay.

15     Q.  Then on -- on 220 you've got 9 through 11.

16     A.  Yes, sir.

17     Q.  Okay.  Can you go ahead and just familiarize

18  yourself with that Settings section that stretches from 219

19  to 220?

20     A.  Okay.

21     Q.  Okay.

22     A.  Okay.

23     Q.  Okay.  So -- does this portion of the manual that

24  we're looking at, 219 to 220 -- do those -- does that

25  describe portions of the -- of the campaign building



1    enter -- account for?

2         A.  No, sir.

3         Q.  Is that ever something you've encountered?

4         A.  I understand the term but we don't.

5         Q.  Okay.  It's not an adjustable setting.

6         A.  No.

7         Q.  Okay.  If you turn to 698.  Do you see the entry

8    for Predictive Mode -- Predictive Dialing Mode?  Excuse me.

9         A.  Yes.

10        Q.  Okay.  Can you go ahead and -- and read that to

11   yourself?

12        A.  Okay.

13        Q.  Does that seem consistent with -- with your

14   understanding of how predictive dialing mode works?

15        A.  Yes, sir.

16        Q.  Okay.  So positive voice detection -- do you see

17   where it says that in there?

18        A.  Yes.

19        Q.  Does that -- is that what you were talking about

20   earlier?  In terms of the system recognizing when a -- a

21   live person has answered the phone.

22        A.  Yes, sir.

23        Q.  Okay.  Do you know how -- do you know whether the

24   system can distinguish between a live person answering and

25   a voicemail that starts with a live person's voice?

1              MR. LARRY:  Correct.

2              MR. PIETRKOWSKI:  -- as we sit here so let's

3    table --

4              MR. ROLFES:  Can we -- can we --

5              MR. PIETRKOWSKI:  -- that.

6              MR. ROLFES:  Can we go off the record?

7              MR. LARRY:  Yeah.  Sure.

8              (Break taken from 11:39 a.m. to 11:45 a.m.)

9         Q.  (BY MR. LARRY) So -- we're back on the record.

10   I've -- I've talked to your counsel.  My understanding is

11   that we're gonna be able to loop back and talk a little bit

12   about the hardware issue that we were just fighting about.

13        A.  Okay.

14        Q.  So -- and I think I have a better idea of how to

15   get at this now after that talk.  So in terms of the actual

16   hardware that somebody's using to place calls and is -- is

17   available to a call center agent --

18        A.  Uh-huh.

19        Q.  -- regardless of what mode they're dialing in --

20   can you please explain the different pieces of hardware

21   that they have there available to them?

22        A.  Sitting on their desk?

23        Q.  Sitting on their desk, wherever.

24        A.  Okay.

25        Q.  That they have available to them to physically

1   make the calls happen.

2       A.  So they have a monitor and a keyboard and a mouse

3   and a computer --

4       Q.  Okay.

5       A.  -- desktop -- whatever -- box.  And they log into

6   Aspect.  So they'll log -- well, they log into My Supervi-

7   -- to Aspect via My Supervisor.

8       Q.  Okay.

9       A.  So they put in their -- their username and

10  password, blah, blah, blah.  They make that audio path via

11  their phone, which is a -- plugged into the computer.  And

12  then at that point there's a connection where My Sup is

13  talking to Aspect via -- via a -- there's a term -- called

14  an API.

15      Q.  Uh-huh.

16      A.  And basically at that point My Supervisor is

17  sending commands back and forth telling Aspect what to do.

18      Q.  Okay.  And when you said phone -- were you

19  referring to a headset?

20      A.  Yes.

21      Q.  Okay.  And your understanding is that -- you --

22  you don't know whether calls were made to Faye Levins using

23  manual mode.  But regardless of the mode they were -- they

24  were made in -- the agents handling the calls would have

25  had the same set of equipment.



1  point?

2     A.  So -- be re- -- it would require someone from my

3  team to actually point those campaigns to a target with a

4  group of agents in it.  And then before any type of dialing

5  could commence, an agent has to log into the system and put

6  themselves in a status to be available to take a phone

7  call.  So logging in, username, password, validation code

8  and then defining when I log in, do I want to go into a

9  meeting to meet with my manager or am I ready to take a

10  phone call?

11     Q.  Are there other choices besides going into a

12  meeting?

13     A.  Well -- yeah, we call them not ready codes.  So

14  meeting, coaching -- anything the business defines that we

15  would like to give the agent time off the phone.  Personal

16  time, you have to go to the rest room.  Anything like that.

17     Q.  Are these not ready codes something that can be

18  used throughout the day?

19     A.  Yes.

20     Q.  And agents do use them?

21     A.  Yes.

22     Q.  And when a not ready code is pressed -- does it

23  have any effect on the predi- -- on the dialer?

24     A.  Yes.  At that point, the agent's no longer

25  available and they're taken out of the -- they're not idle.



1   So a call would not be launched in -- in their place for

2   them.  If that makes sense.

3       Q.  What about when an agent is on a call with a

4   consumer and they want to finish that call and then

5   indicate their availability for the next call?  Is there

6   any human intervention in that process?

7       A.  So for them to -- before they would get the next

8   call -- once they complete the call with the -- the current

9   person on the phone, they would go into a -- when the call

10  disconnects, they would go into a wrap status.  And then at

11  that point they would need to disposition the call.  Hit

12  the Done button to disposition it.  And then they would

13  have to hit a Get Next button to move themselves into an

14  idle state.  So basically until they've made that

15  determination to submit the disposition and be ready,

16  they're in a state that is unavailable for the predictive

17  campaign to identify them as an available resource.

18      Q.  So if they're on a call with a consumer and the

19  consumer hangs up -- are they immediately going to get the

20  next call through the dialer?

21      A.  No.

22      Q.  So what has to happen for that next call to come

23  to them?

24      A.  The agent would -- again, they would have to

25  disposition the phone call and then they would have to hit



1   the Get Next button to move into an idle status.

2       Q.  What does it mean --

3       A.  Otherwise --

4       Q.  -- "disposition the phone call"?

5       A.  Put a -- put a call result on there.  So if I'm

6   talking to the customer and they make a payment, I might

7   disposition the call.  A promise to pay.

8       Q.  And then they have to press a -- a Done button?

9       A.  They have to hit a Done button to submit the note

10  into the system.  And then they would hit Get -- when

11  they're ready, they would hit Get Next.  And then they go

12  into what we call an idle status.  And once you're idle --

13  you're available at that point to take a phone call.

14      Q.  And until they go into the idle status, they're

15  unavailable to receive calls.

16      A.  Correct.

17      Q.  And what effect does that have on the dialer?

18      A.  The dialer would not -- it would not launch calls.

19  Understanding that that person's available to take those

20  phone calls -- it would -- it only would make calls based

21  on agents that are available at that time to take calls.

22      Q.  And at the beginning of the day is there human

23  intervention involved in uploading numbers to the dialing

24  system?

25      A.  Yes.  My guys have to go in and actually upload



# TAB 8

# In the Matter of:

*Henry Espejo, et al.*

*vs.*

*Santander Consumer USA, Inc., et al.*

---

*Henry Espejo*

*December 3, 2014*

---

⬜ ORIGINAL

**MERRILL CORPORATION**

LegaLink, Inc.

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

1    1411 line, did anyone ever ask you if this was a

2    contact number that they could contact you at?

3         A.   I don't believe so.  No.  They never asked

4    me.

5         Q.   Did they ever say in sum and substance, is

6    this a good contact number for you, Mr. Espejo?

7         A.   Oh, for me?

8         Q.   Yes.

9         A.   Yeah, they would ask me, Can we call you

10   on this number?

11        Q.   What did you say?

12        A.   I said yes.  I mean, it's my number.

13        Q.   Do you know if your wife has a cell phone?

14        A.   She doesn't, to be honest with you.  Well,

15   I think she got one with my son.

16        Q.   And what is your son's name?

17        A.   Andrew.

18        Q.   Do you know if Andrew has made a payment

19   for this car?

20        A.   Not really.  No, he's never paid a

21   payment.

22        Q.   He's never made a payment on your wife's

23   loan, is what I wanted to say?

24        A.   No.

25        Q.   How old is your son?

1      A.   I don't know what it means.

2      Q.   So you have no idea one way or the other

3  if you get charged for incoming calls?

4      A.   I don't know what it means.

5      Q.   Well, do you know if you get charged for

6  incoming calls?

7           MR. BALABANIAN:  Objection, asked and

8      answered.

9           THE WITNESS:  No, I don't know.

10 BY MR. ROLFES:

11     Q.   Did you ever request that Santander stop

12 calling your 1411 number?

13     A.   Yes, I did.

14     Q.   And when did you do that?

15     A.   Every time they would call, to be honest.

16     Q.   Every time you would say, Don't call this

17 number?

18     A.   Yeah, I would ask them.

19     Q.   Okay.  Can you tell me what you said to

20 them along those lines?

21     A.   I would say very specifically, Listen,

22 this is not my car.  That is my wife's car.  Please

23 call her.  Very specifically.

24     Q.   Okay.  Anything else you said with regard

25 to whether Santander should call you or not?

1    calling me at that number?  Things like that.  I

2    told you that.

3        Q.    So now your testimony is, I do not want to

4    be called.  Is that what you said?

5            MR. BALABANIAN:  No.  His testimony is his

6        testimony.  You just said that, Jim.  You can

7        read back what he said.  We're not going to do

8        asked and answered.  We're not going to ask him

9        the same question six times so you can try to

10       get him to change his testimony.  He just

11       answered.  You said what specifically.

12   BY MR. ROLFES:

13       Q.    What made you remember that you had said,

14   I don't want to be called, when Mr. Balbarian --

15           MR. BALABANIAN:  Balabanian.

16   BY MR. ROLFES:

17       Q.    -- Balabanian asked you the question?

18       A.    What was that?

19       Q.    What made you recall that that's what you

20   had said when Mr. --

21       A.    Because that's what I've been saying.  I

22   didn't want them to call.  I've always said that.

23   Why are you calling me?  Don't call me.  Call my

24   wife.  Call my number -- the 592 number, home

25   number.

1          That's what she's always used.

2     Q.    How about when you called them?  Did you

3  want to talk to them, for instance, on the time that

4  you were asking that you could make a payment so she

5  wouldn't have her car repossessed?

6     A.    Say that again.

7     Q.    Did you want to call Santander -- you

8  called Santander to talk to them about the payment

9  related to the repossession --

10    A.    Yes.

11    Q.    -- is that right?

12    A.    Yes.

13    Q.    Did you say, in part of that conversation,

14 Hey, don't call me again?

15    A.    Well, I was hoping that that was the last

16 conversation that I would have with them, yes.

17    Q.    So you didn't say it on that conversation?

18    A.    You're being very specific on that day.

19 I'm talking in general, every time they would call

20 me I would say that.  Specifically that day?  I know

21 I told them a lot of times -- almost every time they

22 would call, I would give them the wife's number that

23 she gave, the 592, the home number.

24    Q.    Do you remember in some of these

25 conversations, when you were talking about making

**TAB 9**

1      IN THE UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF ILLINOIS

2

          NO. 11 CV 8987

3

4      Honorable Charles P. Kocoras

5

HENRY ESPEJO, Individually and

6   on behalf of all others

similarly situated,

7

       Plaintiff,

8   vs.

9   SANTANDER CONSUMER USA INC., an

Illinois corporation,

10

       Defendant.

11  _____/

12

13

14       66 West Flagler Street

         Miami, Florida

15      December 3, 2014

         Wednesday, 1:16 p.m.

16

17

18

19    D E P O S I T I O N

20

          OF

21

22    MARIA ESPEJO

23

24   Taken on Behalf of the Defendant

    Pursuant to Notice of Taking Deposition

25

1    was an institution known as Sovereign or Sovereign

2    Bank?

3        A.  Sovereign.  Can you repeat the question?

4        Q.  Sure.  Did you ever come to know that the

5    financial institution that provided the financing

6    for your car was referred to -- had the name of

7    Sovereign or Sovereign Bank?

8        A.  Yes.

9        Q.  Okay.  Do you have in front of you

10   Defendant's Exhibit 5?  Defendant's Exhibit 5 is a

11   document a little cut off the top, but the top

12   starts with the 3508 Torremolinos Avenue.  It is

13   Bates numbered SCUSA/E 10 and 11.

14       Can you take a moment to familiarize

15   yourself with that document?

16       A.  Yes.

17       Q.  Do you see on this document about half --

18   maybe four inches down, there is an assignee or

19   lender listed there?

20       A.  Yes, I do.

21       Q.  Do you see Sovereign Bank?

22       A.  Yes.

23       Q.  Did you ever make any payments on this

24   loan to Sovereign Bank; do you recall?

25       A.  I don't remember.

1     Q.  Do you recall any time receiving any

2    correspondence that indicated that Santander

3    Consumer USA had merged with or in some way become

4    the same as Sovereign Bank?

5     A.  I don't remember.

6     Q.  Is there a point in time when you became

7    aware that your loan, the amount that you owed on

8    your loan was owed to Santander?

9     A.  The amount that I owed at this moment?

10    Q.  No. On the loan.

11    Did there ever come a time that you found

12    out that Santander was the person you had to make

13    loan payments to?

14     A.  Oh, yes.

15     Q.  Can you tell me when that occurred,

16    roughly?

17     A.  No, I don't remember.

18     Q.  Were you ever contacted by someone who

19    claimed to be from Sovereign Bank?

20     A.  No, I don't think so.

21     Q.  Do you know who has the legal title to

22    your car?

23     A.  At the moment, I don't know.

24     Q.  Did you ever have title to your car?

25     A.  No.

**App.  157**

**TAB 10**

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF ILLINOIS

 3                  EASTERN DIVISION

 4   ARICA BONNER, et al.,

 5   on behalf of themselves and        ORIGINAL

 6   all others similarly situated,

 7         Plaintiffs,

 8   Vs.                      No: 1:12-CV-04671

 9   SANTANDER CONSUMER USA, INC.,

10         Defendant.

11

12

13

14

15

16   DEPOSITION OF:  Faye Maria Levins

17   DATE:  July 14, 2015

18   TIME:  9:30 a.m.

19   LOCATION:  Burr & Forman, LLP

20              420 20th Street North, Suite 3100

21              Birmingham, Alabama 35203

22

23
```

1    I'll let you review that.

2       A.   Okay.   Yes, this agreement here looks

3    like from Adamson Ford on a credit

4    application.

5       Q.   Okay.   So this is a credit application

6    that you completed when you purchased your

7    car from Adamson Ford?

8       A.   That is correct.

9       Q.   Is that your signature on the first

10   page?

11      A.   That is correct.

12      Q.   And it's dated January 31st, 2009?

13      A.   That is correct.

14      Q.   Does that refresh your memory of when

15   you purchased the 2007 Impala from Adamson

16   Ford?

17      A.   Yes, January 31st of 2009, that is

18   correct.

19      Q.   Did you provide the information that

20   was put into the second page of --

21      A.   Yes.

22      Q.   -- this credit application?

23      A.   Yes.

1      Q.   I see that there are two -- it's the

2    same phone number,                , that's are

3    handwritten under home phone number and

4    cellphone number.  Did you provide that phone

5    number to Adamson Ford?

6      A.   Yes.

7      Q.   Is that your handwriting?

8      A.   Yes.

9      Q.   And it says employed by T-Mobile.

10     A.   Yes.

11     Q.   So you were employed by them at the

12   time?

13     A.   Yes, at the time, 2009.

14     Q.   And that was your home address at the

15   time,                 : that is on this

16   application?

17     A.   That is correct.

18     Q.   And it says that you have been employed

19   at T-Mobile for eight months as of January,

20   2009.  Does that seem accurate?

21     A.   That seems accurate, yes.

22     Q.   So you started working at T-Mobile in

23   the middle of 2008; correct?

1    A.   Yes.   The company had policies and

2  procedures to go by.

3    Q.   (BY MR. PIETRKOWSKI)   Do you remember

4  how much time you typically gave the T-Mobile

5  customers if they needed more time?

6    A.   I can't remember exactly.   It all

7  depended on the situation.

8    Q.   Did sometimes the same person, the same

9  T-Mobile customer call twice asking for

10  payment arrangements?

11    A.   Rarely.

12    Q.   When you received this credit

13  application and signed it, did you read

14  everything on these two pages?

15    A.   No.   I can't tell you that I read every

16  word on there, no, I can't say I did that.

17    Q.   On the second page of Exhibit 6 -- if

18  you will turn to the second page.

19    A.   Okay.

20    Q.   If you will look at the very bottom --

21    A.   Yes.

22    Q.   -- it says "By providing my cellphone

23  number, I give my prior expressed consent to

1    receive calls and text messages from the

2    creditor or its third-party debt collector at

3    that number, including calls and messages

4    made by using an autodialer or prerecorded

5    message."

6         Do you remember reading that language

7    when you signed the credit application?

8    A.   Yes, for

9    Q.   When you were receiving calls at

10   T-Mobile in your role as a collector, did you

11   ever get calls from people who complained

12   that they receiving too many phone calls from

13   T-Mobile?

14   A.   We didn't call the customer, the

15   customer called us.

16   Q.   Right.  I know you didn't, it wasn't

17   your job to call them, but when they called

18   in to you, did you ever receive complaints

19   from them about whoever's job it was to call

20   that they are getting too many?

21        MR. LARRY:  Objection, relevance.  Go

22   ahead.

23   A.   Rarely.

1    Q.  And that was after the house fire?

2    A.  Yes.

3    Q.  And then you move into your current

4  residence at 7518 5th Avenue?

5    A.  Yes.

6    Q.  Do you remember what year you lived

7  with your daughter?

8    A.  I moved -- I lived with my daughter I

9  would say maybe in the year of 2012.

10    Q.  All right.  Do you have any reason to

11  believe that the calls that are -- the notes

12  that appear on this exhibit, Exhibits 13 and

13  14, are inaccurate?

14    MR. LARRY:  Objection, foundation.

15    A.  No, I don't have any reason to believe

16  they are inaccurate, I don't have any reason

17  to believe that.

18    Q.  (BY MR. PIETRKOWSKI) All right.  Let me

19  ask you without looking documents just a

20  general question.  Are you familiar with the

21  term speed pay?

22    A.  No.

23    Q.  Did you ever make a payment --

1    Do you remember a conversation where they --

2    for instance, they -- a Santander employee

3    asked you whether your address was still

4    current?

5        A.  Yes.

6        Q.  And did that happen often when you

7    spoke to the Santander employees?

8        MR. LARRY:  Objection, vague.  Go

9    ahead.

10       A.  Yes.

11       Q.  (BY MR. PIETRKOWSKI) What about your

12   current cellphone number, did Santander

13   employees when you spoke with them, did they

14   attempt to verify that this was your current

15   cellphone number?

16       A.  Would they attempt to verify?  They

17   would repeat what -- is it okay.  To call you

18   at this number.  So I would say, yes.

19       Q.  When they asked that question, they

20   give you the number that they were referring

21   to, and then you would agree or disagree;

22   correct?

23       A.  Yes.

1      Q.  So let me just kind of give you a --

2  let me see if I can find an example.

3          MR. PIETRKOWSKI:  Let's go off the

4  record for a moment.

5          (Short recess was had.)

6          MR. PIETRKOWSKI:  Back on the record.

7      Q.  (BY MR. PIETRKOWSKI)  You mentioned

8  that your daughter, Jacqueline, sometimes

9  spoke for you and you gave her authorization

10  to speak to Santander on your behalf?

11      A.  Yes.  I had to speak to Santander to

12  give them authorization to discuss the

13  account with my daughter.

14      Q.  Do you know how many times,

15  approximately, that happened that your

16  daughter spoke with Santander?

17      A.  No, I don't know how many times.

18      Q.  So going back to the verifications for

19  a moment, I did find a couple of examples.

20  If you look -- this is one of the pages we

21  already saw for December 29th, 2009 --

22  December 22nd, 2009, there's a line that says

23  14:22 RECC.  And if you kind of go across

1  there, it says "Agent initiated recording for

2  deferment"; right?  And then underneath that,

3  it says "Verifications were required for Faye

4  Levins; Mailing address verified, no change

5  required; physical address verified, no

6  change required; home phone verified, no

7  change required; cellphone verified, no

8  change required; e-mail verified, no change

9  required; employer verified, no change

10  required."

11      Does that refresh your memory of the

12  types of information that Santander would be

13  asking you for during these calls --

14      A.  Yes.

15      Q.  -- to verify?

16      A.  To verify the information they asked.

17      Q.  And they're asking -- when they verify

18  it, how did those conversations go?

19      A.  I simply verified what was asked.

20      Q.  And they were asking for your current

21  information and you had to tell them whether

22  it was current or not; is that correct?

23      A.  Yes.

1    Q.  And this didn't just happen once, it

2  happened a number of times over the years;

3  correct?

4    A.  That is correct.

5    Q.  Now, there were a number of times over

6  the course of your financing of the car that

7  your payments were late; correct?

8    A.  Yes.

9    Q.  I mean, what I have written down just

10  from analyzing it is 18 times you were more

11  than 30 days late on a payment, 11 times you

12  were more than 60 days late, and then four

13  times you were more than 90 days late.  Does

14  that sound accurate to you?

15    A.  Yes.

16    Q.  And sometimes you had payment returned

17  because your bank account was frozen or

18  closed; is that right?

19    A.  Yes.

20    Q.  So given the history of late and

21  returned payments, were you surprised to be

22  getting collection calls from Santander?

23      MR. LARRY:  Objection, relevance.

1          MR. LARRY:  Same objection.  You can go

2     ahead.

3          MR. PIETRKOWSKI:  And Nick, I mean, can

4     we just stipulate to that because you sent me

5     an e-mail saying that.

6          MR. LARRY:  I thought we had.  We're

7     fine stipulating to that.

8          MR. PIETRKOWSKI:  I just want to get it

9     on the record.

10          MR. LARRY:  Off the record.

11          MR. PIETRKOWSKI:  Okay.

12          (OFF-THE-RECORD.)

13          MR. PIETRKOWSKI:  So we are back on the

14     record after a discussion, you know, with

15     plaintiff's counsel.  We are stipulating that

16               is not a number that is at issue

17     with respect to the Telephone Consumer

18     Protection Act claims.

19          Nick, is that right?

20          MR. LARRY:  Let's make sure that was

21     the right one.

22          That's correct.  So stipulated.

23     Q.  (BY MR. PIETRKOWSKI)  And then there

1   of any of those calls made to Santander from

2   the 6074 number?

3       A.  No.

4       Q.  Did anyone else use the 6074 number

5   besides Jacqueline?

6       A.  No.

7       Q.  Do you know if Jacqueline ever provided

8   the 6074 number to Santander as a number

9   where she could be reached?

10          MR. LARRY:  Objection, foundation.

11      A.  I'm not sure.

12      Q.  (BY MR. PIETRKOWSKI)  Did you ever

13  provide the 6074 number as a number where you

14  could be reached?

15      A.  Yes.

16      Q.  Do you remember when?

17      A.  No.

18      Q.  What about just like the year that you

19  provided it?

20      A.  For 6074?

21      Q.  Yes.

22      A.  Probably 2009 or 2010.

23      Q.  Let's talk about the 9678 number, and

1      A.   Okay.

2      Q.   Okay.   There's one, 5/28/2010 --

3      A.   Okay.

4      Q.   -- at 003 MGUP.

5      A.   Okay.

6      Q.   And, again, the same information, it

7   has the 6074 number.   Do you have any memory

8   of providing the 6074 number for that

9   MoneyGram payment?

10      MR. LARRY:   Objection to form.

11      A.   I must have used that phone number.

12      Q.   (BY MR. PIETRKOWSKI)   And then if you

13   go up a little bit on the page to 6/11/2010,

14   003 MGUP, the same information --

15      A.   The same information.

16      Q.   -- the 6074 number.

17      So just looking at these entries, do

18   you have any reason to believe that you did

19   not provide your 6074 number in connection

20   with those MoneyGram payments?

21      A.   No, I probably provided the number in

22   case something went wrong, they could call my

23   daughter.   I probably used the number as a

1    reference in case something was wrong, they

2    could call this number.

3        Q.  And if you flip a few pages back before

4    that to 11-11-2010 --

5        A.  Okay.

6        Q.  -- November 11, 2010.

7        A.  Okay.

8        Q.  And then if you look at 11/11/2010,

9    1503 WUUP --

10       A.  Okay.

11       Q.  -- and WUUP, to explain, stands for

12   Western Union.  This is a Western Union

13   payment.  And again, it listed your name,

14   your address, and it looks like the 6074

15   number.

16           So, you know, the same question:  Any

17   reason to believe that you did not provide

18   your 6074 number in connection with the

19   Western Union payment you made on that date?

20           MR. LARRY:  Objection, foundation,

21   speculation.

22       A.  That was probably the phone number that

23   was given is all I can say on those payments.

1       Q.   (BY MR. PIETRKOWSKI)   And then up

2    farther on the same page on 12/10/2010 there

3    is another 1501 WUUP with the same

4    information, the 6074 number.  The same

5    question --

6           MR. LARRY:  Same objection.

7       Q.  -- any reason to believe you did not

8    provide your 6074 number in connection with

9    the 12/10/2010 Western Union payment?

10          MR. LARRY:  Same objection.

11      A.   I probably provided that number

12   according to the records.

13      Q.  (BY MR. PIETRKOWSKI)   And then one

14   more.  Flip back one page to 1/6/2011,

15   12 o'clock WUUP.

16      A.   Okay.

17      Q.   And, again, this appears to be another

18   Western Union payment on January 6th, 2011

19   and it does list the 6074 number.

20      A.   Okay.

21      Q.   Any reason to think you didn't provide

22   the 6074 number in connection with that

23   Western Union payment?

1          MR. LARRY:  Objection, foundation,

2     speculation.

3          A.  It probably was provided.

4          Q.  (BY MR. PIETRKOWSKI)  Do you know if

5     you ever verified the 9678 number when you

6     spoke to Santander?

7          MR. LARRY:  Objection, form.

8          A.  Did I ever verify the number?

9          Q.  (BY MR. PIETRKOWSKI)  Did you ever

10    verify the 9678 number as your current number

11    when you spoke with Santander?

12         A.  Yes, I probably did.  I had that phone

13    number, and that was one of the numbers I

14    probably -- yes.

15         Q.  Do you remember when you verified it?

16         MR. LARRY:  Objection, misstates the

17    record.

18         A.  I don't happen to know the exact date.

19         Q.  (BY MR. PIETRKOWSKI)  Do you remember

20    what year the collection calls from Santander

21    started?

22         MR. LARRY:  Objection, asked and

23    answered.

1      A.   I don't remember the exact year.

2      Q.   (BY MR. PIETRKOWSKI) It was after 2008

3   though; right?

4      A.   I would assume so, yes.

5           MR. LARRY:  Can we take a break?

6           MR. PIETRKOWSKI:  Yes.

7           (Lunch recess was had.)

8           MR. PIETRKOWSKI:  So we're back on the

9   record after a lunch break.

10      Q.   (BY MR. PIETRKOWSKI)  The first thing I

11  want to do is play a recording for you that

12  we've produced to your counsel already.

13           Have you heard the recording?

14      A.   I'm not sure.

15      Q.   Okay.  You didn't listen in preparation

16  for the deposition?

17      A.   We did listen to a call yesterday.

18           MR. LARRY:  We did listen knowing what

19  is coming today.  This is one of them.

20      Q.   (BY MR. PIETRKOWSKI)  All right.  So

21  this is one of the recordings you listened

22  to.  I'm just going to pay -- it's a really

23  long one, so I am just going to play the

1  beginning of it and my question is going to

2  be is that your voice on the other end.

3       It's very quiet, so I did the best I

4  could to amplify it?

5       (Playing recording.)

6    Q.  (BY MR. PIETRKOWSKI) All right.  I'm

7  going to stop it there.

8       My question is:  And I know it's

9  difficult to hear your voice, but was that

10  your voice on the other end of the line?

11    A.  Yes.  I had had surgery and I could

12  hardly talk.  I had my thyroid removed.

13    Q.  My understanding is that that recording

14  is May 14, 2012.

15    A.  I had a problem for a long time until

16  my voice got right.

17    Q.  When was your surgery?

18    A.  The exact date?

19    Q.  Just approximately.

20    A.  The thyroid was 2010, cervical was

21  2011.

22    Q.  So you still had some problems talking?

23    A.  It took me awhile, about two years or

1    more.  It's getting better now.

2       Q.  So I'm going to flip towards the end of

3    the call, and I want you to listen to this

4    part.

5           (Playing recording.)

6       Q.  (BY MR. PIETRKOWSKI) All right.  So let

7    me stop it there again.

8           My question is after hearing that

9    recording, do you recall having given your

10   9678 number to Santander on that call as a

11   current cellphone number --

12      A.  Yes.

13      Q.  -- and as a number that if Santander

14   wanted to, it could contact you at?

15      A.  Yes.

16      Q.  And is this the type of verification

17   where they're asking for your address and

18   your e-mail and your cellphone, is that

19   pretty -- what you heard on the recording

20   here, is that typical of other verifications

21   you did with Santander?

22      A.  Yes.

23      Q.  Did you ever request that the calls

1    from Santander stop?

2        A.   Yes.

3        Q.   Do you remember the details of any of

4    those calls in which you told Santander to

5    stop?

6        A.   I requested speaking to a supervisor

7    and I addressed the issue of why are you

8    calling so many times.  They would call after

9    arrangements had already been issued -- had

10   already been addressed.  The calls were still

11   coming, and I requested to speak to a

12   supervisor.  I can't remember what the

13   supervisor's name was, but that's a

14   conversation that I have had approximately --

15   maybe two times with the supervisor there.

16       Q.   When you had these conversations --

17   well, first of all, can you remember the date

18   of any of the conversations you were just

19   describing?

20       A.   No.

21       Q.   When you had the conversation, you

22   described it as why are you calling so many

23   times, did you ever have a conversation where

1    you said I want you to stop calling my

2    cellphone forever?

3         A.  I just said stop calling my number.  At

4    the time, I think I only had cellphone

5    number, I didn't have a home number.

6         Q.  But the way you described it before was

7    why are you calling so many times.

8              So here is my question:  When you made

9    that request, were you asking that all calls

10   to your cellphone stop forever or only stop

11   for a certain period of time?

12        A.  Well, it was logical that the issue had

13   been addressed in regards to maybe payment

14   arrangements of what I was going to pay, but

15   the calls were still coming after that been

16   had done.  So that was my issue and concern.

17        Q.  And then after that situation was

18   resolved, that specific situation, if you

19   missed another car payment, did you expect

20   the calls to resume?

21        A.  Yes.

22             MR. LARRY:  Objection, relevance.  Go

23   ahead.

1          Can you repeat it?  I think we were

2     speaking over each.

3        A.  Can you repeat the question?

4          MR. PIETRKOWSKI:  Read back the

5     question.

6          (Requested portion read by the

7     reporter.)

8          MR. LARRY:  Objection, relevance.  Go

9     ahead.

10       A.  Yes.

11       Q.  (BY MR. PIETRKOWSKI)  Did you ask for

12    the calls to stop to a specific phone number,

13    if you remember?

14       A.  I don't remember.

15       Q.  Do you remember whether you were

16    speaking with a man or a woman during these

17    calls?

18       A.  I don't remember.

19       Q.  Do you remember how long each of those

20    conversations lasted?

21       A.  No.

22       Q.  Do you remember if it was a call that

23    you made to Santander or one that Santander

1   made to you that you had those conversations?

2      A.   Usually calls that Santander made to

3   me.

4      Q.   But you don't recall the specifics?

5      A.   No.

6      Q.   Do you remember you initiating a call,

7   making a call to Santander for the purpose of

8   telling them to stop calling me or was it

9   always when Santander called you?

10     A.   Oh, no, I have called when they wasn't

11  calling me to a request to speak to a

12  supervisor because it crazy because of the

13  number of times that they were calling that

14  wasn't normal for any business.  I called

15  requesting to speak to a supervisor to

16  address that even though we had set up a

17  payment arrangement, they knew when I was

18  going to pay and then they're calling; why

19  are you still calling.

20     Q.   While the payment arrangement was in

21  place?

22     A.   Yes.

23     Q.   After the payment arrangement, if you

1      Q.   That's what I understand this document

2   is.

3      A.   Okay.  I don't see anything.

4      Q.   So I guess just to summarize this,

5   there is nothing you can point to in this

6   call log that's Exhibit 14 that supports your

7   contention that you told Santander to stop

8   calling?

9      A.   Nothing here to support it, no.

10     Q.   When did the calls stop?

11     A.   Let me take a look at this sheet.  I

12  don't know exactly.

13     Q.   If you want to look at your

14  interrogatory answers, you can reference

15  those.

16     A.   Yeah.

17     Q.   It would be Exhibit 3.

18          If you look at Page 25 of your

19  interrogatory answers, at the end of the

20  list, the last call that I see is dated

21  June 26th, 2012.

22     A.   Okay.

23     Q.   Does that sound right to you?  Is that

1    with two different figures on it.

2       Q.   (BY MR. PIETRKOWSKI)   Okay.   But those

3    contracts came from Adamson Ford; right?

4       MR. LARRY:   Objection, legal

5    conclusion.

6       Q.   (BY MR. PIETRKOWSKI)   Did Santander do

7    anything to mislead you regarding the actual

8    balance owed on the vehicle note?

9       MR. LARRY:   Objection, legal

10   conclusion.

11      A.   I'm not sure.   I don't know.

12      Q.   (BY MR. PIETRKOWSKI)   Paragraph 43 on

13   the next page says "Ms. Levins never provided

14   Santander with permission to contact her

15   cellphone."

16        But we just listened to that recording

17   where you did verify your 9678 number as a

18   good number to call; right?

19      A.   Yes, to call me as a representative

20   calling me, yes, you can call me on that

21   number.

22      Q.   Well, did you discuss limiting

23   contacting you to representatives as opposed

1    make calls?

2        A.   I have.

3        Q.   Do you know if that was something that

4    you did more than once?

5        A.   I have made more than one -- yes, more

6    than once used her phone.  It's my phone and

7    I gave her the number -- that line.

8        Q.   And did you ever answer calls made to

9    that phone?

10       A.   I have.

11       Q.   Did anyone ever call that number

12   attempting to contact you aside from

13   Santander?

14       A.   It was simply a -- yes, a secondary

15   number.  If you couldn't reach me at my

16   primary number, you would know to call me on

17   the 6074 number.

18       Q.   Moving on from that, we talked a bit

19   earlier today about the number of calls you

20   received.  And at one point you said you

21   thought it was a maximum of five calls that

22   you received in a single day.

23       A.   Yes.

1   nine or 10 calls, why are those nine or 10

2   calls not reflected on your interrogatory

3   answers for a particular day?

4       A.  I have no answer for that.

5       Q.  Now, you mentioned that there was a

6   supervisor called where you told -- you said

7   stop calling?

8       A.  Yes.

9       Q.  But we have already talked about those

10  calls before and those conversations involved

11  stop calling while you have a payment plan in

12  place; correct?

13      A.  Yes.

14      Q.  And once the placement plan was done

15  and you missed another payment, you expected

16  to receive more calls; correct?

17      A.  Or call, yes.

18      Q.  And then for this last one, the

19  June 28th, 2010 entry that you were talking

20  about, you started cussing and you said to

21  come and get the car.  Why is it that you

22  remembered now after your attorney asked you

23  about that particular situation that you said

# TAB 11

1        IN THE UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF ILLINOIS

2             EASTERN DIVISION

3    ARICA BONNER, et al, individually and on

     behalf of all others similarly situated,

4

          Plaintiffs,        Case No. 1:12-cv-9431

5                             Related to Case No.

          v.                  1:11-cv-08987

6                             Case No. 1:12-cv-4671

7    SANTANDER CONSUMER USA, INC., an

     Illinois corporation,        Honorable Charles P.

8                     Kocoras

     Defendant.

9

     *********************************************************

10           ORAL DEPOSITION OF

             MARK NERIOS

11           JULY 17, 2015

             VOLUME 1

12   *********************************************************

13

14

15

16        ANSWERS AND DEPOSITION OF MARK NERIOS, produced as a

17   witness at the instance of the Plaintiff, taken in the

18   above-styled and -numbered cause on the 17th day of July,

19   2015, A.D., beginning at 9:05 a.m., before D. Beth

20   Randolph, a Certified Shorthand Reporter in and for the

21   State of Texas, at the offices of Esquire Deposition

22   Solutions, located at 1700 Pacific Avenue, Suite 1000,

23   Dallas, State of Texas, in accordance with the Federal

24   Rules of Civil Procedure and the agreement hereinafter set

25   forth.

App. 185

1    Levins debt if I'm feeling adventurous. Okay. So you

2    said these are the activity notes. How would these have

3    been generated if you know?

4        A. Any time there's a phone call or a communication

5    between the customer and a Santander representative, we

6    document or summarize what happened on the account.

7        Q. Okay.

8            MR. LARRY: I'm going to go ahead and

9    introduce another exhibit now to hopefully save us some

10   time later. Okay. This is going to be Exhibit 3. Jim,

11   there's a copy.

12           MR. ROLFES: Thank you.

13           (Exhibit No. 3 was marked for

14           identification.)

15       Q. (BY MR. LARRY) There you go. Take a second and

16   flip through there and then I'll ask you about that

17   document. Have you seen this collection of documents

18   before?

19           MR. ROLFES: Object to being beyond the

20   scope of the 30(b)(6) notice.

21       Q. (BY MR. LARRY) You can go ahead and answer.

22       A. This is the first time I'm actually looking at

23   this.

24       Q. Okay. So I can represent to you that this is a

25   collection of documents produced by Santander in this

1    in reverse chronological order. So go to the page that's

2    Bates marked. Those are the numbers at the bottom.

3    SCUSA/B 00034. And again going forward, I'm going to omit

4    the zeros and the prefix. I'm just going to call them by

5    page numbers. So Page 34 there.

6            If you go up I would say about a fifth

7    of the way up the page, there is an entry on March 25th,

8    2009 at nine o'clock with the abbreviation ICNR next to

9    the nine o'clock. If you follow that to the right, I

10   believe that's the first mention in here of the 6954

11   telephone number. Are you able to tell from that entry or

12   any of the surrounding entries what the source of that

13   telephone number is?

14   A.  The 6954 number?

15   Q.  Yeah, the 6954.

16   A.  I couldn't tell -- I couldn't tell from here.

17   Q.  Okay. Switch back to Exhibit 3 then. And if you

18   look to page -- if you go to Page 54. So roughly halfway

19   through. There's a document that says applicant's credit

20   statement at the top. And if you look at the middle, do

21   you see there are two fields where that number has been

22   written in, home phone number and cell phone number. Do

23   you see those?

24   A.  Yes, sir.

25   Q.  Okay. Is it safe to say that is most likely the

1  source of the telephone number or the way that Santander

2  obtained that number?

3    A. Yes, sir.

4    Q. Okay. And based on your understanding of

5  Santander's policies and procedures, would an application

6  like this be a common way for Santander to obtain the

7  telephone numbers that it's going to call if a consumer

8  fails to pay a debt?

9    A. Yes, sir.

10    Q. Okay. Do you know whether this form is a

11  standard credit -- or is this a standardized form that

12  Santander uses?

13        MR. ROLFES: Objection to being beyond

14  the scope of the 30(b)(6).

15    Q. (BY MR. LARRY) You can go ahead and answer.

16    A. I can't --

17    Q. You should probably turn back to it and look.

18    A. Yeah. This page?

19    Q. 54.

20        MR. ROLFES: Also object on foundation.

21    A. I mean, I can't say that. They all look the

22  same.

23    Q. (BY MR. LARRY) Okay. Now, is there anything --

24  can you review the last few pages of the -- of Exhibit 2,

25  the account notes?

1    Q.  Okay.  Okay.  Let's move on to a different --

2    well, actually let's keep going with that.  Do you know --

3    well, actually scratch that.  Are you familiar with the

4    number

5    A.  Yes, sir.

6    Q.  Okay.  And how are you familiar with that number?

7    A.  In reviewing the notes.

8    Q.  Okay.  Based on your review of the notes and any

9    other knowledge you have, are you able to tell me how

10   Santander obtained that telephone number?

11   A.  Yes, sir.

12   Q.  Okay.  Please tell me.

13   A.  If you look at the first time the phone number

14   appears in the notes, looks like it's 3-27-2009.

15   Q.  Okay.

16   A.  You see the incoming call from

17   Q.  Yeah.

18   A.  Next to that it shows IVR1's home.

19   Q.  Okay.

20   A.  So that's when the number would have been updated

21   at that time.

22   Q.  Okay.  And can you explain to me what IVR1's home

23   means?

24   A.  I can.  IVR1's home is -- well, IVR stands for

25   interactive voice response.

1    Q.  Okay.

2    A.  The fact that it shows home means that an

3  associate had to designate a field for that phone number.

4    Q.  Okay.

5    A.  So this is the contact here so, I mean, that

6  would have been the phone call where this phone number was

7  updated by the customer.

8    Q.  Okay.  And are you able to tell from that note

9  what the process was for actually collecting that number

10  so -- well, actually scratch that.  Do you know whether

11  based on that account note the agent on the telephone had

12  to ask the person on the other end for that telephone

13  number?

14    A.  Yes, sir.

15    Q.  Okay.  And how do you know that?

16    A.  Because it's listed as IVR1 home.

17    Q.  Okay.  And can you just generally for me describe

18  how that sort of conversation would take place?

19    A.  On -- in this particular situation, the customer

20  would have called prior when maybe the office was closed

21  or something in order to have their phone number loaded as

22  IVR.

23    Q.  Okay.

24    A.  So when they call in this time, it would come up

25  as IVR1.

1    Q.   Okay.

2    A.   So when they're talking to the associate and when

3    the phone number comes up, they say, hey, this number that

4    you're calling in from, what type of phone number is this.

5    Q.   Okay.  So -- okay.  So on IVR1 specifically just

6    that portion of it.

7    A.   Uh-huh.

8    Q.   Is that an automatically generated entry that

9    happens when an individual calls in to Santander but

10   doesn't actually connect with somebody, with a live agent?

11   A.   Yes, sir.

12   Q.   Okay.  Is there any other way that you know of

13   that a number would end up with the designation IVR1

14   regardless of what's after that?

15   A.   Just that situation that you --

16   Q.   Okay.  Okay.  So then based on that call, what's

17   noted as Miss Levins called in after having previously

18   called and the agent asked what type -- I see -- would

19   they say something like I see you're calling from 6074?

20   A.   Right.

21   Q.   What type of telephone number is that?

22   A.   What type of telephone number.

23   Q.   Sure.

24   A.   Is this a good number to contact you at.

25   Q.   Okay.  And what would the options be for that

1    part of the field? So there's home. Would cell have been

2    an option?

3        A. Yes, sir, cell would be an option.

4        Q. Okay. What about -- what about workplace or

5    something of that nature?

6        A. Business is in there as well.

7        Q. Business. Okay. Are there any others that

8    you're aware of?

9        A. I believe there might be another but I'm not a

10   hundred percent positive. I believe there is though.

11       Q. Okay. If there is another, do you know what it

12   would be?

13           MR. ROLFES: I'm going to object to the

14   sort of speculative nature of that question.

15       Q. (BY MR. LARRY) Sure. Well, I guess -- and I can

16   clarify that. There's sort of two things there.

17   There's -- I'm going to quote a good friend, Donald

18   Rumsfeld here. There's an unknown unknown. You know

19   there might be something else out there. You have no idea

20   what it is. Or there's one that you know -- you know it

21   could be one, and if there is another one, it's definitely

22   that.

23           So, for instance, cousin's house. I

24   assume that's not it, but do you know if there is, in

25   fact, a fourth category what that fourth category is?

1    A. Ask the question one more time.

2    Q. Sure. When they're running through that process

3  that you just described where they're asking what type of

4  phone number it is, do they identify the phone number or

5  do they say I see you're calling from 6074?

6         MR. ROLFES: I'll object --

7    Q. (BY MR. LARRY) Or are they -- are they saying I

8  see you're calling from or something to that effect? Do

9  they list the number off or do they just say this number?

10         MR. ROLFES: I'll object to the form of

11  the question as well as being beyond the scope of the

12  notice.

13    A. I mean, I listen to a ton of calls. Sometimes

14  the customer will say, hey, add this number. Sometimes,

15  you know, the agent will say this number that you're

16  calling in from and reading --

17    Q. Okay.

18    A. You know, read the phone number to -- there's no

19  way from looking at the notes I could tell how the

20  conversation went.

21    Q. Okay. And then as far as the process that the

22  agents are trained to do, they are to confirm that that is

23  a good contact phone number?

24    A. Yes, sir.

25    Q. Okay. Can you tell me the question they're

1    trained to ask to learn whether it's a good contact

2    number?

3              MR. ROLFES:  I'll object.  This is

4    beyond the 30(b)(6) and plus this was the subject of the

5    deposition with Mr. Nightingale four or five months ago.

6         Q.   (BY MR. LARRY) You can go ahead and answer.

7         A.   Yeah, they would ask if it was a good contact

8    number.

9         Q.   Okay.

10             MR. LARRY:  And just to clarify, I was

11   asking about the training which is one of the subjects of

12   this deposition that he's been designated at that Wayne

13   specifically didn't know much about.

14             MR. ROLFES:  Training about FDCPA?

15             MR. LARRY:  Sure.

16             MR. ROLFES:  Okay.  So you're asking

17   about -- about how these numbers -- what is asked about

18   the contact information and how to get that which is the

19   TCPA training which was --

20             MR. LARRY:  It's both.

21             MR. ROLFES:  -- specifically covered in

22   Mr. Nightingale's.

23             MR. LARRY:  It's both and it's how these

24   numbers -- this number at issue were obtained so.

25        Q.   (BY MR. LARRY) All right.  Let's quit wasting

1    from a mutual point of understanding so we can go from

2    there.  So Santander doesn't just decide randomly which

3    delinquent customers to call and when.  Right?  There's

4    some sort of process or methodology in place.  Correct?

5        A.  There's strategies in place.  I guess you could

6    say there's strategies in place.

7        Q.  Sure.  And if my understanding is correct, the

8    way the system works is that whatever those strategies may

9    be, Santander comes up with -- with criteria and runs

10   those criteria against its systems and then determines

11   groups of telephone numbers to call or groups of accounts

12   at least to call.

13          MR. ROLFES:  I'll object to that as

14   clearly beyond the scope of this 30(b)(6) and that was the

15   subject of the previous 30(b)(6) deposition.

16       A.  That's still -- I mean --

17       Q.  (BY MR. LARRY) Okay.  So let's skip over that

18   then and get to kind of the end product.  And that is once

19   whatever that process is, once it has been determined that

20   a call or more multiple calls will be placed regarding a

21   specific account, can you please describe the process for

22   determining which telephone numbers will be called?

23          MR. ROLFES:  I'm going to object.

24   That's beyond the scope of this 30(b)(6) and, I mean, we

25   went through this with Wayne on how the numbers are

**App. 195**

**TAB 12**

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4  HENRY ESPEJO, individually   )
   and on behalf of all         )
5  others similarly situated,   )
                                )
6         Plaintiff,            )
                                )
7  VS.                          ) Case No:  1:11-cv-08987
                                ) Honorable Charles P.
8  SANTANDER CONSUMER USA,      ) Kocoras
   INC., an Illinois            )
9  corporation,                 )
                                )
10        Defendant.

11

12         - - - - - - - - - - - - - - - - - - - - - - - - - -

13              ORAL DEPOSITION OF

14             WAYNE NIGHTENGALE

15             OCTOBER 22, 2014

16                 VOLUME 1

17         - - - - - - - - - - - - - - - - - - - - - - - - - -

18

19

20

21

22

23

24

25          Arden Stanberry, CSR #8987



1          (Short break from 10:22 to 10:33 a.m.)

2     Q.  Mr. Nightengale, can we look back at Plaintiff's

3   Exhibit 2, again.  So we are still in paragraph two.

4   You see in the second sentence where you refer to the

5   characteristics of the dialing system utilized by

6   Santander, do you see that?

7     A.  Yes.

8     Q.  What do you mean by dialing system utilized by

9   Santander?

10    A.  The system we utilize for inbound and outbound

11   phone calls.

12    Q.  Okay.  Is that both hardware and software?

13    A.  Yes.

14    Q.  Okay.  Does it have a specific name, the dialing

15   system?

16    A.  Yes.

17    Q.  What is that?

18    A.  Aspect Telephone System.

19    Q.  Is there a specific version of the Aspect

20   Telephone System that Santander uses?

21    A.  I believe when we installed it, it was 6.5, but

22   you've have minor upgrades 6.1 or 6.5 over time.

23    Q.  You said when it was installed, do you recall

24   when it was first installed?

25    A.  2006.



1    use a blend, where you can take inbound or make outbound

2    phone calls, you can set for inbound only.  Technically,

3    you could set it for outbound only.  But those are the

4    characteristics we utilize.  I know they have an online

5    chat module we don't utilize.  It's the characteristics

6    we use of the telephone system.

7        Q.  Let me ask you a different question.  Have you

8    ever heard of Aspect's blaster mode?

9        A.  No.

10       Q.  Have you ever heard of Aspect's predictive dialer

11   mode?

12       A.  Yes.

13       Q.  Does Santander utilize that?

14       A.  We utilize a common term which is predictive

15   dialer, which we can get into the definition of, if you

16   would like.  But yes, we use a predictive dialer feature

17   of Aspect.

18       Q.  Okay.  So what's your definition of predictive

19   dialer with respect to Aspect?

20       A.  Aspect has an algorithm that helps maintain

21   efficiency on inbound and outbound phone calls.

22       Q.  So that's the predictive dialer mode?

23       A.  Yes.

24       Q.  Utilizing that algorithm?

25       A.  Yes.



1    A.  I can say almost on daily basis, yes.  And you'll

2    have exclusion of holidays or anything like that.

3    Q.  Okay.  From 2011 earlier, how often did Santander

4    utilize the predictive dialer mode?

5    A.  I believe we used it six days a week.

6    Q.  Do you know which days?

7    A.  Monday through Saturday.

8    Q.  24 hours a day?

9    A.  No.

10   Q.  Okay.  Do you know the hours of each day it was

11   used?

12   A.  Central time, it would be 7 a.m. to -- and again,

13   it varies Monday through Thursday, to 11 p.m. central

14   time.  Friday, I believe only until 7 p.m., and Saturday

15   7 a.m. to, I believe, 5 or 6 p.m. central.

16   Q.  Okay.  Does Santander maintain records of when it

17   used each dialing mode?

18   A.  Repeat that question for me.

19   Q.  Does Santander maintain records of when each

20   dialing mode was used?

21   A.  Every account is documented with any and all

22   attempts, so yes.

23   Q.  Okay.  So each account would show what dialing

24   mode was used to make a particular call, is that right?

25   A.  Yes, you can ascertain that information.



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.  But those would be the technical people at

2  Santander, right?

3    A.  Yes.

4    Q.  Okay.  Can you take a look at paragraph three and

5  give that a read, and let me know when you're done.

6    A.  Yes.

7    Q.  Okay.  You see where it says, Santander's dialing

8  system does not store any customer information.  What do

9  you mean by "store"?

10    A.  We do not keep information on the Aspect dialing

11  system.

12    Q.  Okay.  And when you say customer information,

13  what do you mean by that?

14    A.  You would have everything from names, account

15  numbers, interest rates, loan amounts, per diem, vehicle

16  type, insurance information, anything of that nature.

17    Q.  Do you see also reference account and contact

18  information, in paragraph three?

19    A.  Yes.

20    Q.  Is that different than what you just described?

21    A.  That's inclusive of.

22    Q.  Okay.  What types of contact information does

23  Santander store?

24    A.  Anytime we communicate with a customer, either a

25  letter, either a phone call, either inbound or outbound.



800.211.DEPO (3376)
EsquireSolutions.com

1   It is documented at the account level in our host

2   system.

3       Q.  So when you say contact information, you're not

4   referring to something like mailing address, right?

5   You're referring to times you have contacted a customer?

6       A.  No, it's mailing address and everything is stored

7   on our host system.

8       Q.  I see.  So the phone numbers would be stored on

9   the host system?

10      A.  Yes.

11      Q.  Mailing address is stored on the host system?

12      A.  Yes.

13      Q.  Okay.  Got it.  Do you know what form the account

14  information is stored in on the host system?

15              MR. COLMAN:  Objection as to the term

16  "form."

17      Q.  You can answer?

18      A.  Define that one for me.

19      Q.  Okay.  Sure.  Is it stored in a database, is it

20  stored in a paper file?  What form is it in?

21      A.  Both.

22      Q.  Okay.

23      A.  Like the image of a contract is stored.  So

24  that's information relevant to an account.  Then other

25  information that is contact information from a



1    standpoint of an inbound, outbound or letter is stored

2    in a database.

3        Q.  Okay.

4        A.  Even the contract technically is stored in a

5    database.

6        Q.  But it's all in electronic form?

7        A.  Yes.

8        Q.  Okay.  So if you have a paper contract, it gets

9    scanned in and goes into the host system?

10       A.  The information is, and then I can actually view

11   the image of the individual contract as well.

12       Q.  I see.

13       A.  The obvious individual contracts are stored in a

14   safe place, document storage facility.

15       Q.  Do you know where that storage facility is?

16       A.  Unfortunately, I do not.

17       Q.  Do you know who would know?

18       A.  I would reach out to -- I could actually refer to

19   a similar -- some of our documentation is at Iron

20   Mountain, but I can't remember the actual vendor that we

21   utilize.

22       Q.  It's a third-party vendor?

23       A.  Yes, that's stores the original physical

24   documentation from the original loan file.

25       Q.  When you refer to Santander host system, excuse



1   me -- what do you mean when you say "host system"?

2      A.   Our system we utilized is based upon Shaw, which

3   a commercially available customer account management

4   system.  On top of that, we have built a graphic use

5   interface called My Supervisor or My Sup, for short.

6   That is what we consider our host system, which all

7   relevant data, including contract information, address,

8   phone number, all account notes, are stored in our host

9   system.

10     Q.   I understand.  And there's just the one host

11  system?

12     A.   Correct.

13     Q.   Okay.  Do you know what version of Shaw Santander

14  is utilizing?

15     A.   No, I do not.

16     Q.   I'm sorry.  Go ahead.

17     A.   Shaw is the basis of the engine which does the

18  interest accruals, statements, things like that, but we

19  utilize My Supervisor, which is a graphic interface on

20  top of it.  So we'll make continual changes to My

21  Supervisor on an ongoing basis.

22     Q.   Okay.  Do you know whether there's been different

23  versions over time of My Supervisor?

24     A.   Yes, there has.

25     Q.   Do you know whether there are any written manuals



1  specific people, but not necessarily a specific job

2  title?

3     A.  Technically, it would be a job title.  Managers

4  in the data operations group, they would handle that.

5     Q.  I see, so management refers to managers, but not,

6  for example, an executive?

7     A.  No, management could be all inclusive.  So I

8  don't know whether I would consider myself an executive,

9  but at the same time, I have direct responsibility and

10  input on the two, exactly what we will dial on a daily

11  basis.

12     Q.  Okay.  So does the management group change at

13  all?  Has it changed over time?

14     A.  I've been the consistent piece of it, but yes,

15  management has changed over time, job duties have

16  changed over time.

17     Q.  Can you recall any specific people that were part

18  of this management group that you're referring to in

19  paragraph four?

20     A.  Joseph Burda, is currently a person.

21     Q.  Anyone else?

22     A.  He's got individuals, managers directly

23  underneath him.  But I don't have a name for you.

24     Q.  We won't tell them that.

25        Later on in paragraph when you make the



800.211.DEPO (3376)
EsquireSolutions.com

1  statement, create a list of phone numbers, what do you

2  mean create a list of phone numbers?

3      A.  We create a list based on certain criteria that

4  would determine if you will be placed in the outbound

5  dialer for a potential phone call that day.

6      Q.  Okay.  What's the criteria?

7      A.  There's a multitude of criteria.

8      Q.  Does it change day-to-day?

9      A.  Technically, yes, every day.

10     Q.  Okay.  So what criteria can you recall, as you

11 sit here today?

12     A.  Behavior scores on account.  Past due, number of

13 days past due, balances on account, there's a multitude

14 of criteria.

15     Q.  Okay.  Is there a comprehensive list of criteria

16 that would be used?

17     A.  Yes.

18     Q.  Okay.  Do you have access to that?

19     A.  Which timeframe are you referring to.

20     Q.  We can stick to the relevant timeframe from your

21 declaration?

22     A.  Going back that far, I don't know if I have exact

23 criteria being used at that time.

24     Q.  Do you have a current list that's comprehensive

25 of the criteria that's used?



800.211.DEPO (3376)
EsquireSolutions.com

1    A.  Yes.

2    Q.  Okay.  So how were the criteria selected for any

3    given day?

4    A.  Again, it's new loans for a welcome call can be

5    in there.  You have past due balances amounts, behavior

6    score that drives that determination.  Again, the

7    criteria fluctuates each and every day.

8    Q.  So, for example, is there a specific past due

9    amount that would then include a phone number on the

10   list if --

11   A.  There's specific days past due that are one of

12   the key components that do it, that along with their

13   behavior score.

14   Q.  So if you're a certain number of days past due,

15   you would be included potentially?

16   A.  Correct, potentially.

17   Q.  Is that comprehensive list, the current list

18   anyway, is that in written form?

19   A.  Yes.

20   Q.  Okay.  And you said you have access to that,

21   right?

22   A.  Correct.

23   Q.  Okay.  Who specifically is responsible for

24   creating the list of phone numbers, you can do it by job

25   title?



1    Q.   Do you have records of when those changes are

2    made?

3    A.   For when?

4    Q.   For the relevant time period -- timeframe, excuse

5    me?

6    A.   No, probably not.

7    Q.   Do you have records since December 2011 of when

8    those criteria would have changed?

9    A.   I know I have records probably for the past year

10   of criteria that's changed.

11   Q.   Okay.  So then if I understand you correctly, the

12   cry is set, right, at some point in time by yourself?

13   A.   Uh-huh.

14   Q.   And then the system, using that criteria, each

15   day, creates a list of phone numbers that are going --

16   the host system creates the list of phone numbers and

17   the host system loads that into the Aspect dialer?

18   A.   We have an automatic dialer host team, that

19   exported from another system, and we imported into our

20   Aspect Telephone System.

21   Q.   Can you say that first part again?

22   A.   We have our dialer operations team, they -- an

23   individual there would take a file that's generated, and

24   then upload it into the Aspect Telephone System.

25   Q.   Do you know what that individual physically does



800.211.DEPO (3376)
EsquireSolutions.com

1   to upload the file?

2     A.   I know it's a raw file that's created, it's then

3   imported.   It's a format created in a format that Aspect

4   can receive it and then they upload it into the Aspect

5   Telephone System.

6     Q.   Does that person have to literally click keys on

7   their computer keyboard?

8     A.   Yes.

9     Q.   And they do that every morning?

10     A.   Yes.

11     Q.   Do you know what time that happens?

12     A.   If everything is running on time, they usually

13   have the file between 5 a.m. and 6 a.m. in the morning.

14     Q.   Okay.

15     A.   So they may do it at 6 a.m. or 6:30 a.m., but

16   usually they ensure we are up and available by 6 a.m.

17     Q.   Do you know how long it takes to upload that file

18   to their dialer system?

19     A.   No, I do not.

20     Q.   Why do you do it that way as opposed to, for

21   example, the system doing it, automatically uploading

22   the file?

23     A.   You're going to be a consultant now for us?

24     Q.   No, I'm curious.

25     A.   There's a link for telephony piece but a RAW file



1   essentially the first step?  This process, that's what

2   you mean by "initiate"?

3        A.  You have to let the system know you're available.

4   So I have to press a button to let the person know I'm

5   available.  Two people have to do their job in order for

6   anything to occur.

7        Q.  I understand.  And right after that, when you say

8   "human intervention," what do you mean by that?

9        A.  A person physically has to push a button in order

10  to do anything.

11       Q.  Okay.  And so in the context of someone who is

12  there to receive a call, they have to push the button to

13  log in?

14       A.  You have to push the button to log in, and you

15  have to push the button to tell the person you're

16  available.

17       Q.  And with respect to uploading the RAW file, they

18  have to push the button to upload the RAW file?

19       A.  And then they have to start the system as well.

20  So once it's uploaded, then they have to tell the

21  system, okay, we have people logged in and ready to make

22  and receive phone calls.

23       Q.  Okay.  Can you describe physically what that

24  person has to do to start the system?

25       A.  Once the list is loaded, then they physically



ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1      A.   Every time.

2      Q.   Okay.   So they enter the code, they receive one

3   phone call.   Once that's completed, they have to enter

4   the code again?

5      A.   They have to disposition that phone call, and

6   upon disposition of that phone call, then they have to

7   hit -- get next, which means I'm available again.

8      Q.   What do you mean by "disposition" of the phone

9   call?

10      A.   You have to record the events that occurred on

11   that phone call.   Whether it was a customer service

12   call, inquiry about a payoff, outbound collection phone

13   call, promise to pay, left message.   Any type of

14   communication with a customer is then recorded, is what

15   we consider a disposition of that phone call.

16      Q.   How is it recorded?

17      A.   In our activity notes.

18      Q.   And where are the activity notes contained?

19      A.   In the host system.

20      Q.   So that would be through that user interface we

21   discussed, My Sup?

22      A.   Correct.

23      Q.   So once an employee makes themselves available

24   again after the disposition of one phone call, do they

25   immediately receive or make another phone call?



1      A.   There's multiple area codes for the Dallas area.

2    There's 817, there's 214.

3      Q.   So that's the purpose for using the different

4    areas codes in different offices?

5      A.   Yes, all those area codes is where we had offices

6    located.

7      Q.   But what was that purpose of having different

8    area codes?

9              MR. COLMAN:   Objection.   I don't believe

10   Mr. Nightengale has been designated for the person most

11   knowledgeable even on this issue, and irrelevant.

12     A.   Yes.   We have an office in every area code we

13   pulsed out.

14     Q.   (BY MR. RICHMAN)   Okay.   Could an office that's

15   not in the 214 area code have the 214 area code pulsed

16   out?

17     A.   Yes.

18     Q.   Okay.   Does Santander maintain records of the

19   calls that the dialing system places?

20     A.   Each account is updated with any inbound or

21   outbound calls placed, yes.

22     Q.   Does Santander maintain records of the calls in

23   any other way?

24     A.   No.

25     Q.   How long does Santander maintain those records



800.211.DEPO (3376)
EsquireSolutions.com

1  that.

2      A.  We utilized this time frame, the master files,

3  Accurint.  I believe there was one more and the name

4  escapes me.

5      Q.  And how about since December 2011?

6      A.  We've narrowed it down to predominantly

7  Lexis-Nexis, which own Accurint, as the provider.

8      Q.  Okay.  Do you know whether any of the numbers in

9  Maria Espejo's account were obtained by skip-tracing?

10     A.  No, they were not.

11     Q.  Okay.  Was there any other way that Santander

12 obtains phone numbers that are in its host system?

13     A.  If we acquired accounts, the phone numbers that

14 were there when we acquired the account.

15     Q.  What do you mean acquired accounts?

16     A.  We've done Portfolio B.  She's the only person

17 listed on the account for B, and her account was

18 originally done by Sovereign Bank.  We began to service

19 the portfolio for Sovereign Bank.

20     Q.  Does that mean that Santander bought the loan

21 from Sovereign Bank, or is just doing the servicing for

22 Sovereign Bank?

23     A.  Technically, Bank of Santander bought Sovereign

24 Bank and already owned Santander USA.

25     Q.  So aside from entities that had the came



1    A.  Account is on my list.  I can pull up that

2    account, I can choose to dial that phone number.

3    Q.  Okay.  How do you choose to do that?  How would

4    an agent choose to make that call?  Like, physically,

5    what's the process?

6    A.  Okay.  I'm sorry.  Two options:  You can enter

7    the actual ten digits, or the phone number would be blue

8    and hyper linked.  They can click it and dial it if it

9    was an active phone number.

10    Q.  Okay.

11    A.  If it was grayed-out they would be unable to do

12    that.

13    Q.  What would happen if the number was grayed-out

14    but the agent entered the 10-digit number on there, on

15    your own?

16    A.  The system wouldn't allow you.

17    Q.  Wouldn't allow you?

18    A.  Correct.

19    Q.  So we can see the difference between a manual

20    call and dialer call where the agent -- there's an agent

21    disposition if you go to one, two, three -- to the 14th

22    row on the first page?

23    A.  Yes.

24    Q.  There it says in the activity note, dialer call

25    outgoing.  So does that signify the dialer made the call

