**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HENRY ESPEJO, individually and on behalf of all others similarly situated, | |
| *Plaintiff,* | Case No.: 1:11-cv-08987 |
| *v.* | Honorable Charles P. Kocoras |
| SANTANDER CONSUMER USA INC., an Illinois corporation, | |
| *Defendant.* | |

| | |
|---|---|
| ARICA BONNER, *et al.*, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | Case No.: 12-cv-09431 |
| v. | Honorable Charles P. Kocoras |
| SANTANDER CONSUMER USA INC., | |
| *Defendant.* | |

---

**SUPPLEMENTAL APPENDIX TO DEFENDANT**
**SANTANDER CONSUMER USA, INC.'S REPLY MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT**

James A. Rolfes
(Bar No. 6200271)
*jrolfes@reedsmith.com*
Henry Pietrkowski
(Bar No. 6230048)
*hpietrkowski@reedsmith.com*
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-1000

Abraham J. Colman
*pro hac vice*
*acolman@reedsmith.com*
REED SMITH LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 457-8000

Marc A. Lackner
*pro hac vice*
*mlackner@mcguirewoods.com*
David S. Reidy
*dreidy@mcguirewoods.com*
MCGUIRE WOODS LLP
505 Sansome Street, Suite 700
San Francisco, CA 94111
(415) 844-1974

*Attorneys for Defendant Santander Consumer USA, Inc.*

# TABLE OF CONTENTS

| <u>TAB</u> | <u>DESCRIPTION</u> | <u>SUPP. APP. NO.</u> |
|---|---|---|
| 1. | Declaration of Wayne Nightengale dated July 3, 2014 | Supp. App. 001 - 002 |
| 2. | Excerpts from Deposition of Joseph Burda taken July 21, 2015 | Supp. App. 003 - 007 |
| 3. | Excerpts from Deposition of Henry Espejo taken December 3, 2014 | Supp. App. 008 - 010 |
| 4. | Excerpts from Deposition of Faye M. Levins taken July 14, 2015 | Supp. App. 011 - 019 |
| 5. | Excerpts from Deposition of Mark Nerios taken July 17, 2015 | Supp. App. 020 - 024 |
| 6. | Excerpts from Deposition of Wayne Nightengale taken October 22, 2014 | Supp. App. 025 – 029 |
| 7. | *ACA International v. FCC*, No. 15-1211, Joint Brief for Petitioners, filed November 25, 2015 (Dkt. 1585568) | Supp. App. 030 – 129 |
| 8. | *Adams v. Nationstar Mortgage LLC,* No. 2:15-cv-09912-DMG (KSx), slip op. (C.D. Cal. June 14, 2016) (Dkt. 27) | Supp. App. 130 – 132 |
| 9. | *Shahin v. Synchrony Financial,* No. 8:15-cv-02941-MSS-EAJ, slip op. (M.D. Fla. Apr. 12, 2016) (Dkt. 24) | Supp. App. 133 – 136 |
| 10. | *Small v. GE Capital, Inc.,* No. 5:15-CV-02479-JGB-DTB, slip op. (C.D. Cal. June 9, 2016) (Dkt. 31) | Supp. App. 137 - 140 |

# TAB 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HENRY ESPEJO, individually and on behalf of all
others similarly situated,

        *Plaintiff,*

    *v.*

SANTANDER CONSUMER USA, INC., an
Illinois corporation,

        *Defendant.*

Case No.: 1:11-cv-08987

Honorable Charles P. Kocoras

## DECLARATION OF WAYNE NIGHTENGALE

I, Wayne Nightengale, declare as follows:

1.    I am an individual and Senior Vice President of Operations Servicing for respondent Santander Consumer U.S.A., Inc. ("Santander"). I am competent and authorized to testify to the matters set forth herein based on personal knowledge of the facts stated herein.

2.    My job description includes supervising the practices and procedures employed by Santander when contacting customers. I possess expertise regarding the characteristics of the dialing system utilized by Santander to place calls during the relevant time frame for this litigation ("Santander's Dialing System").

3.    Santander's Dialing System does not store any customer information. Instead, all customer information, including customers' account and contact information, is stored on Santander's host system.

4.    Each and every day that Santander's Dialing System *is* used, Santander management must create a list of phone numbers to be called on that day (the "List") and manually load the List onto Santander's Dialing System. The List varies from day-to-day depending on the criteria defined by the Santander manager responsible for creating the List.

US_ACTIVE-118272186.1

5.     Even after the List is loaded onto Santander's Dialing System, no calls can be initiated without human intervention.  Indeed, a live employee must be present and logged into the Dialing System in order for calls to be placed.

6.     In order to initiate a call, a live employee must manually press a button to signal that the employee is ready to dial a call.  Without a live employee pressing the button to initiate a call, no call could be made.

7.     Additionally, Santander's Dialing System does not store or produce telephone numbers to be called using a random or sequential number generator and the equipment did not dial random or sequential phone numbers.

8.     Further, Santander's Dialing System lacks the current capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

9.     Santander's Dialing System can only dial phone numbers that are specifically downloaded into the calling technology.

I declare the foregoing to be true and accurate to the best of my knowledge under the penalty of perjury.

Wayne Nightengale

Executed this _3_ day of July, 2014,
at _Lewisville_, _TX_ .

- 2 -

**TAB 2**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   HENRY ESPEJO, individually
     and on behalf of all others
 4   similarly situated,
                                    Case No.: 1:11-cv-08987
 5             Plaintiff,
                                    Honorable Charles P. Kocoras
 6        v.

 7   SANTANDER CONSUMER USA, INC.,
     an Illinois corporation,
 8
               Defendant.
 9   _____

10   ARICA BONNER, et al,
     individually and on behalf
11   of all others similarly
     situated,
12                                  Case No.: 1:12-cv-9431
     Plaintiff,
13                                  Honorable Charles P. Kocoras
          v.
14
     SANTANDER CONSUMER USA, INC.,
15   an Illinois corporation,

16             Defendant.

17   _____


18   ************************************************************

19            ORAL DEPOSITION OF JOSEPH BURDA

20                     CONFIDENTIAL

21   ************************************************************

22        ANSWERS AND DEPOSITION OF JOSEPH BURDA, produced as a

23   witness at the instance of the Plaintiffs, Henry Espejo and

24   Faye Levins, individually and on behalf of all others

25   similarly situated, taken in the above-styled and -numbered
```



1      A.  They're just waiting --

2      Q.  The custom- --

3      A.  -- for an agent to an- -- to come on the line.

4      Q.  Okay.  So in that situation the call would have

5   connected to the customer and they're waiting?

6      A.  Connected to them, be identified as a human

7   voice --

8      Q.  Sure.

9      A.  -- off the voice -- right -- and then -- yes.

10     Q.  Okay.  And when you say "identified as a human

11  voice" -- that -- is that a feature or some functionality

12  of the Aspect dialing system?

13     A.  Yes.

14     Q.  Okay.  It's got some sort of programming that does

15  some sort of voice recognition.  Right?

16     A.  All proprietary stuff, yes.

17     Q.  Yeah, sure.  Okay.  And -- so what happens if --

18  when a -- when a customer is waiting and they hit the end

19  of that period?  So whatever the available agent wait time

20  is.

21     A.  The call would be dropped.

22     Q.  It would just hang up?

23     A.  Yes.

24     Q.  Okay.  And -- okay.  So what about -- can you

25  explain what No. 3 means?  What the target percentage of



1  abandoned calls is.

2      A.  So that -- that works in conjunction.  So Target

3  Abandon is saying I have a threshold of X percent that --

4  the situation we just discussed can happen.

5      Q.  Okay.  So -- so say -- let's just say 10 percent's

6  the figure.  If it's -- that would prob- --

7      A.  That's --

8      Q.  Your reaction makes it seem like that's either

9  really high or really low.

10     A.  It's really high.

11     Q.  Really high.  Okay.  Let's say 1 percent's the

12  figure.

13     A.  Okay.

14     Q.  If the calls -- so what -- what happens if the

15  campaign starts exceeding that figure?

16     A.  So that's -- the algorithm uses that value -- the

17  -- the goal and the actual value and just says -- basically

18  the way I understand it -- it would -- if it's exceeding,

19  it would slow down.

20     Q.  Okay.

21     A.  It would become considerably more restricted.

22     Q.  Okay.  So is that something that -- does that --

23  does that setting or that factor apply -- do you know if

24  that applies in preview mode as well?

25     A.  It would not be a setting for preview mode.



1   the Get Next button to move into an idle status.

2        Q.   What does it mean --

3        A.   Otherwise --

4        Q.   -- "disposition the phone call"?

5        A.   Put a -- put a call result on there.  So if I'm

6   talking to the customer and they make a payment, I might

7   disposition the call.  A promise to pay.

8        Q.   And then they have to press a -- a Done button?

9        A.   They have to hit a Done button to submit the note

10  into the system.  And then they would hit Get -- when

11  they're ready, they would hit Get Next.  And then they go

12  into what we call an idle status.  And once you're idle --

13  you're available at that point to take a phone call.

14       Q.   And until they go into the idle status, they're

15  unavailable to receive calls.

16       A.   Correct.

17       Q.   And what effect does that have on the dialer?

18       A.   The dialer would not -- it would not launch calls.

19  Understanding that that person's available to take those

20  phone calls -- it would -- it only would make calls based

21  on agents that are available at that time to take calls.

22       Q.   And at the beginning of the day is there human

23  intervention involved in uploading numbers to the dialing

24  system?

25       A.   Yes.  My guys have to go in and actually upload



1  the file into Aspect.

2           MR. PIETRKOWSKI:  All right.  That's all I

3  have.

4           MR. LARRY:  I've got a few more questions.

5                 FURTHER EXAMINATION

6  BY MR. LARRY:

7      Q.  Okay.  So we -- we talked about some of the steps

8  that -- that you've -- you take the view are -- are human

9  intervention.  Were there any steps that you didn't mention

10 that in your mind would include human intervention?

11     A.  I think I covered all of them.

12     Q.  Okay.  Somebody has to pay the electrical bill.

13 Right?

14           MR. PIETRKOWSKI:  Object to the form.

15     A.  Okay.

16     Q.  (BY MR. LARRY) For -- for there to be electricity

17 to the call center for the calls to go through.  Right?

18     A.  Yes.

19     Q.  Okay.  What about making sure the power is on for

20 everything?

21     A.  Yes, our power company would have --

22     Q.  If a --

23     A.  -- to do that.

24     Q.  If a circuit breaker gets tripped, somebody has to

25 reset it presumably.



**TAB 3**

1       IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS

2
                NO. 11 CV 8987

3

4          Honorable Charles P. Kocoras

5
        HENRY ESPEJO, Individually and

6       on behalf of all others
        similarly  situated,

7
            Plaintiff,

8       vs.

9       SANTANDER CONSUMER USA INC., an
        Illinois corporation,

10
            Defendant.

11      _____/

12

13          66 West Flagler Street
            Miami, Florida

14          December 3, 2014
            Wednesday, 8:54 A.M.

15

16

17

18      D E P O S I T I O N

19
                OF

20

21          HENRY ESPEJO

22

23

24      Taken on Behalf of the Defendant
        Pursuant to Notice of Taking Deposition

25

---

Supp. App. 008

1    occasions about conversations you had had with

2    Santander.

3        Do you remember that?

4    A.  Yes, by phone.

5    Q.  Yeah.  So he asked you to recount kind of

6    generally the substance of those conversations.

7        Do you remember him asking you those

8    questions?

9    A.  Yes.

10   Q.  And do you remember answering those

11   questions?

12   A.  Yes.

13   Q.  Okay.  And he asked you to describe

14   generally what the content of those conversations

15   were?

16   A.  Yes.

17   Q.  Do you remember that?

18   A.  I do, yes.

19   Q.  And he -- you explained kind of generally

20   what the content of those conversations were, right?

21   A.  Right.

22   Q.  And do you remember kind of generally what

23   you had said the content of those conversations

24   were, the character that they took?

25   A.  Yeah.  You know, Why are you calling me?

Supp. App. 009

1   Or they would say, you know, Your wife is behind on

2   this debt.  Well, basically, we're calling in regard

3   to the Toyota Corolla 2007.

4         That's how they would always start.

5     Q.  And your response?

6     A.  That's not my car.

7     Q.  You said other things.  What else did you

8   say to them?

9     A.  I told them not to call me.  I said, Call

10  my wife; it's not my debt.

11        That's the general language.

12        Why are you calling me?

13    Q.  When you ended up speaking to Santander

14  representatives --

15    A.  Yes.

16    Q.  -- did you always say, Don't call me?

17    A.  Pretty much all the time, yes.

18        Well, don't call me.  Why are you calling

19  me?  Don't call me.  Talk to her.

20        I would give them my home number.

21    Q.  Did you say, Stop calling me?

22    A.  Yes, I did.

23    Q.  Counsel asked you whether somebody from

24  Santander had asked whether the 1411 number --

25    A.  Yes.

Supp. App. 010

**TAB 4**

1        IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF ILLINOIS

3                EASTERN DIVISION

4    ARICA BONNER, et al.,

5    on behalf of themselves and

6    all others similarly situated,

7        Plaintiffs,

8    Vs.                    No: 1:12-CV-04671

9    SANTANDER CONSUMER USA, INC.,

10       Defendant.

11

12

13

14

15

16   DEPOSITION OF:  Faye Maria Levins

17   DATE:  July 14, 2015

18   TIME:  9:30 a.m.

19   LOCATION:  Burr & Forman, LLP

20          420 20th Street North, Suite 3100

21          Birmingham, Alabama 35203

22

23

1    is in reverse order.

2       A.  Okay.

3          MR. LARRY:  Just so we're all on the

4    same page, why don't you say what the time

5    and date are on it.

6          MR. PIETRKOWSKI:  Okay.

7       Q.  (BY MR. PIETRKOWSKI)  So it's the entry

8    for -- there are a number of entries for

9    December 22nd, 2009.  That's what we're

10   looking for.

11      A.  December 22nd, 2009?

12      Q.  Correct.

13         MR. LARRY:  You will see at the bottom

14   page is something from December 17th.  Keep

15   an eye out for that as you're flipping

16   through it.

17      A.  Okay.  December 17th, I have that.

18      Q.  (BY MR. PIETRKOWSKI) So then if you

19   move up a little bit into the middle of the

20   page, do you see December 22nd, 2009?

21      A.  Yes.

22      Q.  So here there is a reference to a

23   deferment request.  It says deferment reason,

1    medical expenses; number of months requested,

2    two.  There is another reference on that same

3    date saying "Had surgery, will make another

4    payment on 1/8, deferment verbal."

5          So my only question is:  Is this an

6    accurate depiction of what that conversation

7    would have been at the time?

8      A.  Yes.

9          MR. LARRY:  Did you see where he was

10   talking about?

11     A.  On December 22nd?

12     Q.  (BY MR. PIETRKOWSKI) 2009.

13     A.  2009.  Yeah.

14     Q.  Okay.  And then if you turn to

15   June 28th, 2010, which is going to be in the

16   other direction because it's in reverse

17   order --

18     A.  Okay.

19          MR. LARRY:  Is that the page where 28

20   is on the bottom or the top?

21          MR. PIETRKOWSKI:  At the bottom.

22     A.  June 28th?

23     Q.  (BY MR. PIETRKOWSKI) June 28th, 2010.

1      MR. PIETRKOWSKI:  And, Nick, if you

2  want to help her find it, that's fine.

3      MR. LARRY:  Here (indicating).

4      A.  Okay.

5      Q.  (BY MR. PIETRKOWSKI)  So December 28th,

6  2010, there's some notes referring to another

7  deferment.

8      A.  Is that December, 2010?

9      Q.  No, June 28th, 2010.

10     A.  Okay.

11     Q.  And it refers to a family emergency as

12  the reason for the two-month deferment in

13  June 2010.

14     MR. LARRY:  Which time?

15     MR. PIETRKOWSKI:  There is one that

16  days 12 o'clock, RECC, and right there it

17  says "Agent initiated recording for

18  deferment; reason, family emergency; number

19  of months requested; two.

20     Q.  (BY MR. PIETRKOWSKI) Do you have any

21  memory of requesting another deferment for a

22  family emergency in June of 2010?

23     A.  I could have, I'm not sure.  I don't

1    remember.  All of that sounds --

2        Q.  Does that sound familiar?

3        A.  I think my dad at that time.

4        Q.  So you have no reason to think that is

5    inaccurate?

6        A.  Oh, no.

7        Q.  And there were a number of times you

8    requested deferment on the loan?

9        A.  Uh-huh, I would.

10       Q.  And when you requested the deferment,

11   either you or your daughter called in to

12   Santander?

13       A.  Yes.

14       Q.  And Santander, did they generally grant

15   these deferments?

16       A.  They generally worked with me.

17       Q.  Okay.  And then let's go to

18   January 12th, 2011.

19          MR. PIETRKOWSKI:  And you can help her

20   find that.

21          MR. LARRY:  Bottom or top?

22          MR. PIETRKOWSKI:  Let's start with the

23   bottom.

1      A.  I don't know the exact date.

2      Q.  You started working at T-Mobile in

3  2008?

4      A.  2008.

5      Q.  And you worked there for three years?

6      A.  Yeah, '09, '10, '11.  Surgeries began

7  in 2010, and I never come back to work from

8  that.

9      Q.  All right.  So it makes sense then that

10  in January of 2011 you would have asked for a

11  deferment because of a change in employment?

12      A.  Yes, a change in employment.

13      Q.  So this note appears to be an accurate

14  conversation?

15      A.  Yes.

16      Q.  Okay.  And then let's go to August 2nd,

17  2011 starting at the bottom of the page.

18          So at the bottom of the page, the last

19  couple of lines, it says "Agent initiated

20  recording for a deferment."

21          So there was another request for

22  deferment in August of 2011.  Do you see

23  that?

1      A.   Yes.

2      Q.   And then flip the page.

3      A.   (Witness complies.)

4      Q.   The fifth entry down, which says 15:33

5   REXD, there is a reference "Has been out of

6   work for eight months."

7      A.   Okay.

8      Q.   So that's consistent with what we just

9   were looking at January of 2011.

10      A.   Yes.

11      Q.   "House was damaged in a tornado."

12      A.   Yes.

13      Q.   I believe you were asking for another

14   deferment because of the tornado.

15           So do you remember that your house

16   being damaged by a tornado in August of --

17      A.   We had some wind -- I had a roof

18   knocked off in a storm.  I can't remember if

19   it was August, but I had some damage.

20      Q.   But that timing seems right that in

21   August of 2011 your roof was damaged --

22      A.   The roof got knocked off.

23      Q.   -- and so you asked for more time?

1    This note seems accurate?

2       A.   It does.

3       Q.   You mentioned to me you had a house

4    fire.  When did that happen?

5       A.   I would have to look at my documents.

6    I don't want to give you -- I knew all that

7    but I'm going blank.

8            Let me see.  I think the house fire was

9    May of 2011.

10      Q.   Okay.  And did the fire destroy your

11   house completely?

12      A.   Yes.

13      Q.   Okay.

14      A.   I was going to have surgery and left

15   soup on the stove.

16      Q.   So the tornado that ripped off the roof

17   in August of 2011, was that at your new

18   house, the one you are at now?

19      A.   No.

20      Q.   It was still at the old house?

21      A.   Maybe I have got the dates mixed up.  I

22   am not sure of those dates.

23           I have got a copy of all of that

1   information.  I've got the years mixed up.

2       Q.  Do you know if this roof damage

3   happened before the fire?

4       A.  The roof came before the fire.

5       Q.  And then the fire happened and then the

6   house was completely destroyed?

7       A.  Yes.

8       Q.  So that would have been sometime after

9   August, 2011?

10      A.  Yes.

11      Q.  And that's when you moved into your

12  current residence?

13      A.  Yeah.  I lived on 280 for maybe eight

14  months, and then I moved to my current

15  residence.  I lived in an apartment on

16  Highway 280.  It was my daughter's apartment,

17  I moved in with her on 280.

18      Q.  For how long?

19      A.  I stayed with her almost a year, and

20  then I found the house that I'm at now, 7518.

21      Q.  Okay.  So you stayed with your

22  daughter, Jacqueline, for almost a year?

23      A.  Uh-huh.

**TAB 5**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   ARICA BONNER, et al, individually and on
     behalf of all others similarly situated,
 4
          Plaintiffs,            Case No. 1:12-cv-9431
 5                               Related to Case No.
     v.                          1:11-cv-08987
 6                               Case No. 1:12-cv-4671

 7   SANTANDER CONSUMER USA, INC., an
     Illinois corporation,          Honorable Charles P.
 8                                   Kocoras
          Defendant.
 9
     ************************************************************
10                      ORAL DEPOSITION OF
                          MARK NERIOS
11                       JULY 17, 2015
                          VOLUME 1
12   ************************************************************

13

14

15

16        ANSWERS AND DEPOSITION OF MARK NERIOS, produced as a

17   witness at the instance of the Plaintiff, taken in the

18   above-styled and -numbered cause on the 17th day of July,

19   2015, A.D., beginning at 9:05 a.m., before D. Beth

20   Randolph, a Certified Shorthand Reporter in and for the

21   State of Texas, at the offices of Esquire Deposition

22   Solutions, located at 1700 Pacific Avenue, Suite 1000,

23   Dallas, State of Texas, in accordance with the Federal

24   Rules of Civil Procedure and the agreement hereinafter set

25   forth.
```



1  back.  I assume Santander war the defendant in that case?

2      A.   Yes, sir.

3      Q.   Okay.  Do you recall what claims or legal

4  violations or wrongdoing that the plaintiff was claiming

5  occurred?

6      A.   I do not.

7      Q.   Okay.  Do you remember -- do you recall whether

8  it had to do with -- with debt collection methods?

9      A.   The only part I saw on that one was transaction

10  history.

11      Q.   Okay.

12      A.   So I wasn't involved in anything else.  I don't

13  know what it was.

14      Q.   Okay.  Do you know how any of the cases in which

15  you were deposed ended?  So whether they resulted in

16  arbitration verdict or a settlement or a dismissal?

17      A.   The second one that I did in Denver was a

18  settlement.

19      Q.   Okay.

20      A.   Honestly the one that I did in Birmingham, I

21  don't know how it ended or who it was.  I don't remember.

22      Q.   Okay.  So you're site director in Colorado.  Can

23  you explain -- did I get that right?

24      A.   Yes, sir.

25      Q.   Okay.  Can you explain what your job



800.211.DEPO (3376)
EsquireSolutions.com

1   responsibilities are?

2       A.    Uh-huh.   I oversee the site, the building in

3   Colorado.   We have servicing and customer service and

4   involved in pretty much everything.   You know, the

5   training aspect, the coaching, disciplinary actions,

6   everything that, you know, that involves the servicing

7   side of it, I'm involved in.

8       Q.    Okay.   And how long have you been in that job or

9   how long have you had that job title?

10      A.    I've been in that job for two years now.

11      Q.    Okay.   And how long have you been working for

12  Santander generally?

13      A.    I've been working for Santander will be seven

14  years.

15      Q.    And can you tell me your previous job titles with

16  Santander?

17      A.    I was an assistant vice president.

18      Q.    An assistant vice president of what?

19      A.    Of servicing.

20      Q.    Servicing?   Okay.

21      A.    Correct.

22      Q.    And was there anything before that?

23      A.    I started off as a manager.

24      Q.    Okay.   And if you recall, how long did you have

25  each of those job titles?



1      A.    Roughly, you know, just going off memory,

2   three -- a little over three years for AVP.

3      Q.    Okay.  So that would leave a little bit under two

4   for manager?

5      A.    Correct.

6      Q.    Okay.

7      A.    Yes, sir.

8      Q.    So prior to working for Santander, did you have

9   any previous jobs?

10     A.    I worked for Triad Financial.

11     Q.    And what does Triad Financial do or what did they

12   do at the time?

13     A.    Triad Financial is automobile -- same type

14   industry.

15     Q.    Okay.  So auto financing?

16     A.    Yes, sir.

17     Q.    Okay.  And how long did you do that?

18     A.    I was there for five years.

19     Q.    And what were your -- what was your last job

20   title there?

21     A.    I was a manager there as well.

22     Q.    Okay.  And was manager the same sort of job both

23   at Santander and at Triad?

24     A.    Similar.

25     Q.    Okay.



1  2009, 11:03.

2      A.   What was that date, sir?

3      Q.   September 14, 2009, 11:03 in the morning.

4      A.   Okay.

5      Q.   SYSM.  Verifications were required for Faye

6  Levins and were completed.  So looking at that, is it

7  accurate to say that any calls made -- oh, okay.  So

8  here's a good example.  If you go -- we've got that on the

9  14th, 2009.

10     A.   Uh-huh.

11     Q.   If you go up to the 17th, 2009, 11:32 in the

12 morning, SYSM, agent, CHRO, it says verifications were

13 required for Faye Levins and were completed.  Can you

14 explain why in that instance two verifications were

15 required within three days of each other?

16     A.   Okay.  This was 2009.  The verification tab

17 had -- just started using the verification tab.  It had

18 come out.

19     Q.   Okay.

20     A.   And now it specifies how you know what, you know,

21 cell phone and I'm sure if you -- I mean, there's probably

22 records in here that show that.

23     Q.   I understand what you're talking about, yes.

24     A.   So it's evolved.

25     Q.   Okay.  Do you know -- do you know when the



**TAB 6**

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4    HENRY ESPEJO, individually  )
     and on behalf of all        )
5    others similarly situated,  )
                                 )
6          Plaintiff,            )
                                 )
7    VS.                         ) Case No:  1:11-cv-08987
                                 ) Honorable Charles P.
8    SANTANDER CONSUMER USA,     ) Kocoras
     INC., an Illinois           )
9    corporation,                )
                                 )
10         Defendant.

11

12        ------------------------------------

13                 ORAL DEPOSITION OF

14                 WAYNE NIGHTENGALE

15                 OCTOBER 22, 2014

16                    VOLUME 1

17        ------------------------------------

18

19

20

21

22

23

24

25           Arden Stanberry, CSR #8987



800.211.DEPO (3376)
EsquireSolutions.com

1    A.   And Xerox.

2    Q.   Like the copiers?

3    A.   Yes.

4    Q.   Okay.  So if I understand you correctly, an

5  employee arrives at their Santander location, is it they

6  go to a computer terminal and log in?

7    A.   Yes.

8    Q.   Okay.  And each employee has a dedicated computer

9  terminal, at least for that day?

10   A.   Yes.

11   Q.   And they have got a separate computer monitor,

12 right?

13   A.   Yes.

14   Q.   Separate key board of their own, right?

15   A.   Yes.

16   Q.   Mouse?

17   A.   Yes.

18   Q.   Headset, I assume?

19   A.   Yes.

20   Q.   Okay.  Anything else that's part of that

21 terminal?

22   A.   Not that I can think of off the top of my head.

23   Q.   I'm a visual person.  I'm just trying to picture

24 it.  I assume they have chairs too, but that's not

25 really relevant.



1          So can you describe for us the process of logging

2    in to make or receive calls?

3    A.  Yes.  You would use your log in credentials to

4    access our network.  Once you access our network, you

5    would then log into the respective dialer, our Aspect

6    Telephony System.

7          Once you log into it, you would use your access

8    credentials, and with that, once you log in, then you

9    have a choice of codes to put yourself in.  Whether it's

10   a break, whether it's a coaching, whether it's a

11   meeting, whether available to take phone calls, you

12   would then place yourself in the appropriate -- I want

13   to say appropriate designation for what you're

14   attempting to do at that time.  And if it is available

15   to take phone calls, then you would hit -- once you

16   select it and hit enter, then your system would be

17   available to take phone calls.

18   Q.  Does "available to take phone calls" mean place

19   and receive?

20   A.  Yes.

21   Q.  Okay.  You said that an employee would have to

22   log into their respective dialer, does that mean there's

23   more than one dialer?

24   A.  Yes.

25   Q.  Okay.  Are they all part of the Aspect Telephony



1   System?

2      A.   Yes.

3      Q.   What are the different dialers that you're

4   referring to?

5      A.   There's one through four.

6      Q.   Is there any difference between them?

7      A.   No.

8      Q.   Then why are there four different ones?

9      A.   Capacity.

10     Q.   So each dialer has a limited number of employees

11  it can handle?

12     A.   Yes.

13     Q.   And I assume a limited number of phone calls at

14  an amount of time it can handle?

15     A.   Yes.

16     Q.   Are there any other limitations?

17     A.   You would have to ask Aspect for that, but those

18  are the main limitations for us.

19     Q.   So once an employee is logged in, they have

20  entered the correct code, let's assume for this scenario

21  that I'm giving you for right now, it's to make and

22  receive phone calls, do they have to enter the code

23  every time to -- every time they receive a phone call?

24     A.   Yes.

25     Q.   Every time?



1    A.   Every time.

2    Q.   Okay.  So they enter the code, they receive one

3 phone call.  Once that's completed, they have to enter

4 the code again?

5    A.   They have to disposition that phone call, and

6 upon disposition of that phone call, then they have to

7 hit -- get next, which means I'm available again.

8    Q.   What do you mean by "disposition" of the phone

9 call?

10   A.   You have to record the events that occurred on

11 that phone call.  Whether it was a customer service

12 call, inquiry about a payoff, outbound collection phone

13 call, promise to pay, left message.  Any type of

14 communication with a customer is then recorded, is what

15 we consider a disposition of that phone call.

16   Q.   How is it recorded?

17   A.   In our activity notes.

18   Q.   And where are the activity notes contained?

19   A.   In the host system.

20   Q.   So that would be through that user interface we

21 discussed, My Sup?

22   A.   Correct.

23   Q.   So once an employee makes themselves available

24 again after the disposition of one phone call, do they

25 immediately receive or make another phone call?



# TAB 7

No. 15-1211 (and consolidated cases)

------

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

------

### ACA INTERNATIONAL ET AL.,

*Petitioners,*

v.

### FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents*

------

### CAVALRY PORTFOLIO SERVICES, LLC ET AL.,

*Intervenors for Petitioners*

------

## ON PETITIONS FOR REVIEW FROM AN ORDER
## OF THE FEDERAL COMMUNICATIONS COMMISSION

------

## JOINT BRIEF FOR PETITIONERS ACA INTERNATIONAL, SIRIUS XM, PACE, SALESFORCE.COM, EXACTTARGET, CONSUMER BANKERS ASSOCIATION, U.S. CHAMBER OF COMMERCE, VIBES MEDIA, AND PORTFOLIO RECOVERY ASSOCIATES

------

Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

*Counsel for Petitioner the Chamber
  of Commerce of the United States
  of America*

Shay Dvoretzky
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone:  (202) 879-3939

*Counsel for Petitioners Sirius XM Radio
  Inc. and Professional Association for
  Customer Engagement, Inc.*

*Additional Counsel Listed on Inside Cover*

Brian Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Telephone: (612) 486-1589

*Counsel for Petitioner ACA International*

Tonia Ouellette Klausner
Keith E. Eggleton
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7706

*Counsel for Petitioners salesforce.com, inc.
    and ExactTarget, Inc.*

Kate Comerford Todd
Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Petitioner Chamber of
    Commerce of the United States of
    America*

Michele Shuster
MAC MURRAY, PETERSEN & SHUSTER LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone: (614) 939-9955

*Counsel for Petitioner Professional
    Association for Customer Engagement, Inc.*

Monica S. Desai
Amy L. Brown
Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

*Counsel for Petitioner Consumer Bankers
    Association*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300

*Counsel for Petitioner Vibes Media, LLC*

Robert A. Long
Yaron Dori
Michael Beder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Petitioner Portfolio Recovery
    Associates, LLC*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    Parties and Amici

1.    There were no district court proceedings.  Petitioners are ACA International (No. 15-1211); Sirius XM Radio Inc. (No. 15-1218); Professional Association for Customer Engagement, Inc. (No. 15-1244); salesforce.com, inc. and ExactTarget, Inc. (No. 15-1290); Consumer Bankers Association (No. 15-1304); Chamber of Commerce of the United States of America (No. 15-1306); Vibes Media, LLC (No. 15-1311); Rite Aid Hdqtrs. Corp. (No. 15-1313); and Portfolio Recovery Associates, LLC (No. 15-1314).

2.    Respondents are the Federal Communications Commission and the United States of America.

3.    The following entities are intervenors:

Intervenors for Petitioners:  Cavalry Portfolio Services, LLC; Conifer Revenue Cycle Solutions, LLC; Council of American Survey Research Organizations; Diversified Consultants, Inc.; Gerzhom, Inc.; Marketing Research Association; Mercantile Adjustment Bureau, LLC; MRS BPO LLC; and National Association of Federal Credit Unions.

Intervenors for Respondents:  None.

4.    The following entities are *amici curiae*:

In support of Petitioners:  American Gas Association; Credit Union National Association; CTIA—The Wireless Association; Edison Electric Institute; National Association of Chain Drug Stores; National Association of Water Companies; National Restaurant Association; National Retail Federation; and Retail Litigation Center, Inc.

In support of Respondents:  None known.

In support of neither party:  None known.

B.    Ruling Under Review

The ruling under review was released on July 10, 2015 by the Federal Communications Commission.  *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015).  The Order is an omnibus declaratory ruling and order that addressed 21 separate requests for TCPA-related action from the Commission.

C.    Related Cases

All petitions for review of the Commission's Order were consolidated in this Court under the lottery procedures set forth in 28 U.S.C. § 2112(a).  Petitioners are not aware of any other related case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

1.    ACA International, the Association of Credit and Collection Professionals, is a Minnesota nonprofit corporation with offices in Washington, DC, and Minneapolis, Minnesota.  Founded in 1939, ACA represents nearly 3,700 members, including credit grantors, collection agencies, attorneys, asset buyers, and vendor affiliates.  ACA produces a wide variety of products, services, and publications, including educational and compliance-related information; and articulates the value of the credit-and-collection industry to businesses, policymakers, and consumers.  ACA has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

2.    Sirius XM Radio Inc. (Sirius XM) is the nation's largest satellite radio provider.  Sirius XM Holdings Inc. owns all of the outstanding capital stock of Sirius XM Radio Inc.  Liberty Media Corporation beneficially owns more than 50 percent of the outstanding capital stock of Sirius XM Holdings Inc.

3.    Professional Association for Customer Engagement, Inc. (PACE) is a non-profit trade organization dedicated to the advancement of companies that use contact centers as an integral channel of operations.  It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

4.    salesforce.com, inc. is a leading provider of enterprise cloud computing solutions.  ExactTarget, Inc. is a provider of on-demand software solutions.  salesforce.com, inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.  ExactTarget, Inc. is wholly owned by salesforce.com, inc.

5.    Consumer Bankers Association is a non-profit corporation and trade association representing the retail banking industry—banking services geared toward consumers and small businesses.  It has no parent corporation, and no publicly held corporation owns a 10 percent or greater interest in it.

6.    The Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation.  It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  The Chamber is a non-profit, tax-exempt organization incorporated in the District of Columbia.  It has no parent corporation and no publicly held corporation owns a 10 percent or greater interest in it.

7.    Vibes Media, LLC is a leading provider of mobile marketing technology and services.  It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

8.     Portfolio Recovery Associates, LLC, is a Delaware limited liability company.  It is a subsidiary of PRA Group, Inc., a publicly traded company.  PRA Group provides a broad range of revenue and recovery services, returning millions of dollars annually to business and government clients.  No publicly held corporation owns 10 percent or more of PRA Group, Inc. stock.

# TABLE OF CONTENTS

                                                                              **Page**

CERTIFICATE AS TO THE PARTIES, RULINGS, AND RELATED
    CASES ...................................................................................... i

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF AUTHORITIES ............................................................................ ix

GLOSSARY .................................................................................................. xvii

INTRODUCTION ......................................................................................... 1

JURISDICTION ............................................................................................ 3

ISSUES ....................................................................................................... 4

STATUTES AND REGULATIONS ................................................................... 4

STATEMENT OF THE CASE ......................................................................... 5

    A.    Congress Enacts the TCPA To Restrict Particular Practices .............. 5

    B.    The Commission's Subsequent Orders Generate Significant
        Confusion as Wireless Communications Increase Dramatically ........ 7

        1.    The Commission's Orders Concerning Predictive Dialers
            Create Significant Confusion ................................................ 7

        2.    Wireless Communications Become Commonplace .................. 8

    C.    TCPA Litigation Explodes ................................................................ 10

    D.    The Commission's Order ................................................................. 11

STANDARD OF REVIEW ............................................................................. 14

SUMMARY OF ARGUMENT ......................................................................... 14

STANDING ................................................................................................. 18

ARGUMENT ............................................................................................... 21

I.    THE COMMISSION'S INTERPRETATION OF ATDS IS
    UNLAWFUL .......................................................................................... 21

    A.    An ATDS Must Have the Present Ability To Generate Random
        or Sequential Numbers and To Dial Such Numbers
        Automatically ................................................................................. 22

**Supp. App. 037**

## TABLE OF CONTENTS
### (continued)

Page

    1.    "Capacity" refers to equipment's present abilities ..................22

    2.    An ATDS must be able to automatically generate and dial random or sequential numbers ...........................31

B.    The Commission's Vague, Self-Contradictory Interpretation Violates the APA and Due Process ....................................34

    1.    The Commission must interpret the TCPA coherently............34

    2.    The Commission's interpretation of "capacity" lacks a meaningful limiting principle ..................................35

    3.    The Commission contradicted itself in describing the functions of an ATDS ...........................................37

II.    THE ORDER'S PROVISIONS REGARDING REASSIGNED NUMBERS ARE UNLAWFUL ...........................................39

A.    The Commission Misinterpreted "Called Party" ...............41

    1.    The TCPA makes sense only if "called party" means "expected recipient"..................................................41

    2.    The Commission's interpretation of "called party" violates the First Amendment ..................................46

    3.    The Commission did not justify its interpretation of "called party" ..................................................47

B.    The Commission's One-Call Rule Exacerbates the Problems Created by Its Definition of "Called Party" ..................50

    1.    The one-call rule does not solve the problems created by the Commission's interpretation of "called party" ..............51

    2.    The Commission offered no plausible explanation of how its purported safe harbor solves the problem that it identified ..................................................53

III.    THE COMMISSION'S TREATMENT OF REVOCATION OF CONSENT IS UNLAWFUL..................................................54

A.    The Commission's Unworkable Revocation-of-Consent Regime Is Arbitrary and Capricious ..................................55

**Supp. App. 038**

**TABLE OF CONTENTS**
**(continued)**

Page

   B.   The Commission Improperly Prevented Callers and Recipients
       from Agreeing to Reasonable Means of Revocation .........................60

CONCLUSION .................................................................................................64

CIRCUIT RULE 32(a)(2) ATTESTATION

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

**Supp. App. 039**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Almay, Inc. v. Califano,*
  569 F.2d 674 (D.C. Cir. 1977)...........................................................55

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn,*
  418 F.3d 600 (6th Cir. 2005) ...........................................................46

*Am. Gas. Ass'n v. FERC,*
  593 F.3d 14 (D.C. Cir. 2010)...........................................................58

*Am. Library Ass'n v. FCC,*
  401 F.3d 489 (D.C. Cir. 2005)...........................................................19

*Ark. Dairy Co-op. Ass'n v. USDA,*
  573 F.3d 815 (D.C. Cir. 2009)...........................................................25

*Bell Atl. Tel. Cos. v. FCC,*
  24 F.3d 1441 (D.C. Cir. 1994)...........................................................47

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
  467 U.S. 837 (1984)...........................................................14, 25

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984)...........................................................26

*Cmty. for Creative Non-Violence v. Turner,*
  893 F.2d 1387 (D.C. Cir. 1990)...........................................................34, 36, 37

*Community-Service Broad. of Mid-Am., Inc. v. FCC,*
  593 F.2d 1102 (D.C. Cir. 1978)...........................................................27

*Competitive Telecommc'ns Ass'n v. FCC,*
  309 F.3d 8 (D.C. Cir. 2002)...........................................................54

**Supp. App. 040**

\* Authorities upon which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Cramer v. United States,*
   325 U.S. 1 (1945)..................................................................49

*Credit Alliance Corp. v. Campbell,*
   845 F.2d 725 (7th Cir. 1988) ............................................61

*De Los Santos v. Millward Brown, Inc.,*
   No. 13-80670-CV, 2014 WL 2938605 (S.D. Fla. June 30, 2014)...............25, 28

*Dominguez v. Yahoo, Inc.,*
   No. 14-1751, 2015 WL 6405811 (3d Cir. Oct. 23, 2015) ...............5, 6, 7, 31, 39

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
   485 U.S. 568 (1988)..................................................................25

*FCC v. AT&T, Inc.,*
   131 S. Ct. 1177 (2011).................................................................22

*FCC v. Fox Television Stations, Inc.,*
   132 S. Ct. 2307 (2012).................................................................34

*Gager v. Dell Fin. Servs., LLC,*
   727 F.3d 265 (3d Cir. 2013) .........................................................61

*Gaza v. LTD Fin. Servs.,*
   No. 8:14-cv-1012, 2015 WL 5009741 (M.D. Fla. Aug. 24, 2015) ...................39

*Gensel v. Performant Techs., Inc.,*
   No. 13-C-1196, 2015 WL 402840 (E.D. Wis. Jan. 28, 2015).....................11, 44

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974)..................................................................46

*Gragg v. Orange Cab Co., Inc.,*
   995 F. Supp. 2d 1189 (W.D. Wash. 2014) .........................................25

**Supp. App. 041**

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
    134 S. Ct. 604 (2013) ................................................................. 63

*Hunt v. 21st Mortg. Corp.*,
    No. 2:12-CV-2697, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013) ................. 25

*Illinois v. Rodriguez*,
    497 U.S. 177 (1990) ................................................................. 49

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
    847 F. Supp. 2d 1253 (S.D. Cal. 2012) ............................................. 29

*Initiative & Referendum Institute v. U.S. Postal Service*,
    417 F.3d 1299 (D.C. Cir. 2005) ............................................. 26, 27, 28

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) ..................................................... 34, 38

*Judulang v. Holder*,
    132 S. Ct. 476 (2011) ............................................................... 54

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ................................................................... 32

*Marks v. Crunch San Diego, LLC*,
    55 F. Supp. 3d 1288 (S.D. Cal. 2014) ............................................. 25

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................. 18

*Mfrs. Ry. Co. v. Surface Transp. Bd.*,
    676 F.3d 1094 (D.C. Cir. 2012) ..................................................... 34

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ..................................................... 60, 62

**Supp. App. 042**

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Morissette v. United States,*
    342 U.S. 246 (1952)....................................................................61

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983)................................................................14, 58

*N.Y. State Elec. & Gas Corp. v. Sec'y of Labor,*
    88 F.3d 98 (2d Cir. 1996) ............................................................55

*NLRB v. Rockaway News Supply Co.,*
    345 U.S. 71 (1953)......................................................................63

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) (per curiam)............................51, 53

*Osorio v. State Farm Bank, F.S.B.,*
    746 F.3d 1242 (11th Cir. 2014) .............................................47, 48, 61

*Reno v. ACLU,*
    521 U.S. 844 (1997)....................................................................46

*Sable Commc'ns v. FCC,*
    492 U.S. 115 (1989)....................................................................28

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) ......................................................31

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002)....................................................19

*Smith v. California,*
    361 U.S. 147 (1959)....................................................................46

*Soppet v. Enhanced Recovery Co., LLC,*
    679 F.3d 637 (7th Cir. 2012) ................................................47, 48

**Supp. App. 043**

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Specialty Equip. Mkt. Ass'n v. Ruckelshaus,*
    720 F.2d 124 (D.C. Cir. 1983) .................................................................57

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) ...........................................................................46

*Tripoli Rocketry Ass'n v. BATF,*
    437 F.3d 75 (D.C. Cir. 2006) ......................................................34, 36, 37

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) .................................................................................25

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ...............................................................................26

*United States v. Mezzanatto,*
    513 U.S. 196 (1995) ...............................................................................63

*United States v. Stevens,*
    559 U.S. 460 (2010) ...............................................................................31

*United States v. Wilson,*
    503 U.S. 329 (1992) ...............................................................................23

* *USPS v. Postal Regulatory Comm'n,*
    785 F.3d 740 (D.C. Cir. 2015) ...............................34, 35, 36, 37, 38

* *Util. Air Regulatory Grp. v. EPA,*
    134 S. Ct. 2427 (2014) ...................................................30, 41, 45, 50

*Video Software Dealers Ass'n v. Webster,*
    968 F.2d 684 (8th Cir. 1992) ..................................................................46

*Walter O. Boswell Mem. Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984) ...............................................................30

**Supp. App. 044**

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)...............................................................26

*Wedgewood Village Pharmacy v. DEA,*
  509 F.3d 541 (D.C. Cir. 2007).............................................55

**STATUTES**

5 U.S.C. § 706 ................................................................3, 14

12 U.S.C. § 1715z-13a(j) .........................................................23

12 U.S.C. § 2605(e) ...............................................................59

15 U.S.C. § 1666(a) ...............................................................59

15 U.S.C. § 1681s-2(a) ............................................................59

15 U.S.C. § 1692c(c) ..............................................................59

28 U.S.C. § 2342 ...................................................................3

28 U.S.C. § 2343 ...................................................................3

28 U.S.C. § 2344 ................................................................3, 4

42 U.S.C. § 300x-27(b) ...........................................................23

47 U.S.C. § 151 ....................................................................3

47 U.S.C. § 152 ....................................................................3

47 U.S.C. § 153 ....................................................................3

47 U.S.C. § 154 ....................................................................3

47 U.S.C. § 201 ....................................................................3

47 U.S.C. § 227 ....................................................................3

**Supp. App. 045**

## TABLE OF AUTHORITIES
### (continued)

Page(s)

\* 47 U.S.C. § 227(a) ............................................. 2, 5, 15, 21, 23, 24, 31, 32

47 U.S.C. § 227(b) ............................. 1, 5, 8, 14, 16, 20, 39, 42, 50, 59

47 U.S.C. § 227(c) ........................................................................24

47 U.S.C. § 227(d) ........................................................................50

47 U.S.C. § 227 note ...............................................................42, 45

47 U.S.C. § 402(a) .......................................................................3, 4

47 U.S.C. § 403 ...............................................................................3

47 U.S.C. § 405(a) ...........................................................................4

47 U.S.C. § 503(b) .........................................................................20

Bipartisan Budget Act of 2015, Public Law No. 114-74, 129 Stat. 584, § 301 .............................................................................................5

**OTHER AUTHORITIES**

47 C.F.R. § 1.4(b) ............................................................................4

*Black's Law Dictionary* 1004 (10th ed. 2014)........................................53

H.R. Rep. No. 102-317 (1991)...................................................6, 27

*Hearing Before the Subcomm. on Commc'ns of the S. Comm. on Commerce, Science, and Transp.*, 102d Cong. 45 (1991) ........................8

MacMillan Dictionary (2015) ........................................................23

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)......................23

New Oxford American Dictionary (1st ed. 2001) ................................32

Restatement (Second) of Contracts § 211 cmt. a (1981) .........................57

Supp. App. 046

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Restatement (Third) of Agency § 5.01, cmt. (c) (2006) ............................................61

S. Rep. No. 102-178 (1991) ...................................................................................6

**ADMINISTRATIVE MATERIALS**

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    7 FCC Rcd. 8752 (1992) .................................................................................6

*Implementation of Section 6002(B) of the Omnibus Budget*
    *Reconciliation Act of 1993,*
    10 FCC Rcd. 8844 (1995) ...............................................................................9

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    10 FCC Rcd. 12391 (1995) .............................................................................6

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    18 FCC Rcd. 14014 (2003) ....................................................................7, 8, 32

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    23 FCC Rcd. 559 (2008) .................................................................................8

*In re Rules and Regulations Implementing the Telephone Consumer*
    *Protection Act of 1991,*
    27 FCC Rcd. 15391 (2012) .............................................................................8

*Westfax, Inc. Petition for Consideration and Clarification,*
    30 FCC Rcd. 8620 (Consumer & Governmental Affairs Bur. 2015)...............41

**Supp. App. 047**

# GLOSSARY

| | |
|---|---|
| 2003 Order | Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003) |
| APA | Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* |
| ATDS | Automatic Telephone Dialing System, defined in 47 U.S.C. § 227(a)(1) |
| Order | Declaratory Ruling and Order, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7691 (2015) |
| O'Rielly Dissent | Statement of Commissioner Michael O'Rielly Dissenting in Part and Approving in Part, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) |
| Pai Dissent | Dissenting Statement of Commissioner Ajit Pai, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) |
| TCPA | Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394, codified at 47 U.S.C. § 227 |

**Supp. App. 048**

## INTRODUCTION

Every organization—schools, charities, political parties, small businesses, major corporations—must be able to reach people efficiently.  Organizations must be able to issue safety alerts, solicit political or charitable support, notify consumers of new products and services, make individuals aware of problems with their accounts, or just tell people their pizza is coming.  Those communications, which often occur by telephone or text message, are vital to contemporary society.

Congress has always recognized the importance of these communications. In the 1980s, however, a particular problem arose:  telemarketers began to use specialized dialing equipment that automatically generated and dialed thousands of random or sequential numbers, often to deliver unwanted prerecorded messages. That practice became especially troublesome when those aimless calls reached cellular phones, tying up entire wireless networks in a given area and forcing recipients to pay pricey per-minute charges.

In response, Congress in 1991 enacted the Telephone Consumer Protection Act (TCPA) to prohibit calls to cellular and certain specialized telephone lines made using an "automatic telephone dialing system" (ATDS) without the "prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  Congress defined an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator;

**Supp. App. 049**

- 1 -

and (B) to dial such numbers." *Id.* § 227(a)(1). Congress thus restricted calls from particularly defined equipment. It did not ban unsolicited calls generally, nor did it prohibit all computer-assisted dialing.

The Commission rewrote the TCPA in the Order under review. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015). *First*, the Order embraces an atextual and self-contradictory definition of ATDS that severely curtails a wide range of legitimate communications that Congress never sought to restrict. It asks whether equipment *could be modified* to have the ability to store or produce random or sequential numbers, or perhaps the ability to dial numbers randomly or sequentially, or perhaps the ability to dial telephone numbers without human intervention—rather than focusing on the *present ability* of equipment to perform *all* of the statutorily defined tasks. Contrary to the First Amendment and common sense, the Order threatens to turn even an ordinary smartphone into an ATDS.

*Second*, the Order imposes liability on callers who call or text numbers that were assigned to consenting customers but that, unbeknownst to the caller, were later reassigned to different users. This approach prevents callers from reasonably relying on their customers' consent. It makes an empty promise of Congress's assurance that callers may lawfully contact willing recipients, and it chills constitutionally protected expression.

**Supp. App. 050**

- 2 -

*Third*, the Order authorizes individuals to revoke consent by "any reasonable means" of their choosing. This degree of customization of revocation methods makes it all but impossible for callers to track and process revocations, leaving everyone (including consumers) worse off. Just as impermissibly, the Order prohibits callers and recipients from *agreeing* on a specific means of revocation by contract.

The Order jeopardizes desirable communications that Congress never intended to ban. And it will further encourage massive TCPA class actions seeking crippling statutory damages. Its unlawful provisions should be vacated.

## JURISDICTION

These are petitions for review of a final order of the Federal Communications Commission. The Commission had jurisdiction under 47 U.S.C. §§ 151-154, 201, 227, and 403. This Court has jurisdiction under 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342-2344, and 5 U.S.C. § 706. The Order was released on July 10, 2015, and the petitions—filed on July 10 (No. 15-1211), July 14 (Nos. 15-1218 and 15-1244), August 26 (No. 15-1290), September 1 (No. 15-1304); September 2 (No. 15-1306), September 4 (No. 15-1311), and September 8 (No. 15-

1314) of 2015—were timely filed within 60 days. *See* 47 U.S.C. §§ 402(a), 405(a); 28 U.S.C. § 2344; 47 C.F.R. § 1.4(b).[1]

## ISSUES

1.  Whether the Commission interpreted ATDS in a way that unlawfully turns on the equipment's potential rather than present abilities, nullifies the statutory random-or-sequential-number-generation requirement, and provides inadequate guidance to regulated parties.

2.  Whether the Commission unlawfully prevented callers from reasonably relying on the "prior express consent of the called party" by imposing liability for innocent calls to reassigned numbers.

3.  Whether the Commission unlawfully imposed an unworkable regime for handling revocation of consent.

## STATUTES AND REGULATIONS

The Addendum contains all applicable provisions.

---

[1] The Commission also published the Order in the *Federal Register* on October 9, 2015.  Out of abundance of caution, Petitioners Sirius XM and PACE filed protective petitions on November 23, 2015, as did Petitioners ExactTarget.com, salesforce.com, and ACA International on November 24, 2015.

**Supp. App. 052**

- 4 -

## STATEMENT OF THE CASE

### A.    Congress Enacts the TCPA To Restrict Particular Practices

In the TCPA, Congress imposed two basic restrictions on calls to emergency-service numbers, hospital rooms, wireless numbers, and other specialized lines. *First*, Congress banned calls to such numbers "using … an artificial or prerecorded voice" without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A); *see id.* § 227(b)(1)(B) (same for "residential telephone line[s]"). *Second*, Congress banned calls to specialized numbers using an ATDS—"equipment which has the capacity … (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers"—without such consent. *Id.* § 227(a)(1), (b)(1)(A). Congress created a private right of action with statutory damages of $500 per violation and $1,500 per willful or knowing violation. *Id.* § 227(b)(3).[2]

The ATDS provision targeted harmful practices that emerged in the 1980s. Then, "telemarketers typically used autodialing equipment that either called numbers in large sequential blocks or dialed random 10-digit strings." *Dominguez*

---

[2] The restrictions on ATDS and prerecorded calls do not apply to calls made "for emergency purposes" or (since November 2, 2015) to certain calls "made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(a)(1), (b)(1); Bipartisan Budget Act of 2015, Public Law No. 114-74, 129 Stat. 584, § 301.

**Supp. App. 053**

- 5 -

*v. Yahoo, Inc.*, No. 14-1751, 2015 WL 6405811, at *2 (3d Cir. Oct. 23, 2015).
Random dialing allowed callers to reach and tie up unlisted and specialized
numbers. *See* S. Rep. No. 102-178, at 2 (1991).  And sequential dialing allowed
callers to reach all such numbers in an area, creating a "potentially dangerous"
situation in which no outbound calls (including emergency calls) could be placed.
H.R. Rep. No. 102-317, at 10 (1991).

Accordingly, the Commission "initially interpreted the [TCPA] as
specifically targeting equipment that placed a high volume of calls by randomly or
sequentially generating the numbers to be dialed." *Dominguez*, 2015 WL
6405811, at *2.  In its first TCPA-related order, the Commission declared that
equipment with "speed dialing," "call forwarding," and "delayed message"
functions are not ATDSs, "because the numbers called are not generated in a
random or sequential fashion." *In re Rules and Regulations Implementing the
Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, ¶47 (1992).  It
later explained that the TCPA's ATDS provisions do not apply to calls "directed to
[a] specifically programmed contact number[]" rather than "to randomly or
sequentially generated numbers." *In re Rules and Regulations Implementing the
Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, ¶19 (1995).  For
fifteen years, the scope of the ATDS restriction remained settled.

**Supp. App. 054**

- 6 -

**B.    The Commission's Subsequent Orders Generate Significant Confusion as Wireless Communications Increase Dramatically**

Two developments—the Commission's further interpretation of the TCPA and the explosion of wireless communications—transformed the TCPA's narrow restriction of specific equipment into a high-stakes assault on legitimate, beneficial communications that Congress never meant to restrict.

**1.    The Commission's Orders Concerning Predictive Dialers Create Significant Confusion**

By the mid-2000s, the TCPA had largely achieved its goal of eliminating the use of random or sequential number generators. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶132 (2003) (2003 Order).  Computer-assisted dialing, however, remained useful for calling targeted lists of numbers. *Id.* Those lists were often fed into "predictive dialers," which use "algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and [an agent] will be available to take the call." *Id.* ¶8 n.31. Some predictive dialers could call only from lists; others could generate and dial random or sequential numbers. *Id.* ¶131.

Starting in 2003, the Commission concluded that some predictive dialers qualify as ATDSs, *id.* ¶133, but its orders were "hardly a model of clarity," *Dominguez*, 2015 WL 6405811, at *2.  The Commission quoted the random-or-

**Supp. App. 055**

sequential-number-generator requirement, 2003 Order ¶129, and suggested that

equipment does not lose the capacity to satisfy that requirement simply because it

is "paired with predictive dialing software and a database of numbers," *id.* ¶133.

But the Commission also suggested varied tests for liability: whether the

equipment can *dial* "at random, in sequential order, or from a database of numbers,"

*id.* ¶131; whether it can "store or produce telephone numbers," *id.* ¶¶132-33; and

whether it can "dial numbers without human intervention," *id.* at ¶132; *see also In*

*re Rules and Regulations Implementing the Telephone Consumer Protection Act of*

*1991*, 23 FCC Rcd. 559, ¶¶12-14 (2008); *In re Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd.

15391, ¶2 n.5 (2012). The Commission further concluded that text messages

qualify as "call[s]" under § 227(b)(1)(A). 2003 Order ¶165.

### 2. Wireless Communications Become Commonplace

The rise of wireless communications magnified the impact of these

confusing statements. The number of wireless subscribers had increased from only

six million in 1991 to 326 million in 2012. *See In re Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7689,

¶7 (2015) (Order); *Hearing Before the Subcomm. on Commc'ns of the S. Comm. on*

*Commerce, Science, and Transp.*, 102d Cong. 45 (1991) (statement of Thomas

Stroup). Moreover, although "fewer than three percent of adults" "were wireless-only" in 2003, "39 percent" were by 2013. Order ¶7.

The uses of wireless devices also changed significantly. In the early 1990s, cell phones were used almost exclusively for calls—and, given the price of sending and receiving calls, not too many. *See Implementation of Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 10 FCC Rcd. 8844 (1995), tbls. 3-4 (60-minutes-per-month plan cost $63 in 1991). Today, by contrast, many plans allow subscribers to make and receive unlimited calls and text messages.

Businesses and other organizations contact people through wireless calls and text messages to provide many useful services. Schools reduce truancy by alerting parents when children are absent. Fairfax Cty. Pub. Schs. Comments, 2 (Apr. 15, 2015).[3] Non-profit organizations provide safety alerts, appointment reminders, and schedule-change notifications. Nat'l Council of Nonprofits Comments, 3 (Sept. 24, 2014). Utilities notify customers that payments are due. Nat'l Rural Elec. Coop. Ass'n Comments, 2-3 (Nov. 17, 2014). And businesses engage in targeted outreach that looks nothing like random or sequential dialing. Sirius XM, for instance, calls car owners who have satellite-radio subscriptions to explain the

---

[3] Unless otherwise indicated, all cited agency record materials come from CG Docket No. 02-278.

**Supp. App. 057**

service and ask whether they wish to extend it. *See* Sirius XM Radio Inc. Ex Parte, 4 (May 18, 2015).

### C.     TCPA Litigation Explodes

Litigants seized on the confusion created by the Commission's orders—and the significant statutory penalties for violations—and filed numerous class-action lawsuits challenging communications that bear no resemblance to the practices that troubled Congress.  Between 2010 and 2014, TCPA lawsuits increased by more than 560 percent, *see* U.S. Chamber of Commerce *et al.* Letter, 2 (Feb. 2, 2015), with more than 2,000 filed in 2014 alone.  Statement of Commissioner Michael O'Rielly Dissenting in Part and Approving in Part, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, at 124 (2015) (O'Rielly Dissent).  These lawsuits target companies in almost every sector of the economy, threatening billions in statutory penalties.[4]  One law firm even created an app that lets plaintiffs and the firm "laugh all the way to the bank" by matching incoming calls to a database of callers and forwarding the information to the firm so it can file a class action.  http:// www.blockcallsgetcash.com; O'Rielly Dissent 131 n.36.

---

[4] *See, e.g., In re Capital One TCPA Litig.*, Dkt. No. 329 in MDL No. 2416, 1:12-cv-10064 (N.D. Ill.) (approving class settlement involving "approximately 1.9 billion phone calls" and *minimum* statutory damages of "$950 billion dollars").

Supp. App. 058

The prevalence of number reassignment also has increased litigation. About 37 million wireless numbers are reassigned every year. Dissenting Statement of Commissioner Ajit Pai, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, at 117 (2015) (Pai Dissent). Yet consenting subscribers do not always inform callers of the change. Callers may dial a number that they have every reason to believe belongs to a consenting recipient, but that has been transferred to someone else.

As the Order recognizes, callers cannot avoid this problem. The largest database of reassigned numbers includes only "80 percent of wireless … numbers," Order ¶86 n.301, so companies that take elaborate precautions may still accidentally reach reassigned numbers, *see* DIRECTV, LLC Comments, 6-10 (Mar. 10, 2014); Twitter, Inc. Comments, 9 (Apr. 22, 2015). Some plaintiffs have even refused to tell the caller about the reassignment—letting the call roll into an uninformative voicemail or answering without identifying themselves—and then sued over "unwanted" calls. *See* Pai Dissent 120; Rubio's Rest., Inc. Petition, 2-3 (Aug. 15, 2014); *Gensel v. Performant Techs., Inc.*, No. 13-C-1196, 2015 WL 402840, at *2 (E.D. Wis. Jan. 28, 2015).

### D.    The Commission's Order

Against this backdrop, 21 parties asked the Commission to clarify or revise its view of the TCPA. A divided Commission issued an Order addressing the

**Supp. App. 059**

statutory definition of ATDS, the handling of reassigned numbers, and the revocation of consent.

The Commission concluded that "the capacity of an [ATDS] is not limited" to what the equipment is capable of doing in its "current configuration[,] but also includes its potential functionalities," Order ¶16—that is, what it *could* do if modified, at least if those possible modifications are not too "theoretical" or "attenuated," *id.* ¶18. At one point, the Commission suggested that an ATDS must be able to "store or produce, and dial random or sequential numbers," but elsewhere it "reaffirm[ed]" its earlier orders and offered several different tests for the functions an ATDS must have the capacity to perform. *Id.* ¶10; *see also id.* ¶¶12-14.

The Order also addresses reassigned numbers. The Commission concluded that "called party" in the consent exception means the "current subscriber (or non-subscriber customary user of the phone)," not the "intended recipient of a call." *Id.* ¶72. A caller therefore faces liability if it tries to call a consenting customer but inadvertently reaches someone to whom the number has been reassigned. The Commission recognized "callers lack guaranteed methods to discover all reassignments immediately after they occur." *Id.* ¶85. To mitigate this "severe" result, *id.* ¶90 n. 312, the Commission allowed callers unaware of reassignment to make one liability-free call, *id.* ¶85. But regardless whether that call is answered

**Supp. App. 060**

or the caller otherwise has *any* reason to suspect a reassignment, callers (and their affiliates and subsidiaries) are strictly liable for all subsequent calls if, in fact, the number has been reassigned. *Id.* ¶¶85, 88, 95.

Finally, the Commission concluded that customers may revoke consent through any individualized means they choose, so long as that method is "reasonable" under the "totality of the facts and circumstances." *Id.* ¶¶55, 64 n.233. It also prohibited a caller from "limit[ing] the manner in which revocation may occur." *Id.* ¶47.

Commissioners Pai and O'Rielly dissented. Both recognized that every ATDS must be able "to store or produce telephone numbers to be called, using a random or sequential number generator." Pai Dissent 114; O'Rielly Dissent 129. They also explained that interpreting "capacity" to include "potential functionalities" both "dramatically depart[ed] from the ordinary use of the term," Pai Dissent 115, and could transform "every smartphone, tablet, [and] VoIP phone" into an ATDS. Pai Dissent 115; *accord* O'Rielly Dissent 128.

As to reassigned numbers, the dissenting Commissioners concluded that interpreting "called party" to mean "expected recipient" is "by far the best reading of the statute," Pai Dissent 118, and the only way to avoid unconstitutionally chilling "communications that consumers have expressly consented to receiv[e]," *id.* at 120; *accord* O'Rielly Dissent 134. They also explained that the

**Supp. App. 061**

Commission's one-call rule "demand[s] the impossible," Pai Dissent 121, because it is "absolutely ludicrous" to presume that one (perhaps unanswered) call or text makes the caller aware of the reassignment, O'Rielly Dissent 131.

Finally, the dissenters explained that the Commission's position on revocation inflicts unworkable burdens on callers. For instance, consumers could tell any retail salesperson that they want to revoke their consent, disregarding any centralized system established by the retailer for the orderly and effective intake and processing of such requests. Pai Dissent 123.

## STANDARD OF REVIEW

Agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory ... authority." 5 U.S.C. § 706(2). Under this standard, agency action is unlawful if it contradicts the governing statute, resolves statutory ambiguities unreasonably, fails to consider important aspects of the problem at hand, or adopts a solution contrary to the evidence. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

## SUMMARY OF ARGUMENT

I.    Anyone who calls wireless lines with an "automatic telephone dialing system" must have the consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii).

**Supp. App. 062**

- 14 -

An ATDS is "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such calls." *Id.* § 227(a)(1). Two questions follow: what does it mean for equipment to have the "capacity" to perform the functions of an ATDS, and what are those functions? The Commission's substantively mistaken and hopelessly vague answers must be set aside.

A.    "Capacity" refers to present ability—what equipment can do now, in its current configuration—not potential functionalities if modified. The Commission's interpretation contradicts the ordinary meaning, structure, and purposes of the TCPA. The Commission's interpretation also leads to absurd and unconstitutional results because virtually every kind of modern phone, including every smartphone and office phone, could be modified to generate random or sequential numbers.

The TCPA also addresses what functions any ATDS must be capable of performing. An ATDS must be able to (1) generate random or sequential numbers; (2) use the generator to store or produce numbers to be called; and (3) dial those numbers. Moreover, the ATDS must be able to perform these tasks automatically. The Order misinterprets the statute by suggesting that the mere ability to dial from any list of numbers suffices and that the equipment need not be able to work automatically.

**Supp. App. 063**

- 15 -

**B.**     The Commission's interpretations are also impermissibly vague and internally inconsistent.  The Commission concluded that "capacity" includes "potential functionalities" that could be created by modifying the equipment, at least where those potential functionalities are not too "attenuated" or "theoretical."  The Commission did not explain what that means other than to say that rotary phones are not ATDSs.  Callers remain in the dark about what modifications are *too* theoretical or attenuated to turn a modern-day phone into an ATDS.  Similarly, the Commission put forth self-contradictory descriptions of the functions that an ATDS must be able to perform—including suggesting that the ability to dial from any list of numbers (whether random or sequential or not) is, by itself, enough.  It is arbitrary and capricious for the Commission to force regulated parties to guess about the scope of its speech-restrictive regime.

**II.**     The Commission also made it impossible for callers to rely on consent they have received.  The TCPA protects automated and prerecorded calls made "with the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  The Commission interpreted "called party" to mean "the current subscriber" or "non-subscriber customary user of the phone," Order ¶72, rather than the call's expected recipient.  But this makes consent meaningless:  how is a caller to know, *before* placing a call to the number associated with a consenting consumer, that the number has changed or that somebody else will answer?

**Supp. App. 064**

- 16 -

**A.** In the context of the TCPA's consent exception, "called party" must mean the call's expected recipient. Callers that try to reach consenting individuals face a practical problem: as the Order recognizes, 100,000 wireless numbers are reassigned *daily*, but callers have no reliable means of tracking all of these reassignments. Interpreting "called party" to mean "expected recipient" is therefore necessary to give effect to the TCPA's protection of consensual calls. By contrast, interpreting "called party" to mean the phone's current subscriber or customary user renders this protection meaningless, and violates the First Amendment, by threatening strict liability for callers who unexpectedly reach someone other than the consenting consumer.

**B.** The Commission's "solution" of exempting the first call to a reassigned number does not fix the Order's defects. Calls often go unanswered, and texts unreturned. Imposing strict liability for all subsequent calls, *regardless* whether the first call gives the caller any reason to believe that the number has been reassigned, is arbitrary and capricious.

**III.** Finally, the Commission created an unworkable, unreasonable regime governing revocation of consent.

**A.** To ensure adequate recording and processing of revocations of consent, callers must be able to rely on uniform revocation procedures. The Commission could have allowed consumers to revoke consent without sabotaging

**Supp. App. 065**

- 17 -

the need for uniformity by, for example, prescribing standard revocation procedures. It instead allowed each consumer to use any means of revoking consent that is "reasonable" under the "totality of the facts and circumstances," and it prevented callers from relying on any sort of centralized process for handling such requests. This case-by-case approach is arbitrary and capricious because it ignores callers' needs for uniformity and undermines consumers' ability to have their requests processed.

**B.** At a minimum, the Commission unlawfully concluded that callers and consumers may not voluntarily agree on means of revocation. Under the TCPA's common-law backdrop, parties may agree upon means of notice, including for revocations of consent. And even if the TCPA allows consumers to revoke consent however they wish, nothing in the statute overcomes the strong presumption that statutory rights are waivable by contract.

## STANDING

"Only one of the petitioners needs to have standing to permit [this Court] to consider the petition for review." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). If a petitioner is "an object of the [agency] action (or forgone action) at issue—as is the case usually in review of a rulemaking and nearly always in review of an adjudication—there should be little question that the action or inaction has caused [it] injury, and that a judgment preventing or requiring the action will redress it."

**Supp. App. 066**

- 18 -

*Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Moreover, an association

has standing if there is a "substantial probability that the FCC's order will harm the

concrete and particularized interests of at least one of [its] members." *Am. Library*

*Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005).

Each Petitioner has standing. Petitioner Sirius XM, and members of

Petitioners ACA International, PACE, the Chamber, and the Consumer Bankers

Association, communicate with customers by telephone calls or text messages,

relying on equipment that the Order arguably treats as ATDSs. *See* Moore

Declaration ¶4, Add. 8 (Sirius XM); Sailors Declaration, Add. 9-10 (PACE

member CSG International); Brubaker Declaration, Add. 6 (PACE member

InfoCision, Inc.); ACA Int'l Ex Parte, 2-5 (May 9, 2014); U.S. Chamber of

Commerce and U.S. Chamber Institute for Legal Reform Ex Parte, 2, 6 (June 11,

2015); U.S. Chamber of Commerce, Am. Bankers Ass'n, *et al.* Ex Parte, 1 (Mar. 4,

2014); Consumer Bankers Ass'n Petition, 8-9 (Sept. 19, 2014); *see also* Sundgaard

Declaration, Add. 11 (explaining that Petitioner Portfolio Recovery Associates

owns and wishes to use computerized dialers). For example, PACE members

InfoCision, Inc. and CSG International, and ACA International member

AllianceOne Receivables Management, Inc., call customers using computerized

dialers. Brubaker Declaration, Add. 6; Sailors Declaration, Add. 9-10; ACA Int'l

May 9, 2014 Ex Parte at 3.

**Supp. App. 067**

For their part, Petitioners salesforce.com, ExactTarget, and Vibes Media provide their customers with technologies that the Order arguably treats as ATDSs. *See* ExactTarget, Inc. Comments, 2 (Aug. 8, 2014); salesforce.com, inc. and ExactTarget, Inc. Ex Parte, 1 (June 10, 2015); Vibes Media, LLC Ex Parte, 1 (June 10, 2015).

Because the Order took effect upon release, *see* Order ¶188, Petitioners or their members must either change their business practices or face the threat of liability for the use of this equipment, in either administrative enforcement actions, *see* 47 U.S.C. § 503(b)(1)(B), or private litigation, *see id.* § 227(b)(3).  Indeed, Petitioners or their members already face lawsuits in which plaintiffs rely on the Order.  *See In re Portfolio Recovery Assocs., LLC Telephone Consumer Protection Act (TCPA) Litig.*, No. 11-md-2295 (S.D. Cal.); *Hooker v. Sirius XM Radio Inc.*, No. 13-cv-00003 (E.D. Va.); *see also* Chamber June 11, 2015 Ex Parte at 3.

Separately, Petitioners or their members or customers also obtain and rely on consent to make calls arguably covered by the Commission's new interpretations. *See* Sailors Declaration ¶4, Add. 9 (PACE member CSG International); Brubaker Declaration ¶4, Add. 6 (PACE member InfoCision); *see also* salesforce.com & ExactTarget June 10, 2015 Ex Parte at 1; U.S. Chamber of Commerce and U.S. Chamber Institute for Legal Reform Comments, 3 (Apr. 6, 2015); Consumer Bankers Sept. 19, 2014 Petition, at 8; Vibes June 10, 2015 Ex Parte at 2-4; Moore

**Supp. App. 068**

- 20 -

Declaration ¶4, Add. 8 (Sirius XM). The Order's provisions on reassigned numbers and revocation of consent prevent Petitioners or their members or customers from relying on that consent. Again, Petitioners or their members or customers must choose between making calls and facing the threat of liability under the Order.

Petitioners also participated in the proceedings below. *See* Order Appendices B, D, F, G, K, L, N, R, U, & V; Sirius XM May 18, 2015 Ex Parte at 1; salesforce.com & ExactTarget June 10, 2015 Ex Parte at 1.

## ARGUMENT

## I. THE COMMISSION'S INTERPRETATION OF ATDS IS UNLAWFUL

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). This definition prompts two questions: what does it mean for equipment to have the "capacity" to perform the functions of an ATDS, and what are those functions? The Commission's answers misinterpret the TCPA, violate the Constitution, provide no guidance to regulated parties, and contradict themselves. They must be set aside.

A.    **An ATDS Must Have the Present Ability To Generate Random or Sequential Numbers and To Dial Such Numbers Automatically**

1.    **"Capacity" refers to equipment's present abilities**

Every relevant principle of statutory interpretation confirms that "capacity" refers to what equipment can do as is, not what it might be able to do if changed.

(a)    **Text and context confirm that "capacity" refers to what equipment can do in its unmodified state**

Congress did not define "capacity," so its "ordinary meaning" controls. *FCC v. AT&T, Inc.*, 131 S. Ct. 1177, 1182 (2011). In ordinary usage, "capacity" refers to present ability. Consider this sentence: "Lambeau Field has the capacity to seat 80,735 people." That means Lambeau can hold 80,735 people *now*—not that, although it actually seats only 75,735, it could be remodeled to accommodate 5,000 more. *See* Pai Dissent 115 & n.574. Similarly, one might say: "That program does not have the capacity to display pdfs, but it will after I install this update." If "capacity" included what the software might be rewritten to do, this sentence would make no sense. Although the program obviously *could have been* reprogrammed to open pdfs, it still lacked the capacity to do so when the speaker made the statement. Likewise, no one would say that a factory has the capacity to produce 1,000 widgets a day just because the company could add another 100-widget-per-day machine to its existing nine.

Dictionaries confirm this definition. "Capacity" is "the facility or power to produce, perform, or deploy," as in "a plan to double the factory's capacity."

**Supp. App. 070**

- 22 -

Merriam-Webster's Collegiate Dictionary 182 (11th ed. 2003); *see also* MacMillan Dictionary (2015) ("the ability to do something," as in "Her poor health limits her earning capacity."). These definitions refer to *present* ability. If "capacity" accounted for hypothetical modifications, it would make no sense to speak of "a plan to double the factory's capacity."

Congress's other references to "capacity" confirm this understanding. Congress has authorized certain housing loans, provided the house "contain[s] a heating system that ... has the capacity to maintain a minimum temperature ... of 65 degrees Fahrenheit ...." 12 U.S.C. § 1715z-13a(j)(3)(A). Residents would be left cold by the argument that, although the system could not currently warm the house, it might be reconfigured to do so. Congress has also required certain substance-abuse programs to preferentially refer qualifying pregnant women "to a treatment facility that has the capacity to provide treatment" to them. 42 U.S.C. § 300x-27(b)(2)(A)-(B). That obligation would not be discharged by sending a woman to a hospital that could acquire the bed needed to care for her but has not.

Moreover, "Congress' use of a verb tense is significant," *United States v. Wilson*, 503 U.S. 329, 333 (1992), and here Congress said that an ATDS "is" equipment that "has" the requisite capacity. 47 U.S.C. § 227(a)(1). "Had Congress wanted to define [ATDS] more broadly it could have done so by adding tenses and moods, defining it as 'equipment which has ... or could have the

capacity.'" Pai Dissent 115; *cf.* 47 U.S.C. § 227(c)(1)(A), (B) (requiring the Commission to "evaluate the categories of … entities that *would have the capacity*" to administer procedures for protecting residential subscribers' privacy rights (emphasis added)). That Congress chose not to do so confirms that the definition encompasses only *present* ability.

Finally, a "potential functionalities" test would sweep in "pretty much any calling device or software-enabled feature" because "[i]t's trivial to download an app, update software, or write a few lines of code that would modify" the device's software "to dial random or sequential numbers." Pai Dissent 115. As a result, a potential functionalities test would cover "every smartphone, tablet, [and] VoIP phone." *Id.* Indeed, that test "is so expansive that the [Commission] ha[d] to use a *rotary phone* as an example of a technology that would not be covered." O'Rielly Dissent 128 (emphasis added); *see* Order ¶18.

That cannot be right. *First*, it would nullify Congress's carefully worded requirement that an ATDS have the capacity "to store or produce telephone numbers to be called, *using a random or sequential number generator.*" 47 U.S.C. § 227(a)(1)(A) (emphasis added). If every software-enabled telephone were an ATDS, that requirement would have no real limiting effect. Congress could not have meant for the lone word "capacity" to "do the bulk of th[e] provision's work" while the phrase "using a random or sequential number generator," which accounts

for "half of [the provision's] text," "lie[s] dormant in all but the most unlikely situations." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

*Second*, the results of a "potential functionalities" test would be absurd. *See Ark. Dairy Co-op. Ass'n v. USDA*, 573 F.3d 815, 829 (D.C. Cir. 2009) (absurdity canon applies at *Chevron* step one). Congress could not have intended for its restrictions on ATDSs to require consent for text messages from a smartphone to arrange lunch with a friend, invite an acquaintance to a fundraiser, or remind a customer of a cable-installation appointment. In fact, before the Order, many federal courts interpreted "capacity" to mean "present ability" to avoid precisely this absurdity.[5]

### (b)    The TCPA would violate the First Amendment if "capacity" included "potential functionalities"

A "potential functionalities" test sweeps in so much speech that it violates the First Amendment. At the very least, it raises "serious constitutional questions" that warrant rejecting the Commission's interpretation. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 588 (1988).

---

[5] *See Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1291-92 (S.D. Cal. 2014); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1192-93 (W.D. Wash. 2014); *De Los Santos v. Millward Brown, Inc.*, No. 13-80670-CV, 2014 WL 2938605, at *6 (S.D. Fla. June 30, 2014); *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV-2697, 2013 WL 5230061, at *4 (N.D. Ala. Sept. 17, 2013).

**Supp. App. 073**

Regulations that target a particular medium of communication "often present serious First Amendment concerns," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659 (1994), "and so are always subject to at least some degree of heightened First Amendment scrutiny," *id.* at 640-41. Time, place, and manner restrictions on speech are also subject to heightened scrutiny. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). They must, among other things, be "narrowly tailored to serve a significant governmental interest." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

In keeping with these principles, a restriction must be limited to speech that *actually* causes the problem the Government seeks to solve, rather than include speech that *might* do so. For example, in *Initiative & Referendum Institute v. U.S. Postal Service*, 417 F.3d 1299 (D.C. Cir. 2005), this Court held that "the *potential*" for harassment by those collecting petition signatures outside post offices could not justify a categorical ban; the Government must "targe[t] and eliminat[e] no more than the exact source of the 'evil' it seeks to remedy." *Id.* at 1307.

Although the Commission never acknowledged the sweeping effects of its "potential functionalities" approach on speech or explained what interests it believes that approach serves, it claimed elsewhere in the Order that the ATDS restriction prevents the "nuisance, invasion of privacy, cost, and inconvenience that

**Supp. App. 074**

autodialed ... calls generate." Order ¶29. Those interests cannot justify the Commission's approach.

As an initial matter, courts scrutinizing speech restrictions must focus on the law's "actual purposes," "disallow[ing] after-the-fact rationalizations" that "were not actually considered by [Congress]." *Community-Service Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102, 1146 n.51 (D.C. Cir. 1978). The ATDS restriction's "actual purpose" was to prevent automated dialers from reaching unlisted specialized numbers by dialing *randomly* and from knocking specialized lines out of service by dialing *sequential* blocks of numbers. *See, e.g.*, H.R. Rep. No. 102-317, at 10 (1991). Had Congress's purpose been to prohibit all unsolicited, computer-assisted calls, Congress would have prohibited all unsolicited, computer-assisted calls. Instead, it restricted a particular kind of equipment. And had Congress been troubled by unwanted ATDS calls in general, it would have restricted them when made to residential landlines as well as specialized numbers.

Moreover, whatever the TCPA's actual purpose, the statute already brushes up against the First Amendment. Rather than prohibiting calls that are *in fact* autodialed, it restricts devices that have the present ability to autodial. This prophylaxis does not target the "exact source" of any problem. *Initiative & Referendum Inst.*, 417 F.3d at 1307.

**Supp. App. 075**

Regardless whether the TCPA as written violates the First Amendment, the Commission's prophylaxis-upon-prophylaxis certainly does. Its interpretation restricts the use of equipment that could be modified in such a way that it could have the ability to autodial. This interpretation is even further removed than the statute from any possible harm. If call recipients neither know nor care whether the caller's phone could have been used to autodial, they certainly neither know nor care whether the phone *could be modified* so that it could be used to autodial.

Finally, beyond being divorced from any legitimate interest, the Commission's test covers more speech than the Constitution allows. Threatening crushing liability for millions of everyday calls simply because they came from devices that *could* be modified so that they *might* be able to generate random or sequential numbers "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Id.* The Commission may not "burn the house to roast the pig." *Sable Commc'ns v. FCC*, 492 U.S. 115, 127 (1989).

Unsurprisingly, the United States and a number of federal courts have read "capacity" to refer to "present ability" to stave off these constitutional concerns. *See, e.g., Millward Brown, Inc.*, 2014 WL 2938605, at *64 (agreeing with the United States, in response to defendant's argument that the TCPA is unconstitutionally broad, that "'capacity' refers to 'present, not potential,

capacity'"); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262 (S.D. Cal. 2012) (adopting the Government's position that "capacity" does not capture "smartphones" or "personal computers"). This Court should do the same.

### (c)    The Commission provided no plausible response to these deficiencies

The Commission provided little support for its contrary interpretation. Regarding the text, it stated only that interpreting "capacity" "to include 'potential ability' is consistent with formal definitions of 'capacity,' one of which defines 'capacity' as 'the potential or suitability for holding, storing, or accommodating.'" Order ¶19 (citation omitted). That definition, however, supports Petitioners. To be sure, "capacity" includes a sense of potentiality:  a one-gallon bucket has the "capacity" to hold one gallon even when empty.  But that does not mean it "ha[s] the capacity to hold two gallons of water" just because it could be *modified* to do so.  Pai Dissent 114.

The Commission also asserted that a "present capacity test could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment"—which is generally programmed to call from lists but lacks the ability to generate random or sequential numbers—"would fit the statutory definition of an autodialer."  Order ¶20; *see also id.* ¶19 (claiming the interpretation is needed to "ensure that the restriction on autodialed calls [is not]

Supp. App. 077

- 29 -

circumvented"). This assertion only highlights the TCPA's *success* in restricting designated dialing equipment; "[i]f callers have abandoned that equipment, then the TCPA has accomplished the precise goal Congress set out for it." Pai Dissent 116. The Commission may not "update" the TCPA to cover different equipment: "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014). Moreover, the First Amendment does not tolerate prophylaxis-upon-prophylaxis under the guise of preventing circumvention. *See supra* 26-28.

Finally, the Commission stated that individual consumers "have [not] been sued based on typical use" of smartphones, and it suggested that such suits were unlikely because "friends, relatives, and companies with which consumers do business [do not] find those calls unwanted …." Order ¶21. But the Commission cannot fend off charges of absurdity by swapping in a "typical use" test for smartphones; agencies may not "bring varying interpretations of the statute to bear, depending on whether" they like the result. *Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984). Moreover, the Commission's view ignores reality. Lawyers and (other) profit-seekers have proven eager to exploit the Commission's overreaching before, *see supra* 10-11, and will likely do so again. Regardless, courts reject erroneous statutory interpretations even if no one

seeks to exploit them, and the First Amendment does not leave people at the

"mercy" of the Government's or a private litigant's "*noblesse oblige*." *United*

*States v. Stevens*, 559 U.S. 460, 480 (2010).

### 2.  An ATDS must be able to automatically generate and dial random or sequential numbers

The Commission's conflicting answers to the second question of statutory

interpretation—what functions ATDS equipment must be able to perform—are

also unlawful.

### (a)  Subsection 227(a)(1) demands that ATDS equipment be able to automatically perform three key tasks

Subsection 227(a)(1) defines ATDS to mean equipment that "has the

capacity … to store or produce telephone numbers, using a random or sequential

number generator; and … to dial such numbers." 47 U.S.C. § 227(a)(1). This

provision requires that an ATDS be able to do three things. *First*, the equipment

must be able to generate random or sequential numbers. Otherwise, it cannot do

anything "using a random or sequential number generator." *Id.* § 227(a)(1)(A).

*Second*, the equipment must be able either to store or to produce numbers to be

called by using that random or sequential number generator. *See Satterfield v.*

*Simon & Schuster, Inc.*, 569 F.3d 946, 950-51 (9th Cir. 2009); *Dominguez*, 2015

WL 6405811, at *3 n.1. *Third*, the equipment must be able to dial the numbers

that it stores or produces with a random or sequential number generator. The

**Supp. App. 079**

- 31 -

statutory text—"dial *such* numbers," 47 U.S.C. § 227(a)(1)(B) (emphasis added)—refers back to the stored or produced "telephone numbers to be called, using a random or sequential number generator," *id.* § 227(a)(1)(A).

The statute also requires that the equipment be capable of performing these functions *automatically*—without human intervention—as the Commission itself previously recognized. *See* 2003 Order ¶132. Subsection 227(a)(1) defines "*automatic* telephone dialing system," and the Court "cannot forget that [it] ultimately [is] determining the meaning of [that] term" when parsing subsections 227(a)(1)(A) and 227(a)(1)(B). *Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004). Because something "automatic" can "work[] by itself with little or no direct human control," The New Oxford American Dictionary (1st ed. 2001), an "automatic" telephone dialing system must be able to perform the requisite functions without human assistance.

### (b)    The Commission erred by suggesting that the ability to call from any list suffices

These statutory requirements make clear that an ATDS must be able to do more than dial numbers from a prepared list; it must be able to automatically generate and then dial *random* or *sequential* numbers. The Order blurs that line. It states, for example, that equipment need only be able "to store or produce telephone numbers," not just random or sequential ones. Order ¶12. Elsewhere, it states that what matters is whether the equipment "has the capacity to store or

**Supp. App. 080**

produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers*." *Id.* ¶16 (emphasis added). Still elsewhere, it states that "the basic function" of an ATDS is "to dial numbers without human intervention," without clarifying whether those numbers must be random or sequential. *Id.* ¶17.

All of these alternatives are wrong. Reading the statute to cover equipment with the simple ability "to store or produce telephone numbers" erases the phrase "using a random or sequential number generator." Reading the statute to bar equipment that can dial "at random, in sequential order, or from a database" transforms the definition's number-*generation* requirement into a method-of-dialing requirement. That result is doubly wrong: the definition's only reference to dialing ("dial such numbers") says nothing about the manner of dialing, and adding "from a database" to this imaginary method-of-dialing requirement supplants the definition's number-generation provision.

Finally, subjecting callers to liability whenever their equipment operates without human intervention, Order ¶17, is even further off the mark. If the Commission meant to suggest that the absence of human intervention *suffices* to make equipment an ATDS, it again removed the phrase "using a random or sequential number generator" from the statute. And if the Commission concluded that the absence of human intervention is not a *necessary* feature of an ATDS, it wrote "automatic" out of "automatic telephone dialing system."

**Supp. App. 081**

- 33 -

**B.    The Commission's Vague, Self-Contradictory Interpretation Violates the APA and Due Process**

The Commission's vague explanation of its "potential functionalities" test and internally inconsistent account of the functions an ATDS must be able to perform violate the APA and the Due Process Clause.

**1.    The Commission must interpret the TCPA coherently**

"[A]n agency's exercise of its statutory authority [must] be reasonable and reasonably explained." *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012). "[C]ryptic" explanations that "ha[ve] no content" or "offer[] no meaningful guidance" must be set aside. *USPS v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015); *see also, e.g., Tripoli Rocketry Ass'n v. BATF*, 437 F.3d 75, 81 (D.C. Cir. 2006).

Similarly, the Due Process Clause requires that the statute or regulatory scheme "give fair notice of conduct that is forbidden" and establish adequate standards to prevent "seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also Johnson v. United States*, 135 S. Ct. 2551, 2560 (2015) (while "[e]ach of [a provision's] uncertainties … may [have] be[en] tolerable in isolation, … their sum ma[de] a task … which at best could be only guesswork"). This requirement "applies with particular force in review of laws dealing with speech." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990).

**Supp. App. 082**

## 2.    The Commission's interpretation of "capacity" lacks a meaningful limiting principle

The Commission violated these requirements by adopting an impermissibly vague interpretation of "capacity" that "includes [equipment's] potential functionalities." Order ¶16. Recognizing that virtually anything can be turned into something else with enough effort, the Commission added that "there must be more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer' definition." *Id.* ¶18; *see also id.* (not "too attenuated"). The Commission's test, therefore, is this: equipment is an ATDS because of its "potential functionalities," unless that potential is merely "theoretical" or "attenuated."

This sheds zero light on the critical question callers face: how "theoretical" a modification is too theoretical, how "attenuated" a possibility is too attenuated? Indeed, the Commission admitted the limits of its "test," disclaiming any attempt to provide a standard "administrable industry-wide." *Id.* ¶17.

Applying the APA, this Court has regularly set aside similarly uninformative agency positions. For example, over an agency's assertion of deference, the court invalidated a test that turned on whether a change in mail-preparation requirements would "require mailers to alter a basic characteristic of a mailing in order ... to qualify" for the same rate they did before. *USPS*, 785 F.3d at 748. Like the Commission here, the agency indicated that one change (requiring more

*Supp. App. 083*

informative barcodes and electronic scheduling) was a "basic alteration," while another (requiring stacking of certain flat boxes) was not, but otherwise provided no guidance on the "basic alteration" standard's meaning. *Id.* This "d[id] not come close to satisfying the requirement of reasoned decisionmaking" because the standard "ha[d] no content" and "offer[ed] no meaningful guidance to the Postal Service or its customers on how to treat future changes to mail preparation requirements." *Id.* at 754; *see also Tripoli Rocketry Ass'n*, 437 F.3d at 81 (setting aside "much faster" standard under the APA because the agency "sa[id] nothing about what *kind* of differential makes one [rate] 'much faster' than another"). This Court has similarly held that the Due Process Clause prohibits speech restrictions that turn on ill-defined matters of degree, such as one requiring that speakers use "a conversational tone." *Turner*, 893 F.2d at 1394-95.

The Commission's sparse, contradictory examples make things worse. It said a "rotary-dial phone" does not qualify as an ATDS because the possibility of modification is "too attenuated." But predictive dialers qualify because they only "lack[] the necessary software" to perform the requisite functions. Order ¶16; *see also id.* ¶16 n.63 ("[S]oftware-controlled equipment is designed to be flexible, both in terms of features that can be activated or de-activated and in terms of features that can be added to the equipment's overall functionality").

By contrast, smartphones—which can be programmed to generate random or sequential numbers "through the use of an app or other software," *id.* ¶21—fall within a twilight zone. As software-controlled equipment, they would seem to be covered by the Commission's test. But the Commission equivocated, noting that no one "*ha[d] been sued* based on *typical use* of smartphone technology," and that it would "continue to monitor … private litigation[]" and "provide additional clarification as necessary." *Id.* (emphasis added).

These ambiguities reflect the emptiness of the Commission's test. They exonerate callers who dig up an antique rotary phone and dial by hand. But for real-world callers, who almost always use equipment that runs some piece of software, the Commission could not make up its mind about whether the hypothetical ability to modify that software renders the equipment an ATDS. Regulated parties cannot follow, so agencies cannot lawfully promulgate, such mush. *See USPS*, 785 F.3d at 756; *Tripoli Rocketry Ass'n*, 437 F.3d at 84; *Turner*, 893 F.2d at 1394-95.

### 3. The Commission contradicted itself in describing the functions of an ATDS

The Order also offers a contradictory account of the functions that an ATDS must be able to perform. As noted, the Commission suggested that an ATDS need only be able to dial from a list: it reiterated that equipment need only be able "to store or produce telephone numbers," Order ¶12, and it said that a predictive dialer

qualifies because, "when paired with certain software, [it] has the capacity to store

or produce numbers and dial those numbers at random, in sequential order, or from

a database." *Id.* ¶13. Neither definition comports with the statute, *see supra* 31-33,

and in any event they are not the same.

The Commission's discussion of human intervention puts the confusion on

full display. The Commission said that an ATDS's "basic functions" are "to dial

numbers without human intervention and to dial thousands of numbers in a short

period of time." *Id.* ¶17. It added that "[h]ow the human intervention element"

applies "is specific to each individual piece of equipment" and therefore requires

"a case-by-case determination." *Id.* Three paragraphs later, however, the

Commission "reject[ed] PACE's argument that the Commission should adopt a

'human intervention' test"—that is, make it an "element" for "case-by-case"

consideration—as inconsistent with the Commission's understanding of "capacity."

*Id.* ¶20.

These "incoherent" positions provide no "meaningful guidance" to callers.

*USPS*, 785 F.3d at 744, 754. Particularly when combined with the vagueness of

the potential-functionalities test, these contradictions make application of the

TCPA pure "guesswork." *Johnson*, 135 S. Ct. at 2560. Modern callers therefore

must secure consent (itself now an illusory defense, *see infra* 39-54), use a rotary

**Supp. App. 086**

- 38 -

phone, or not call at all. Both the APA and the Due Process Clause forbid the

Commission from putting callers to that impossible choice.[6]

*    *    *

For these reasons, the parts of the Order interpreting ATDS should be set

aside.

## II.    THE ORDER'S PROVISIONS REGARDING REASSIGNED NUMBERS ARE UNLAWFUL

The TCPA protects otherwise-prohibited calls if they are invited by the

recipient—that is, made "with the prior express consent of the called party." 47

U.S.C. § 227(b)(1)(A). The Commission misinterpreted this critical defense and

violated the First Amendment by interpreting "called party" to mean the called

phone number's "current subscriber or customary user," Order ¶73, rather than the

call's expected recipient. Thanks to the Commission, a caller now faces liability if

it tries to reach a consenting customer but inadvertently reaches someone else to

whom the customer's number has been reassigned.

---

[6] The Third Circuit has noted that the Order is "hardly a model of clarity," *Dominguez*, 2015 WL 6405811, at *2, and district courts have struggled to apply it, *see, e.g.*, *Gaza v. LTD Fin. Servs.*, No. 8:14-cv-1012, 2015 WL 5009741, at *4 (M.D. Fla. Aug. 24, 2015) (reading the Order to cover equipment that can randomly or sequentially generate numbers, predictive dialers, and perhaps all "dialing equipment").

**Supp. App. 087**

Every day, 100,000 cell phone numbers are reassigned to new users, and callers lack any reliable means of identifying every number that has been reassigned. If the "called party" is the reassigned number's new subscriber or customary user—rather than the previous one who consented to be called and whom the caller expects to reach—the threat of unpredictable and unavoidable TCPA liability will deter calls even to people who expressly consented to be contacted. The Commission's interpretation of "called party" would therefore nullify Congress's decision to *permit* consensual calls. That interpretation also violates the First Amendment by imposing strict liability for calls to reassigned numbers and thereby chilling calls to consenting recipients.

The Commission tried to cure these flaws by allowing callers a single call to a reassigned number before they (and their affiliates and subsidiaries) incur liability. But that call may not even hint that the number has been reassigned; a call may go unanswered, or a text message unreturned. The "solution" thus does not come close to solving the serious problem that the Commission identified with its interpretation of "called party." In fact, it only made the Order's approach to reassigned numbers *more* arbitrary by deeming callers to have "constructive knowledge" that a number has been reassigned *no matter what happens* as a result of the first call.

## A.    The Commission Misinterpreted "Called Party"

The natural meaning of "called party" is the expected recipient of the call. Suppose "[y]our uncle writes down his telephone number for you and asks you to give him a call," and then "you dial that number." Pai Dissent 118. It would make perfect sense to "say you are calling … [y]our uncle," and to refer to your uncle, the person "you expect to answer," as the "called party." *Id.* That would remain true even if "your uncle wrote down the wrong number," "he lost his phone and someone else answered it," someone else "actually pays for the service," or his number was reassigned. *Id.*; *see also Westfax, Inc. Petition for Consideration and Clarification*, 30 FCC Rcd. 8620, 8624 (Consumer & Governmental Affairs Bur. 2015) (interpreting "recipient" in § 227(b)(1)(C) to mean "the consumer for whom the fax's content is intended"). In fact, the statutory context demonstrates that "expected recipient" is the only plausible reading of the statute.

### 1.    The TCPA makes sense only if "called party" means "expected recipient"

Statutory provisions must be interpreted to fit with "the broader context of the statute": an agency's interpretation is unreasonable if it "produces a substantive effect" that is incompatible "with the design and structure of the statute as a whole." *Util. Air*, 134 S. Ct. at 2442. Here, Congress sought to balance "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade … in a way that protects the privacy of individuals and permits

**Supp. App. 089**

- 41 -

legitimate telemarketing practices." 47 U.S.C. § 227 note. That is why every kind of communication restricted by the TCPA is permissible with consent. *See* 47 U.S.C. § 227(b)(1)(A), (b)(1)(B), (b)(1)(C). And people consent to all kinds of calls or text messages—for example, instant updates when Amazon announces a sale, a school faces a snow delay, a credit card registers a high-dollar purchase, or Bryce Harper hits a home run.

The Commission's interpretation would gut Congress's protection of such consensual communications, thereby upending the balance Congress struck between protecting consumers and safeguarding beneficial calling practices. Each year, around 37 million wireless telephone numbers are reassigned from one subscriber to another—around 100,000 a day. Pai Dissent 117; O'Rielly Dissent 130. Those reassignments pose unavoidable problems for callers who want to contact consenting consumers. There is no reliable way to ascertain whether a given cell phone number has been reassigned, because no available database tracks all reassignments. As the Commission acknowledged, although there are "tools [that] help callers determine whether a number has been reassigned," they "will not in every case identify numbers that have been reassigned." Order ¶85. Even the database extolled by the Commission claims to include only "80 percent of wireless and hard-to-find phone numbers." *Id.* ¶86 n.301. The consequences of

liability for "only" the remaining 20 percent of reassignments—$500 or $1,500 a call—could still prove catastrophic.

No matter what a caller does, then, it cannot escape the probability that it will call reassigned numbers. DIRECTV, for instance, has gone to great lengths to avoid calling reassigned numbers. It requires customers to "maintain and promptly update" their contact information, and it provides a 24/7 toll-free number for them to do so. When handling changes to a customer's account, DIRECTV's representatives verify the customer's phone number, and automated programs carry any changes throughout DIRECTV's systems. And if a customer calls from an unrecognized number, DIRECTV's representative asks if the customer's number has changed. DIRECTV Mar. 10, 2014 Comments at 6-10. Despite these steps, DIRECTV faces multiple class-action lawsuits from individuals holding reassigned numbers, some of whom never even answered DIRECTV's call. *Id.* at 10-12. DIRECTV is not alone. *See, e.g.*, Abercrombie & Fitch Co. and Hollister Co. Ex Parte, 2 (May 13, 2015).

Some TCPA plaintiffs even *exploit* the reassignment of phone numbers. Rubio's Restaurant sent automated texts to consenting employees to alert them to potential food safety problems, but one employee lost his phone and his number was reassigned. The new holder never asked Rubio's to stop texting him and instead waited to receive hundreds of food safety alerts before suing Rubio's for

**Supp. App. 091**

$500,000. *See* Rubio's Aug. 14, 2014 Petition at 2-3; Pai Dissent 120. In another case, "[i]nstead of simply answering the phone and telling [the defendant] that she wasn't the person they were trying to reach," the plaintiff, "on the advice of counsel," "documented all the calls she received for a lengthy period of time" in a "transparent attempt to accumulate damages." *Gensel*, 2015 WL 402840, at *2. The Order tolerates and indeed encourages this abuse, because it expressly rules that even consumers who act in bad faith are entitled to collect penalties. Order ¶95.

Callers face an additional problem under the Order. Because it interprets "called party" to mean not just the "current subscriber" but also the "non-subscriber customary user" of a number, Order ¶73, a caller may call a number provided by the consenting subscriber, only to reach the phone's different customary user. Again, the caller has no way of discovering this information beforehand—how could it know if someone else primarily uses the number provided by a consenting customer? And what if there is more than one customary user of a number—whose choice controls? The Commission indicated that the consent of a customary user binds the subscriber if the caller accidentally reaches the subscriber, *see id.* ¶78, and the logic underlying that statement is that the subscriber's consent should bind the customary user as well, but the Order fails to make that clear. The Commission's approach is thus arbitrary and

capricious, because it still potentially exposes good-faith callers to unfair liability when they reach the customary user rather than the consenting subscriber, or when they reach a different customary user than the one who provided consent.

Interpreting "called party" to mean the new subscriber or customary user thus eviscerates the statute's consent exception. If every call risks triggering strict liability, callers will refrain from calling consenting consumers in the first place. *See, e.g.*, Nat'l Rural Elec. Coop. Ass'n Nov. 17, 2014 Comments at 6 (some rural utilities have shut down programs that involve contacting consenting customers "because of the risk of litigation" over reassigned numbers); Abercrombie and Hollister Co. May 13, 2015 Ex Parte at 4 (Abercrombie has curtailed texting to avoid reassigned-number liability). Suppressing these calls would defeat Congress's stated objective of "permit[ting] legitimate [calling] practices." 47 U.S.C. § 227 note.

By contrast, interpreting "called party" to mean "expected recipient" avoids these problems and "produces a substantive effect … compatible with" the statutory scheme. *Utility Air*, 134 S. Ct. at 2442. Under this interpretation, a caller who expects to reach a consenting person, but through no fault of its own reaches someone else, would still have made the call with the "prior express consent of the called party." This reading therefore protects the right of callers to make and consumers to receive consensual calls. Moreover, it adequately protects those who

**Supp. App. 093**

- 45 -

do *not* wish to be called. They need only "inform[] [the] caller that he has the wrong number"—by, for example, sending a STOP message or speaking to the operator—and any subsequent call will trigger TCPA liability. Pai Dissent 119.

### 2. The Commission's interpretation of "called party" violates the First Amendment

The First Amendment forbids not only laws that directly prohibit protected speech, but also laws that chill it. *E.g.*, *Reno v. ACLU*, 521 U.S. 844, 872 (1997). Laws that hold speakers strictly liable for the consequences of their speech transgress this limitation: they "have the collateral effect of inhibiting the freedom of expression, by making the individual … more reluctant to exercise it." *Smith v. California*, 361 U.S. 147, 151 (1959); *see, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (no strict defamation liability for speech on matters of public concern); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) (unwittingly participating in a permitless march); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690-91 (8th Cir. 1992) (selling violent videos to children). These principles are all the more significant when private parties as well as government officials may sue to enforce speech restrictions. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014).

The Commission's interpretation of "called party" violates the First Amendment. If callers cannot reliably discover reassignments, any caller that uses an ATDS or prerecorded message—pretty much everyone under the Commission's

**Supp. App. 094**

view, *see supra* 24-25—risks at least $500 in damages per call. These communications are often the only means for delivering desired, time-sensitive information to many people. Deterring these communications through strict liability violates the First Amendment, just as chilling news reports, video rentals, or protest marches does. At a minimum, interpreting "called party" to mean "current subscriber or customary user" raises "substantial constitutional questions," and the term should be interpreted to avoid them, *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445 (D.C. Cir. 1994).

### 3.    The Commission did not justify its interpretation of "called party"

The Commission's rationales for its interpretation of "called party" do not withstand scrutiny.

*First*, the Commission cited decisions stating that "caller intent" is not "relevant" to the consent exception. Order ¶78 (citing *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014)). These decisions predated the Commission's record-based determination that, even using best practices, callers "will not in every case identify numbers that have been reassigned." Order ¶85. Indeed, they assumed that "[o]ther options remain" for callers to identify reassigned numbers. *Soppet*, 679 F.3d at 642. They also did not consider the First

**Supp. App. 095**

- 47 -

Amendment implications of interpreting "called party" to ignore the caller's good-faith expectations.

Moreover, the Commission itself parted ways with *Soppet* and *Osorio*, recognizing the relevance of a caller's expectation under a proper reading of the statute. It defined "called party" to include not just the current subscriber—that is, the person who pays the bills—but also "customary users," on the grounds that "it is reasonable for callers to rely on customary users" and "the caller … cannot reasonably be expected to divine that the consenting person is not the subscriber." Order ¶75. It also justified its one-call rule on the ground that after one call, the caller will have "actual" or "constructive" knowledge of the reassignment. *Id.* ¶¶90-91 & n.312. By accepting that liability should attach only if the caller knows of the reassignment, either in reality or by presumption, the Commission recognized that the caller's expectations matter.

*Second*, the Commission claimed that proving TCPA violations might be too difficult under an "expected recipient" approach because evidence for that "subjective standard" may lie in the "control of the caller." *Id.* ¶78. But the Commission could easily have avoided this problem by using an *objective* "expected recipient" approach, asking what a caller would reasonably expect rather than what the caller in fact expected. That approach would also protect consumers by forcing businesses to take reasonable steps to keep customer information up to

date; otherwise, callers cannot "reasonably expect" to reach a particular person when calling. Even under a *subjective* "expected recipient" approach, moreover, the Commission's concerns are overstated. Because courts routinely infer subjective states of mind from objective circumstances, *see, e.g., Cramer v. United States*, 325 U.S. 1, 33 (1945), courts would have little trouble determining caller intent from business records, consumer testimony, and common sense. *See* Wells Fargo Ex Parte, Exhibit 7 (Jan. 26, 2015) (detailing ways intent can be determined objectively).

*Third*, the Commission stated that "the consent of one party cannot be binding on another." Order ¶78. But that principle is hardly absolute. *Cf., e.g., Illinois v. Rodriguez*, 497 U.S. 177 (1990) (police may conduct a search after receiving consent from a person who reasonably appears to, but does not in fact, have authority over the premises). Even the Commission agrees in some contexts, acknowledging that "the consent of a customary user … *may* bind the subscriber." Order ¶78 (emphasis added). Similarly, the Commission's one-call rule allows the previous subscriber's consent to bind the new subscriber for that call. *Id.* ¶90 n.312.

*Fourth*, the Commission claimed that the TCPA elsewhere uses "called party" to mean "subscriber." Order ¶74. Yet "the presumption of consistent usage readily yields to context, and a statutory term … may take on distinct characters

**Supp. App. 097**

- 49 -

from association with distinct statutory objects." *Utility Air*, 134 S. Ct. at 2441-42.

The TCPA uses "called party" differently in different provisions. For example,

"called party" in subsection 227(d)(3)(B) must refer to the person who picks up the

phone; it discusses what happens when "the called party has hung up." Elsewhere,

"called party" must refer to the subscriber because only the subscriber is

potentially "charged" for the call. 47 U.S.C. § 227(b)(2)(C). There is no obstacle,

then, to interpreting "called party" to mean "expected recipient" in the TCPA's

consent provision. Otherwise, callers cannot meaningfully use the consent

exception the statute establishes, nor can they exercise their constitutionally

protected right to contact those who wish to hear from them.

*Finally*, the Commission suggested that callers deal with its new approach to

reassigned numbers by making *more* calls: they could "remove doubt" through "a

single call ... to confirm identity." Order ¶84. Of course, because so many phones

qualify as ATDSs under the Order's logic, *see supra* 24-25, it may be impossible

to make even that call without risking liability. Moreover, it would be perverse to

read a consumer protection statute to "require companies to repeatedly and

frequently contact consumers" just to ask if their numbers have been reassigned.

United Healthcare Servs., Inc. Petition, 5 (Jan. 16, 2014).

### B.    The Commission's One-Call Rule Exacerbates the Problems Created by Its Definition of "Called Party"

The Commission acknowledged that reading "called party" to mean "current

**Supp. App. 098**

subscriber or customary user" creates the many problems discussed above: "no

one perfect solution exists to inform callers of reassignment," Order ¶88, so callers

will be liable under the Order for innocent calls to reassigned numbers.  Purporting

to mitigate the impossible demands imposed by its interpretation, the Commission

gave callers one liability-free call. Order ¶89.  But that approach does not solve

the problem, because it would arbitrarily impose liability for later calls *regardless*

whether the first call provides any reason to believe that the number has been

reassigned or that the caller has reached the wrong person.

### 1.    The one-call rule does not solve the problems created by the Commission's interpretation of "called party"

An agency that acknowledges a problem and sets out to address it must go

some meaningful distance toward solving it. *See North Carolina v. EPA*, 531 F.3d

896, 907 (D.C. Cir. 2008) (per curiam) (setting aside an EPA rule purportedly

designed to ensure that emissions from upwind states would not impede downwind

states' ability to comply with environmental standards because it did not "achiev[e]

something measurable toward [that] goal").

According to the Commission, the safe harbor "strikes the appropriate

balance" between caller and recipient by giving "the caller [the] opportunity to

take reasonable steps to discover reassignments and cease … calling before

liability attaches" without subjecting those holding reassigned numbers to

numerous mistaken calls.  Order ¶89; *see also id.* ¶¶91-92.  But the one-call rule

**Supp. App. 099**

does no such thing, and thus cannot salvage the Commission's interpretation of

"called party." That one call may reveal nothing about reassignment—the call may

go unanswered, ring busy, roll into an uninformative voicemail message, or

otherwise shed no light on the identity of the current subscriber. *See* Wells Fargo

Jan. 26, 2015 Ex Parte at 4. This is particularly true for text messages, whose

senders have no opportunity to speak with a person or listen to a voicemail

message, and often receive no response at all. O'Rielly Dissent 131. Even so, the

Commission concluded that the caller, its affiliates, and its subsidiaries are deemed

to have "constructive knowledge" that the number has been reassigned. Order ¶72

& n.261.

This leaves callers in an impossible situation. They cannot discover that the

subscriber has changed *before* the first call because even those who deploy all of

the "tools" the Commission discussed "may nevertheless not learn of reassignment."

*Id.* ¶88. And they might not learn of reassignment *during* that call because, as the

Commission again recognized, "a single call to a reassigned number will [not]

always be sufficient for callers to gain actual knowledge of the reassignment." *Id.*

¶90 n.312. Nor is there any way for callers to determine who the "non-subscriber

customary user" of a number is, since all available information relates to the actual

subscriber.

**Supp. App. 100**

The Commission's one-call-and-you're-out approach therefore does not "achiev[e] something measurable toward" the "goal" of solving the problem that the Commission identified. *North Carolina*, 531 F.3d at 907. Instead, it simply takes $500 off the potentially enormous bill that will result from the arbitrary and capricious liability the Order otherwise imposes.

**2.      The Commission offered no plausible explanation of how its purported safe harbor solves the problem that it identified**

The Commission tried a number of tactics to get around the fundamental practical problems created by its misinterpretation of "called party." For example, it deemed callers to have "constructive knowledge" of reassignment after just one call. Order ¶91. But that "is absolutely ludicrous." O'Rielly Dissent 131. "Constructive knowledge" is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Black's Law Dictionary* 1004 (10th ed. 2014). Imputing constructive knowledge— even though the Commission acknowledged that no amount of "reasonable care or diligence" can ensure that the caller is aware of a reassignment—makes the Order all the more arbitrary.

The Commission also attempted to justify its one-call rule by disclaiming, despite its earlier acknowledgments to the contrary, any obligation to make compliance with the TCPA possible. In the Commission's view, it could have

**Supp. App. 101**

- 53 -

adopted a "traditional strict-liability" or "zero call" approach, so callers cannot complain about the uselessness of its one-call rule. Order ¶90 & n.312.

But callers are not stuck with the Commission's we-could-have-hurt-you-worse approach. The Commission cannot impose strict liability on innocent callers without violating the First Amendment. *See supra* 46-47. Moreover, even where an agency has discretion to "limit" the relief it provides, it "must do so in some rational way," not by "flipping a coin." *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011); *see also, e.g.*, *Competitive Telecommc'ns Ass'n v. FCC*, 309 F.3d 8, 16-17 (D.C. Cir. 2002) (applying arbitrary and capricious review to the scope of a safe harbor). The Commission cannot limit its "solution" to the acknowledged problem of reassigned numbers to a useless one-call "safe harbor" any more than it could "solve" that problem by creating a "no TCPA liability on Thursdays" rule.

*         *         *

The Commission misinterpreted the term "called party" and set forth an arbitrary solution to the problem of reassigned numbers. This Court should therefore vacate these parts of the Order.

## III.    THE COMMISSION'S TREATMENT OF REVOCATION OF CONSENT IS UNLAWFUL

The Commission concluded that consumers who consent to prerecorded or ATDS-assisted calls may revoke that consent. Order ¶56. The Commission refused, however, to establish any standardized and workable method of revoking

consent, instead allowing individuals to use whichever methods they prefer, so

long as the Commission or a jury later concludes it was "reasonable" under "the

totality of the facts and circumstances." *Id.* ¶64 & n.233. This every-individual-is-

a-law-unto-himself approach is arbitrary and capricious. Making matters worse,

the Commission evidently prohibited callers and called parties from *agreeing* upon

a means of revocation. *Id.* ¶70. That rejection of private agreements has no

statutory basis.

### A.    The Commission's Unworkable Revocation-of-Consent Regime Is Arbitrary and Capricious

An agency's regulation is arbitrary and capricious if "compliance" with it

"would be unworkable." *Almay, Inc. v. Califano*, 569 F.2d 674, 682 (D.C. Cir.

1977); *see also Wedgewood Village Pharmacy v. DEA*, 509 F.3d 541, 552 (D.C.

Cir. 2007) (rejecting agency ruling as "unworkable for veterinary practice"); *N.Y.

State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 109 (2d Cir. 1996) (setting

aside safety standard because it imposed a "patently unworkable burden on

employers").

The Commission's revocation-of-consent regime violates this principle. The

Commission could have prescribed uniform revocation procedures, or allowed

parties to agree to reasonable standard processes for revocation. Instead, it allowed

each customer to revoke consent by any "reasonable" method as determined by the

"totality of the circumstances." That degree of individualization is impracticable

and deprives callers of the ability to craft efficient and reliable mechanisms for receiving and processing revocations.

Consider, for example, the problems the Commission's approach poses for those who send automated text messages to willing recipients. Before the Commission's Order, industry norms required marketers to inform customers that they can stop future text messages by replying with a keyword from a standardized list: "STOP, CANCEL, UNSUBSCRIBE, QUIT, END, and STOPALL." Vibes June 10, 2015 Ex Parte at 3. Per the Commission, however, a customer could claim freedom to use any nonstandard term, such as "no" or "halt" or "do not call." Because "technological barriers" preclude programming a system to recognize every way in which individuals might express their desire to revoke consent, *id.*, mobile marketers could determine which responses amount to revocations only through manual review, an utterly infeasible method that would eliminate every benefit of sending text messages *en masse*.

Other organizations face similar problems. Customers theoretically could tell the pizza-delivery guy that they no longer wish to receive promotional text messages. Or they could tell their cable installer that they no longer want to receive informational calls about outages. But organizations typically train only particular customer-service agents to deal with revocations of consent. Under the Commission's Order, just about every employee who might interact with a

**Supp. App. 104**

customer would have to receive training in "the nuances of customer consent for TCPA purposes." Pai Dissent 123. An organization cannot tell in advance whether a customer's interaction with a particular employee will later be deemed a "reasonable" medium for revoking consent, so the only way to ward off liability will be to take exorbitant precautions.

Finally, consider more broadly the problems the Order poses for most callers that use dialing technology. Callers use these technologies rather than manual dialing because they wish to reach large numbers of consumers efficiently. Organizations must standardize such exchanges to keep interactions manageable and lawful. *Cf.* Restatement (Second) of Contracts § 211 cmt. a (1981) (describing "standardization" as "essential" to any "system of mass ... distribution"). By disregarding this imperative for uniformity, the Commission imposed on callers the impracticable task of forecasting every possible scenario under which a means of revoking consent could be deemed "reasonable" under the "totality of the circumstances," putting procedures in place to handle each scenario, and training personnel on all of these procedures. The open-endedness of the Order's "reasonableness" standard only compounds these problems. *Cf. Specialty Equip. Mkt. Ass'n v. Ruckelshaus*, 720 F.2d 124, 139-40 (D.C. Cir. 1983) (a regulation requiring parts manufacturers to reimburse vehicle manufacturers for certain

**Supp. App. 105**

"reasonable expenses" was arbitrary and capricious, because the agency's failure to "flesh out these terms" threatened to "lead to costly, protracted disputes").

The Commission did not have to regulate this way. It overlooked proposals from a variety of commenters offering reasonable alternatives to its unworkable approach, such as requiring callers to designate a standard phone number or email address to which revocation requests should be addressed. *See* Santander Consumer USA, Inc. Comments, 3 (Nov. 17, 2014). Or it could have required automated text-messaging systems to recognize certain customer responses (such as "STOP") as revocations of consent. Or it could have required callers' customer-service lines to include an option (say, "press 7") for revoking consent. Rules like these would have allowed businesses to know what is required of them and to standardize their interactions with customers who want to revoke consent, while still protecting the rights of customers. It was arbitrary and capricious for the Commission not to address or adopt these reasonable proffered alternatives. *See Am. Gas. Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) ("[W]here parties raise reasonable alternatives, "reasoned decisionmaking requires considering those alternatives."); *see also State Farm*, 463 U.S. at 48.

In fact, the Commission adopted just such an approach elsewhere in its Order. It ruled that, when a financial institution or healthcare provider sends an automated text about certain types of financial or healthcare information, "the

exclusive means by which consumers may opt out of such messages" is "replying 'STOP.'" Order ¶¶138, 147. If standardized revocation procedures suffice to protect people who get messages from banks and hospitals, why not from school districts and small businesses?

Congress has adopted similar standardized notification procedures. Under the TCPA itself, for example, a fax user must make a "request not to send future unsolicited advertisements to a telephone facsimile machine" "to the telephone or facsimile number of the sender" or through another method of communication identified by the Commission. 47 U.S.C. § 227(b)(2)(E). Other statutes that operate alongside the TCPA and likewise govern business communications with consumers commonly provide standard notification provisions. The Fair Debt Collection Practices Act, for example, establishes a comprehensive regulatory scheme regarding consumer consent for collections calls—including by specifying the manner in which consent must be obtained and requiring that any individual who wishes to revoke such consent must do so in writing. *See* 15 U.S.C. § 1692c(c); *see also, e.g.*, 12 U.S.C. § 2605(e) (homebuyers must submit complaints about mortgages to addresses that mortgage servicers designate); 15 U.S.C. § 1666(a) (consumers seeking correction of credit billing mistakes must submit written notice to addresses that creditors designate); *id.* § 1681s-2(a)(8)(D)

**Supp. App. 107**

(consumers must submit disputes about credit reports to addresses that credit bureaus designate).

Although commenters raised these standardized revocation statutes with the Commission, *see, e.g.*, Santander Consumer USA Ex Parte, 2-5 (Aug. 11, 2014), the Commission failed to squarely address the issue. If the Commission decides to regulate permissible modes of revocation, notwithstanding the absence of any statutory requirement that it do so, it should at least act "consistent with other statutes that expressly address this issue." O'Reilly Dissent 136 & n.60.

The Commission's refusal to allow standardization imposes unworkable burdens on callers and ultimately harms consumers by depriving them of an effective method of revoking consent. Whatever benefits the Commission's approach might provide some consumers in the short run, that small benefit cannot outweigh the many harms the Order inflicts on callers and consumers themselves in the long run. *Cf. Michigan v. EPA*, 135 S. Ct. 2699, 2709 (2015) (regulations are not "appropriate" where their "costs are … disproportionate to the benefits").

## B.    The Commission Improperly Prevented Callers and Recipients from Agreeing to Reasonable Means of Revocation

The Commission's approach to revocation is also improper insofar as it precludes callers and consumers from agreeing to "an exclusive means to revoke." Order ¶63.

**Supp. App. 108**

The Commission's interpretation contradicts the common-law backdrop against which the TCPA was enacted. When Congress borrows a concept from the common law, it "presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette v. United States*, 342 U.S. 246, 263 (1952). In this case, "the TCPA's silence regarding the means of providing or revoking consent [indicates] that Congress sought to incorporate 'the common law concept of consent.'" *Osorio v. State Farm Bank, FSB*, 746 F.3d 1242, 1255 (11th Cir. 2014) (quoting *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013)). At common law, "[a]n explicit agreement among parties ... may prescribe a particular form that a [notification] must have to be effective." Restatement (Third) of Agency § 5.01, cmt. c (2006). For example, in *Credit Alliance Corp. v. Campbell*, 845 F.2d 725 (7th Cir. 1988), the Seventh Circuit held that a guarantor had not revoked consent to a guaranty because the method of revocation she used differed from the method she agreed to use. "Where the parties agree to a method for revoking," the Court explained, "that method should be followed." *Id.* at 729.

Because the TCPA "incorporate[s] 'the common law concept of consent,'" *Osorio*, 746 F.3d at 1255, and because that concept allows parties to agree on the means of revoking consent, the TCPA does too. That is why the Eleventh Circuit has already "conclude[d] that [consumers], *in the absence of any contractual restriction to the contrary*, [are] free to ... revoke any consent [under the TCPA]."

**Supp. App. 109**

*Id.* (emphasis added). Indeed, the Commission itself elsewhere recognized the parties' common-law right to bargain about TCPA-related details. In response to the problem of reassigned numbers, it suggested that callers should contractually require consumers to update their contact information and then sue them for breach if they fail to do so. *See* Order ¶¶47, 86.

The Commission's disregard of the common law is particularly unreasonable because the Commission expressly relied on the common law in concluding that consent is revocable in the first place. *See* Order ¶58 ("Congress intended for broad common law concepts of consent and revocation of consent to apply."). It is unprincipled and unreasonable for an agency to insist that the common law provides important context when deciding whether revocation of consent is permissible at all, but that the common law does not matter when deciding which methods of revocation parties must use. *Cf. Michigan*, 135 S. Ct. at 2708 (an agency interpreting a statutory provision may not simultaneously treat neighboring statutory provisions as relevant context for some purposes, but as irrelevant for others).

In any event, even assuming that the TCPA protects consumers' right to revoke consent in any way they like, consumers may—and often do—waive that right by contract. In the absence of "affirmative indication of Congress's intent to preclude waiver," courts "presum[e] that statutory provisions are subject to waiver

**Supp. App. 110**

by voluntary agreement of the parties." *United States v. Mezzanatto*, 513 U.S. 196,

201 (1995); *accord, e.g., Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 134 S. Ct.

604, 611 (2013) (upholding contractual waiver of rights under ERISA); *NLRB v.*

*Rockaway News Supply Co.*, 345 U.S. 71, 80 (1953) (same under the Labor

Management Relations Act). The TCPA includes no such "affirmative indication"

regarding revocation of consent. So even if the statute grants consumers a right to

use "any reasonable method" to revoke consent, they may still give up that right in

voluntary agreements with callers. It was unreasonable for the Commission to

conclude otherwise.

&ast;   &ast;   &ast;   &ast;   &ast;

The Order misinterprets "ATDS" to consider potential rather than present

ability, erases the random-or-sequential-number-generation requirement from the

statute, and ensnarls regulated parties in uncertain and contradictory tests. It

eviscerates the statutory consent defense and discourages protected speech by

holding callers strictly liable for calls to reassigned numbers. And it encumbers

callers with an unworkable system for processing revocations of consent, while

preventing callers and consumers from overcoming this problem by private

agreement. In short, the Commission's interpretation of the TCPA leads to a $500

pricetag on almost every routine call or text, transforming the statute's focused ban

on random or sequential calling into an expansive source of crippling class-action

liability.

## CONCLUSION

The petitions for review should be granted, and the challenged provisions of

the Order vacated.

Dated:  November 25, 2015

Respectfully submitted,

/s/ Shay Dvoretzky

Helgi C. Walker
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

Shay Dvoretzky
Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone:  (202) 879-3939
Email: sdvoretzky@jonesday.com

Kate Comerford Todd
Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Petitioners Sirius XM Radio*
*Inc. and Professional Association for*
*Customer Engagement, Inc.*

Michele Shuster
MAC MURRAY, PETERSEN & SHUSTER
LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone: (614) 939-9955

*Counsel for Petitioner the Chamber*
*of Commerce of the United States*
*of America*

*Counsel for Petitioner Professional*
*Association for Customer*
*Engagement, Inc.*

**Supp. App. 112**

Brian Melendez
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3903
Telephone: (612) 486-1589

*Counsel for Petitioner ACA
International*

Tonia Ouellette Klausner
Keith E. Eggleton
WILSON SONSINI GOODRICH &
  ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 497-7706

*Counsel for Petitioners salesforce.com,
inc. and ExactTarget, Inc.*

Monica S. Desai
Amy L. Brown
Jonathan Jacob Nadler
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

*Counsel for Petitioner Consumer
Bankers Association*

Christopher J. Wright
Jennifer P. Bagg
Elizabeth Austin Bonner
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300

*Counsel for Petitioner Vibes Media,
LLC*

Robert A. Long
Yaron Dori
Michael Beder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Petitioner Portfolio
Recovery Associates, LLC*

**Supp. App. 113**

## <u>CIRCUIT RULE 32(a)(2) ATTESTATION</u>

In accordance with D.C. Circuit Rule 32(a)(2), I hereby attest that all other

parties on whose behalf this brief is filed consent to its filing.

Dated:  November 25, 2015          /s/ Shay Dvoretzky
                                   Shay Dvoretzky

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's Order of October 13, 2015, because it contains 13,992 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1), as determined by the word-counting feature of Microsoft Word.

Dated: November 25, 2015          /s/ Shay Dvoretzky
                                  Shay Dvoretzky

ADDENDUM

No. 15-1211

## ACA INTERNATIONAL ET AL.,
*Petitioners,*

v.

## FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,
*Respondents*

_____

## CAVALRY PORTFOLIO SERVICES, LLC ET AL.,
*Intervenors for Petitioners*

_____

## PETITIONERS' ADDENDUM
## TABLE OF CONTENTS

Reproduction of Relevant Authorities:

47 U.S.C. § 227(a)(1) ...........................................................Add. 1

47 U.S.C. § 227(b) (2012) ....................................................Add. 1

42 U.S.C. § 227(d)(3)(B).......................................................Add. 3

26 U.S.C. § 227 note.............................................................Add. 3

Bipartisan Budget Act of 2015, § 301(a)...............................Add. 4

47 U.S.C. § 227(b) (as amended) .........................................Add. 5

Materials Related to Standing:

Declaration of Steven Brubaker ............................................Add. 6

Declaration of Michael Moore ..............................................Add. 7

Declaration of Brandon Sailors ............................................Add. 9

Declaration of Tara Sundgaard.............................................Add. 11

## 47 U.S.C. § 227(a)(1)

### (a) Definitions

As used in this section—

**(1)** The term "automatic telephone dialing system" means equipment which has the capacity—

  **(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and

  **(B)** to dial such numbers.

## 47 U.S.C. § 227(b) (2012)

### (b) Restrictions on use of automated telephone equipment

### (1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

  **(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

    **(i)** to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

    **(ii)** to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

    **(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

**(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

\*     \*     \*

**(D)** to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

## (2) Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

\*     \*     \*

**(C)** may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

\*     \*     \*

## (3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

**(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

**(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

**(C)** both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

## 47 U.S.C. § 227(d)(3)(B)

### (d) Technical and procedural standards

\*      \*      \*

### (3) Artificial or prerecorded voice systems

The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

\*      \*      \*

**(B)** any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

## 47 U.S.C. § 227 note

Pub. L. 102–243, § 2, Dec. 20, 1991, 105 Stat. 2394 , provided that: "The Congress finds that:

\*      \*      \*

**(4)** Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

**(5)** Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

\*      \*      \*

**(9)** Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

\*       \*       \*

### Bipartisan Budget Act of 2015, § 301(a)

## SEC. 301. DEBT COLLECTION IMPROVEMENTS.

(a) **IN GENERAL.**—Section 227(b) of the Communications Act of 1934 (47 U.S.C. 227(b)) is amended—

(1) in paragraph (1)—

(A) in subparagraph (A)(iii), by inserting '', unless such call is made solely to collect a debt owed to or guaranteed by the United States'' after ''charged for the call''; and

(B) in subparagraph (B), by inserting '', is made solely pursuant to the collection of a debt owed to or guaranteed by the United States,'' after ''purposes''; and

(2) in paragraph (2)—

(A) in subparagraph (F), by striking ''and'' at the end;

(B) in subparagraph (G), by striking the period at the end and inserting ''; and''; and

(C) by adding at the end the following: ''(H) may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States.''.

## 47 U.S.C. § 227(b) (as amended)

**(b) Restrictions on use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States-

**(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice-

\*    \*    \*

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

**(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

\*    \*    \*

| | |
|---|---|
| **PROFESSIONAL ASSOCIATION FOR CUSTOMER ENGAGEMENT, INC.,**<br><br>        Petitioner,<br><br>    v.<br><br>**FEDERAL COMMUNICATIONS COMMISSION,**<br><br>        Respondent. | **Case No. 15-01244** |

## DECLARATION OF Steven Brubaker

I, Steven Brubaker, hereby state and declare as follows:

1. My name is Steven Brubaker, and I currently serve as the Chief of Staff with InfoCision, Inc., and, as such, I am familiar with InfoCision, Inc.'s business operations.

2. InfoCision, Inc. is a member of the Professional Association for Customer Engagement, Inc.

3. As a part of its business, InfoCision, Inc. uses, and intends to continue to use, predictive dialers and other computerized dialers when placing calls to customers and potential customers.

4. InfoCision, Inc. in many cases obtains, and intend to continue to obtain, express consent from the recipients of these calls.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2015.

*Steven Brubaker*
_____
Steven Brubaker, Chief of Staff

**Supp. App. 123**

Add. 6

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **SIRIUS XM RADIO INC.,** | |
| **Petitioner,** | **Case No. 15-01218** |
| **v.** | |
| **FEDERAL COMMUNICATIONS COMMISSION,** | |
| **Respondent.** | |

## DECLARATION OF MICHAEL MOORE

I, Michael Moore, hereby state and declare as follows:

1. My name is Michael Moore, and I currently serve as the Vice President and General Manager, Care Operations, with Sirius XM Radio Inc. ("Sirius XM"), and, as such, I am familiar with Sirius XM's business operations.

2. As a part of its business, Sirius XM contracts with vendors to call customers with trial subscriptions to Sirius XM's satellite radio service, a service that begins with no charge as a feature of the vehicles they bought or leased. The calls discuss the service and its features and ask customers whether they wish to extend their subscriptions.

3. My understanding of the equipment used by vendors to call cell phones on Sirius XM's behalf rests on my long-term interactions (by phone and in person)

**Supp. App. 124**

Add. 7

with the vendors' representatives, on site visits, and on the expert reports of Ken Sponsler dated February 13, 2015 and March 27, 2015, in *Hooker v. Sirius XM Radio, Inc.*, No. 13-cv-00003 (E.D. Va.).

4. Although Sirius XM's vendors do not all use identical equipment, they have always used, and have advised us that they intend to continue to use, computer-assisted dialing systems when making calls to cellular phones. For example, they have used preview-dialing systems, which present information about a single consumer to an agent, who may then choose to dial the consumer's number by manually clicking the number (or the word "dial") on the screen. The phone line is opened, the number is dialed, and the agent remains on the line for the duration of the call. Once the agent ends the call, the preview-dialing system presents information about another consumer to the agent, who then repeats these manual steps to call that consumer. Sirius XM in many cases obtains, and intends to continue to obtain, consumers' express consent to be called using automated telephone dialing systems.

5. Sirius XM is now defending four putative class-action lawsuits from consumers whom Sirius XM's vendors called using preview-dialing technology. *See Knutson v. Sirius XM Radio, Inc.*, No. 12-cv-00418 (S.D. Cal.); *Trenz v. Sirius XM Radio, Inc.*, No. 15-cv-00044 (S.D. Cal.); *Elikman v. Sirius XM Radio, Inc.*, No. 15-cv-02093 (N.D. Ill.); *Hooker v. Sirius XM Radio, Inc.*, No. 13-cv-00003 (E.D. Va.).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on November 23, 2015.

Michael Moore

2

Add. 8

**Supp. App. 125**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **PROFESSIONAL ASSOCIATION FOR CUSTOMER ENGAGEMENT, INC.,** | Case No. 15-01244 |
| Petitioner, | |
| v. | |
| **FEDERAL COMMUNICATIONS COMMISSION,** | |
| Respondent. | |

## DECLARATION OF BRANDON SAILORS

I, Brandon Sailors, hereby state and declare as follows:

1. My name is Brandon Sailors, and I currently serve as the Director, Business Solution with CSG International, and, as such, I am familiar with CSG International's business operations.

2. CSG International is a member of the Professional Association for Customer Engagement, Inc.

3. As a part of its business, CSG International uses, and intends to continue to use, predictive dialers and other computerized dialers when placing calls to customers and potential customers.

4. CSG International in many cases obtains, and intends to continue to obtain, express consent from the recipients of these calls.

**Supp. App. 126**

Add. 9

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/20/2015.

Brandon Sailors

2

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| ACA International, | ) | |
| | ) | |
| Petitioner | ) | No. 15-1211 (consolidated with Nos. |
| v. | ) | 15-1218, 15-1244, 15-1290, 15-1306, |
| | ) | 15-1304, 15-1311, 15-1313, and 1314 |
| Federal Communications Commission | ) | |
| and United States | ) | |

### DECLARATION OF TARA SUNDGAARD

1.      My name is Tara Sundgaard.  I am employed by Portfolio Recovery Associates, LLC ("PRA") as its Senior Vice President of Operations, a position I have held since 2011.

2.      My duties and responsibilities as Senior Vice President of Operations include supervision of collection operations at PRA's several domestic call centers in Virginia, Tennessee, Alabama, Kansas, Nevada, and Texas.

4.      PRA owns four Avaya Proactive Contact dialers.  PRA's dialers do not have the capacity to store or produce telephone numbers using a random or sequential number generator. In fact, PRA's dialers have never had this functionality or capacity, and it would not make business sense for PRA to call random or sequential telephone numbers because PRA calls only people associated with PRA's accounts.

5.      Although PRA's dialers do not have the capacity to store or produce telephone numbers randomly or sequentially, PRA stopped using its dialers to call cellular telephone numbers due to lawsuits premised on the misinterpretation of the term "automatic telephone dialing system" in the Telephone Consumer Protection Act ("TCPA").

6.      PRA's ability to operate its business in a cost-efficient manner has been adversely affected by its inability to use dialers due to the continued misinterpretation of the TCPA, which the Federal Communications Commission ("FCC") reaffirmed and exacerbated in its recent Declaratory Ruling and Order, 30 FCC Rcd 7961 (2015).

7.      PRA would like to use its dialers again but cannot do so without risking ruinous liability in litigation unless the FCC's Declaratory Ruling and Order is corrected.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of November, 2015.

_Tara Sundgaard_
Tara Sundgaard

DC: 5902836-1

Add. 11

**Supp. App. 128**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2015, I electronically filed the

foregoing document with the Clerk of the United States Court of Appeals for the

District of Columbia Circuit by using the CM/ECF system, which will send

notification of the filing to all parties or their counsel of record.


/s/ Shay Dvoretzky
Shay Dvoretzky

**TAB 8**

UNITED STATES DISTRICT COURT          **STAYED**
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | |
|---|---|
| Case No.  **CV 15-9912-DMG (KSx)** | Date  June 14, 2016 |

| | |
|---|---|
| Title  *Matthew Adams v. Nationstar Mortgage LLC, et al.* | Page  1 of 3 |

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:  IN CHAMBERS - ORDER RE DEFENDANT'S MOTION TO STAY [20]**

**I.**
**PROCEDURAL BACKGROUND**

On December 28, 2015, Plaintiff Matthew Adams filed a complaint against Defendant Nationstar Mortgage LLC, for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, the Rosenthal Fair Debt Collection Practices Act, and the California Consumer Credit Reporting Agencies Act. [Doc. # 1.]  On April 29, 2016, Nationstar filed the instant motion to stay pending decisions from the United States Supreme Court and the United States Court of Appeals for the D.C. Circuit in *Spokeo, Inc. v. Robins*, 742 F.3d 409 (9th Cir. 2014), *cert granted*, 135 S. Ct. 1892 (U.S. Apr. 27, 2015) and *ACA International v. FCC*, No. 15-1211 (D.C. Cir.), respectively.

On May 16, 2016, the Supreme Court issued its decision in *Spokeo*. *See Spokeo, Inc. v. Robins*, No. 12-1339, 2016 WL 2842447 (S. Ct. 2016).  On June 3, 2016, Adams filed his opposition, and argued, in part, that the Supreme Court's decision does not support a stay in this case. [Doc. # 23.]  On June 10, 2016, Nationstar filed its reply. [Doc. # 24.]  Nationstar no longer seeks a stay pending a decision in *Spokeo*. Reply at 2-3.  Instead, it bases its Motion on the pending D.C. Circuit decision in *ACA International* concerning an appeal of Federal Communications Commission ("FCC") ruling.

For the reasons explained below, the Court **GRANTS** Nationstar's motion to stay.

**II.**
**FACTUAL BACKGROUND**

In April 2014, Adams alleges that Nationstar began persistently calling him in connection with outstanding mortgage payments owed by another person not party to this lawsuit. Compl. ¶ 26. According to Adams, Nationstar called him at least 50 times between April 2014 and July

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT                    **STAYED**
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.   **CV 15-9912-DMG (KSx)**                    Date   June 14, 2016

Title  *Matthew Adams v. Nationstar Mortgage LLC, et al.*                    Page   2 of 3

2015 in an attempt to collect mortgage payments. *Id.* Adams alleges that Nationstar placed the calls using an automatic telephone dialing system ("ATDS"). *Id.* ¶¶ 28-30. During a live conversation, Adams informed Nationstar that he had already been evicted from the home and that Nationstar needed to collect outstanding payments form the property's purchaser and not him. *Id.* ¶ 35. The calls to Adams ended in July 2015 when the purchaser paid the outstanding mortgage in full to Nationstar. *Id.* ¶ 39.

## III.
## DISCUSSION

### A.   Legal Standard

A district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, counsel, and litigants. *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 878 n. 6 (1998) (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936)); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (same). For this reason, a district court has discretion to stay proceedings pending before it. The Supreme Court has emphasized that "[a] stay is not a matter of right, even if irreparable injury might otherwise result" but "is instead an exercise of judicial discretion[.]" *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (internal citations and quotation marks omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (internal citations omitted).

In exercising its discretion, the court must weigh competing interests, including the possible damage which may ensue from a stay, the hardship or inequity a party may suffer if the case moves forward, and the "orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005).

### B.   *ACA International*

The issues pending before the D.C. Circuit are directly relevant to this case. In particular, it will address what type of equipment constitutes an ATDS. The TCPA defines ATDS as equipment "which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The issue before the D.C. Circuit is whether the FCC's treatment of the word "capacity" is arbitrary, capricious, or an abuse of discretion. *See* Joint Brief for Petitioners, *ACA International*, No. 15-1211 (D.C. Cir. Nov. 25, 2015), Doc. # 1585568. The FCC had ruled that equipment has sufficient capacity to qualify as an ATDS so long as it has the present or

---

**Supp. App. 131**

UNITED STATES DISTRICT COURT                    **STAYED**
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 15-9912-DMG (KSx)** | Date | June 14, 2016 |

| Title | *Matthew Adams v. Nationstar Mortgage LLC, et al.* | Page | 3 of 3 |

"potential" capacity to produce or store phone numbers using a random generator. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd 7961 (2015).

Because a successful TCPA claim requires Adams to prove that Nationstar contacted him using an ATDS, that term's definition directly implicates this action. Additionally, it is worth noting that the parties in ACA International completed briefing on February 24, 2016. *See ACA International*, No. 15-1211, Scheduling Order and Docket, Doc. ## 1577930 (scheduling order), 1600585-1600695 (final reply briefs filed). The Court thus finds minimal harm to Adams that would result from a stay as a decision by the D.C. Circuit may not be in the distant future. On the other hand, absent a stay, Nationstar may suffer injury from having to engage in discovery and motion practice amidst the uncertainty over the key ATDS term "capacity." Finally, a ruling in *ACA International* may simplify the questions of law and other issues in this action.

Accordingly, the Court exercises its prudential authority to stay the action pending the D.C. Circuit's ruling in *ACA International*. *See, e.g., Errington v. Time Warner Cable Inc.*, , 2016 WL 2930696, at *4 (C.D. Cal. May 18, 2016) (granting motion to stay in TCPA case in light of pending *ACA International* decision); *Fontes v. Time Warner Cable Inc.*, 2015 WL 9272790, at *2-4 (C.D. Cal. Dec. 17, 2015) (granting motion to stay pending *ACA International* and analyzing split within the FCC decision on appeal over the term "automatic telephone dialing system").

### III.
### CONCLUSION

In light of the foregoing, the Court **GRANTS** Nationstar's motion to stay pending the outcome in *ACA International*. The Court **VACATES** the June 24, 2016 hearing on the motion as well as the scheduling conference. The parties shall a joint status report within 15 days after the D.C. Circuit issues its ruling in *ACA International*, including updated proposed pretrial and trial dates, if appropriate. The Court **DENIES** Nationstar's request for judicial notice as moot—the Court did not rely upon those documents in reaching its decision. Adams' request to strike Nationstar's Reply is also **DENIED** as moot as the Court did not rely upon the assertions made in the Reply to which Adams objects.

**IT IS SO ORDERED.**

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |

**TAB 9**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GHASSAN SHAHIN and JAROSLAVA
SHAHIN,

     **Plaintiffs,**

v.                                   **Case No: 8:15-cv-2941-T-35EAJ**

SYNCHRONY FINANCIAL, ALLIED
INTERSTATE LLC, and CAVALRY SPV
I, LLC,

     **Defendants.**

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Defendants' Motion to Stay. (Dkt. 19)  In this action, Plaintiffs allege that Defendants violated federal and state consumer protection laws, including the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, by, *inter alia*, using an automatic telephone dialing system or an artificial or prerecorded voice to place telephone calls to their cellular telephones without their consent.  Defendants request that this case be stayed pending the outcome of two appellate cases: the United States Supreme Court's forthcoming decision in Spokeo, Inc. v. Robins, Case No. 13-1339, and the Circuit Court of Appeals for the District of Columbia's ruling in ACA International v. Federal Communications Commission, Case No. 15-1211.

A district court has the inherent discretionary authority to stay litigation pending the outcome of a related proceeding in another forum. CTI-Container Leasing Corp. v. Uiterwyk Corp., 685 F.2d 1284, 1288 (11th Cir. 1982). The Court's power to stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936); see also Gov't of the Virgin Islands v. Neadle, 861 F. Supp. 1054. 1055 (M.D. Fla. 1994) ("A district court has discretion to stay an action which duplicates one pending in another federal ... court.").

ACA International involves a challenge to the FCC's interpretation of the term "automatic telephone dialing system" and whether the FCC has expanded that definition beyond Congress' intent. (Dkt. 19 at 17-18) Spokeo will resolve a conflict between the circuit courts over "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute." Pet. for Writ of *Certiorari* in Spokeo, Inc. v. Robins, No. 13-1339, 2014 WL 1802228, at *i (U.S. May 1, 2014). In their Amended Complaint, Plaintiffs allege that Defendants used an automatic telephone dialing system to place calls to their cellular phones. They do not allege that they have suffered any actual harm, and appear to rely solely on the fact that Defendants violated the TCPA.

Thus, the Court believes that the rulings in ACA International and Spokeo may be outcome-determinative to this case. It notes that numerous other district courts have stayed TCPA cases in light of the pending appellate cases. See, e.g., Tel. Science Corp.

2

v. Hilton Grand Vacations Co., LLC, No. 6:15-cv-969-Orl-41DAB, 2015 WL 7444409, at

*3 (M.D. Fla. Nov. 20, 2015); Mackiewicz v. Nationstar Mortgage LLC, No. 6:15-CV-465-

Orl-18GJK (M.D. Fla. November 10, 2015); Duchene v. Westlake Servs., LLC, No. 2:13-

CV-01577, 2015 WL 5947669, at *1 (W.D. Pa. Oct. 13, 2015); Abante Rooter and

Plumbing v. OH Insurance Agency, No. 1:15-CV-09025 (N.D. Ill. November 17, 2015);

Eric B. Fromer Chiropractic, Inc. v. New York Life Ins. & Annuity Corp., No. 2:15-CV-

04767-AB-JC, 2015 WL 6579779, at *2 (C.D. Cal. Oct. 19, 2015); Salvatore v. Microbilt

Corp., No. 4:14-CV-01848-YK-MCC, 2015 WL 5008856 (M.D. Pa. Aug. 20, 2015); Hillson

v. Kelly Servs., Inc., No. 2:15-CV-10803-LJM-APP, 2015 WL 4488493 (E.D. Mich. July

15, 2015); Ramirez v. Trans Union, LLC, No. 12-CV-00632-JSC, 2015 WL 6159942 (N.D.

Cal. June 22, 2015); Larson v. Trans Union, LLC, No. 12-CV-05726-WHO, 2015 WL

3945052 (N.D. Cal. June 26, 2015); Syed v. M-I LLC, No. 1:14-CV-00742-WBS-BAM,

2015 WL 3630310 (E.D. Cal. May 29, 2015) (stipulation of the parties); Williams v.

Elephant Ins. Co., No. 1:15-CV- 00119-GBL-TCB, 2015 WL 3631691 (E.D. Va. May 27,

2015).

Furthermore, a review of the record suggests that the Parties will not be prejudiced

by a stay.  This case is in the early stages of litigation and in all likelihood, the stay will

not be lengthy.  ACA International has been fully briefed, and Spokeo will be decided

during the Supreme Court's current term, which means a decision in that case should be

rendered within the next three months.   A stay will conserve both the Parties' and judicial

resources and will help clarify any issues that remain for resolution.

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

3

1. Defendants' Motion to Stay (Dkt. 19) is **GRANTED**.  The case is **STAYED** pending the Supreme Court's decision in <u>Spokeo, Inc. v. Robins</u> and the Circuit Court of Appeals for the District of Columbia's ruling in <u>ACA International v. Federal Communications Commission</u>.

2. The Parties are **DIRECTED** that, within fourteen (14) days of the latter of the decisions in <u>Spokeo</u> and <u>ACA International</u>, they shall notify the Court of the ruling in that case, file a motion to reopen this case if necessary, file a motion to reinstate any terminated motion if necessary, and inform the Court whether and to what extent the rulings in those cases have affected their respective positions in this case.

3. The Clerk is **DIRECTED** to **TERMINATE** any pending motions in this case.

4. The Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, on this 12th day of April, 2016.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
All Counsel of Record
All *Pro Se* Parties

4

**Supp. App. 136**

**TAB 10**

# JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 15-2479 JGB (DTBx)** | Date | June 9, 2016 |
|---|---|---|---|

Title   ***Ross Small v. GE Capital, Inc.***

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   **Order GRANTING Defendant Synchrony Bank's Motion to Stay Case (Doc. No. 20) (IN CHAMBERS).**

Before the Court is Defendant Synchrony Bank's Motion to Stay Case ("Motion," Doc. No. 20). The Court finds the Motion appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers timely filed in support of and in opposition to the Motion, the Court GRANTS the Motion. The June 13, 2016 hearing is VACATED.

## I.  BACKGROUND

On December 4, 2015, Plaintiff Ross Small ("Plaintiff") filed a Complaint against defendant G.E. Capital, Inc., asserting claims under the Telephone Consumer Protection Act ("TCPA"). (Doc. No. 1.) On February 10, 2016, Plaintiff filed the operative First Amended Complaint ("FAC"), asserting TCPA claims against both G.E. Capital, Inc. and Synchrony Bank (collectively, "Defendants"). (Doc. No. 11.) The FAC's claims arise from allegations Defendants placed calls to Plaintiff's cellular phone using an "automatic telephone dialing system" without Plaintiff's prior express consent, in violation of 42 U.S.C. § 227 et seq.

On April 8, 2016, Synchrony Bank filed an Answer to the FAC.[1] (Doc. No. 17.)

On April 27, 2016, Synchrony Bank filed its Motion to Stay Case, requesting that this action be stayed pending rulings by the U.S. Supreme Court in Spokeo, Inc. v. Robins and by the U.S. Court of Appeals for the D.C. Circuit in ACA International v. Federal Communications

---

[1] Plaintiff has not served the FAC on G.E. Capital, Inc.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

**Supp. App. 137**

Commission. (Doc. No. 20.) In support, Synchrony Bank filed a Request for Judicial Notice of thirteen exhibits.[2] ("RJN," Doc. No. 21, 22.) On May 20, 2016, Plaintiff filed an Opposition to the Motion. (Doc. No. 29.) On May 27, 2016, Synchrony Bank filed a Reply. (Doc. No. 30.)

## II. LEGAL STANDARD

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. North American Co., 299 U.S. 248, 255 (1936); see also, Filtrol Corp. v. Kelleher, 467 F.2d 242, 244 (1972). The Court, therefore, may "find it . . . efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Leyva v. Certified Gorcers of Cal., Ltd., 593 F.2d 857, 863 (9th Cir. 1979). The rule applies to judicial proceedings and does not require the issues of such proceedings be necessarily controlling of the action before the Court. Id. at 863-864. A stay should not be granted unless it appears likely that the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims. Id.

## III. DISCUSSION

Synchrony Bank originally requested that this action be stayed pending rulings by the U.S. Supreme Court in Spokeo, Inc. v. Robins and the D.C. Circuit in ACA International v. Federal Communications Commission, No. 15-1211 (D.C. Cir. 2015). (Mot. at 1.) On May 16, 2016, while Synchrony Bank's Motion was pending, the U.S. Supreme Court issued a ruling in Spokeo. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016), as revised (May 24, 2016). Subsequently, in its Reply, Synchrony Bank contended it now only seeks a stay pending a ruling by the D.C. Circuit in ACA International. (Reply at 2-4.) The Court addresses the propriety of such a stay below.

---

[2] Pursuant to Federal Rule of Evidence 201, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). An adjudicative fact may be judicially noticed if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may take notice of federal and state judicial decisions. See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue") (internal citation omitted).

In its Request for Judicial Notice, Synchrony Bank asks the Court to take notice of various judicial decisions supporting its contentions. These decisions are proper subjects of judicial notice. See id. Accordingly, the Court GRANTS Synchrony Bank's Request for Judicial Notice.

---

**CIVIL MINUTES—GENERAL**              Initials of Deputy Clerk MG

**Supp. App. 138**

**A.     The Parties' Contentions**

Synchrony Bank contends a stay of this action is warranted pending the D.C. Circuit's ruling in ACA International. In ACA International, the D.C. Circuit is currently considering a challenge to the Federal Communications Commission's ("FCC") interpretation of the term "automatic telephone dialing system," as the term appears in the TCPA. (See Mot. at 1; RJN, Ex. A.) The TCPA defines an "automatic telephone dialing system" as "equipment which has the *capacity*—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). In a July 10, 2015 ruling, the FCC held that an autodialer that has the "future capacity" to store, generate, or dial random or sequential numbers through future changes in its hardware or software constitutes an "automatic telephone dialing system" under the TCPA. (See RJN Ex. M.) Hence, the FCC did not limit the definition of an "automatic telephone dialing system" under the TCPA to equipment having a "present capacity" to store, generate, or dial random or sequential numbers. (See id. ¶¶ 15-16.) One of the issues before the D.C. Circuit in ACA International is whether an "automatic telephone dialing system" under the TCPA encompasses equipment with a "future capacity," to store, generate, or dial random or sequential numbers, but not a "present capacity" to do so. (See RJN, Ex. A.) Synchrony Bank contends the ruling in ACA International will have an impact on Plaintiff's TCPA claims because its own dialer did not have a present capacity to store, generate, or dial random or sequential numbers at the time of the calls at issue in this action. (Mot. at 8.)

Synchrony Bank argues a stay of this action is warranted because the D.C. Circuit's ruling in ACA International could extinguish Plaintiff's claim or "dictate the scope of the issues and discovery needed in this case." (Mot. at 1.) In support, Synchrony Bank cites a number of district court decisions both inside and outside of the Central District that have granted stays of TCPA actions pending the D.C. Circuit's ruling in ACA International. (Id. at 3-4; RJN, Ex. A-M.) In addition, Synchrony Bank contends: (1) Plaintiff will not be prejudiced by a stay because ACA International has been fully briefed as of February 2016 and will soon be decided; (2) Synchrony Bank will suffer unnecessary litigation expenses if forced to litigate this case before the D.C. Circuit's ruling; and (3) the D.C. Circuit's ruling will directly relate to the issues in this action. (Mot. at 5-9.)

Plaintiff argues a stay is unwarranted on three grounds. First, Plaintiff argues it will "take the D.C. Circuit a substantial amount of time to consider and rule" on the challenge in ACA International and a stay pending a ruling would be indefinite. (Opp. at 4.) Second, Plaintiff argues neither party would suffer hardships if this action proceeds because of the early stage of the proceedings. (Id. at 7-8.) Lastly, Plaintiff contends a stay would not further the interests of judicial economy because "it would actually create a substantial burden on the resources of the Court to have a possible multi-year backlog of TCPA cases waiting in the wings." (Id. at 8-9.)

**Supp. App. 139**

**B.     Analysis**

The Court finds a stay is appropriate.  First, the ruling in <u>ACA International</u> will likely bear on whether Synchrony Bank's dialer at time of the calls at issue was an "automatic telephone dialing system," for purposes of the TCPA.  Consequently, further litigation absent a ruling may be unnecessary and will require both parties and the Court to spend substantial resources.  Second, as Synchrony Bank argues, briefing has been completed in <u>ACA International</u> as of February 2016 and a decision by the D.C. Circuit is forthcoming.  Although Plaintiff is correct that it is unclear when the D.C. Circuit will issue its ruling, numerous district courts within this district have stayed TCPA actions as early as December 2015 in anticipation of a ruling by the D.C. Circuit.  <u>See</u> <u>Errington v. Time Warner Cable Inc.</u>, No. CV 15-02196-RSWL (DTB), 2016 WL 2930696, at *4 (C.D. Cal. May 18, 2016); <u>Fontes v. Time Warner Cable Inc.</u>, No. CV 14-2060-CAS (CWX), 2015 WL 9272790 (C.D. Cal. Dec. 17, 2015).  Lastly, Plaintiff has not shown he will be prejudiced by a stay.  Given the absence of any prejudice to Plaintiff, the possibility the ruling may dispose of Plaintiff's claims against Synchrony Bank, and the advanced stage of the proceedings in <u>ACA International</u>, the Court finds it more efficient to stay this action pending a ruling by the D.C. Circuit in <u>ACA International</u>.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Synchrony Bank's Motion to Stay Case and STAYS this action pending a ruling by the D.C. Circuit in <u>ACA International v. Federal Communications Commission</u>, No. 15-1211 (D.C. Cir. 2015).  The parties shall jointly file a report with the Court every sixty days from the date of this Order regarding the status of the proceedings in <u>ACA International</u>.

The June 13, 2016 hearing is VACATED.

**IT IS SO ORDERED.**

**Supp. App. 140**