**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HENRY ESPEJO, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>SANTANDER CONSUMER USA INC., an Illinois corporation,<br><br>*Defendant.* | Case No.: 1:11-cv-08987<br><br>Honorable Charles P. Kocoras |
| FAYE LEVINS, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>SANTANDER CONSUMER USA INC., an Illinois corporation.<br><br>*Defendant.* | Case No.: 12-cv-09431<br><br>Honorable Charles P. Kocoras |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1
STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendant Santander Consumer USA, Inc. ("Santander") submits the following Response to plaintiffs Faye Levins and Henry Espejo (collectively "Plaintiffs") Local Rule 56.1(b)(3)(c) Statement of Additional Material Facts (*Espejo* Dkt. 197; *Bonner* Dkt. 125.) (Local Rule 56.1(a)(3).) All evidence cited in Santander's responses is to Santander's Appendix ("App.") (*Espejo* Dkt. 171; *Bonner* Dkt. 98), Santander's Supplemental Appendix ("Supp. App.") filed herewith, or to Plaintiffs' Appendix of Additional Summary Judgment Exhibits ("Pls.' Exhibit") (*Espejo* Dkt. 198; *Bonner* Dkt. 126.)

1.      The auto loan that Faye Levins obtained was subject to an interest rate of 24.99%. (SCUSA/B 00045 (Def.'s App 217).)

**RESPONSE:** Undisputed.

2.      Health problems and thyroid surgery, necessitating time off from her job as a customer service agent, made it difficult for Levins to keep current on her loan. (Faye Levins Deposition Transcript ("Levins Dep."), Pls.' Exhibit 1, at 60:7-61:6.)

**RESPONSE:** Santander does not dispute that Levins testified health problems precluded her from making payments on her loan. She also had other excuses for not paying her car loan on time, including separate incidents involving a tornado, a house fire and a change in employment. (Levins Dep. at 68:9-71:10 (Supp. App. 016-019).) Santander accommodated Levins' requests for payment extensions and "generally worked with [her]." (*Id.* at 62:22-63:13; 64:11-65:16 (Supp. App. 012-015).)

3.      On March 27, 2009, Levins called Santander from a cellular telephone number ending -6074 for the first time, promising to make a payment on her auto loan. (SCUSA/E 00034 (Def.'s App. 125).) The activity notes for the call show that a Santander agent designated the -6074 number "IVR1's Home" and that "no verifications were required for Faye Levins." (*Id.*)

**RESPONSE:** Undisputed. Santander further states that verifications only were required when an account was a certain number of days past due. (12/02/15 Nightengale Decl. at ¶ 9 (*Espejo* Dkt. 178-8, *Bonner* Dkt. 102-8).) Even though "no verifications were required" on March 27, 2009, the notes indicate that the agent did ask her on that call whether the 6074 number was a "home" number and whether it was a good number to contact her. (*See* Santander SOF 43-44.)

4.     "IVR" refers to Santander's interactive voice response system, which Santander uses to capture telephone numbers not previously associated with an account during inbound phone calls. (Wayne Nightengale Deposition Transcript ("Nightengale Dep."), Pls.' Exhibit 2, at 93:19-94:21.) The phone numbers are then added to the account as a new method of contact, and a Santander agent can label the number as "home," "cell," or one of several other designations selected from a dropdown menu. (Mark Nerios Deposition Transcript ("Nerios Dep."), Pls.' Exhibit 3, at 42:6-15).)

**RESPONSE:** Undisputed. Plaintiffs, however, provide an incomplete description of Santander's procedures with regard to "IVR" calls. Inbound callers use the IVR system for a number of tasks without ever speaking with an associate, such as to obtain a payoff quote or to use the pay-by-phone "Speed Pay" option, which is available through the IVR system. (06/10/16 Nightengale Decl. at ¶ 28 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4).) On such calls, the caller does not speak with an associate, and the number from which the customer is calling is not designated as "home," "cell" or any other designation. (06/10/16 Nightengale Decl. at ¶ 28 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4); 12/02/15 Nightengale Decl. at ¶ 20 (*Espejo* Dkt. 178-8, *Bonner* Dkt. 102-8).) A single phone number may also reside in several fields, such as the "Home" field and the "IVR1 Home" field, at the same time. (06/10/16 Nightengale Decl. at ¶ 30 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4).) In addition, when an inbound call from the customer is forwarded to an associate, the associate is trained to ask the caller to identify the type of number being called (*i.e.,* home, work or cell), and whether the number is a good number to reach the customer in the future. (*Id.* at ¶ 29). The associate then redesignates the number as "IVR-Home," "IVR-Cell" or "IVR-Work" to signify the type of telephone number and that Santander has permission to call it. (*Id.* at ¶ 7; Nerios Dep. at 37:22-40:6, 51:21-24 (App. 189-93).) If the caller indicates that he or

she does not want Santander to use the IVR number in the future, the associate enters a "do not call" code and Santander's software prevents outbound calls to that number. (06/10/2016 Nightengale Decl. ¶ 29 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4).)

5.    The word "verifications," or similar, in the activity notes column of Santander's call logs indicates that a consumer has confirmed that his or her contact information is correct. (*See id.* at 46:1-16)

**RESPONSE:** Santander objects that the cited testimony does not support the contention asserted. *Ashland Products, Inc. v. Truth Hardware Corp.*, No. 99-CV-5786, 2002 WL 31819027, at *2 n.1 (N.D. Ill. Dec. 12, 2002) (J. Darrah) ("The Court will not consider unsupported statements of fact. . .").

Undisputed that the phrase "verification was performed" in the activity notes signifies that a customer confirmed to the Santander associate that the customer's contact information is correct. (06/10/16 Nightengale Decl. at ¶ 18 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4).) By policy, Santander verifies contact information for customers pursuant to certain systematic verification rules and timing based on the number of days an account has been delinquent. (Nerios Dep. at 48:3-24 (Supp. App. 024), 51:7-52:8 (App. 193-94); 04/21/16 Nightengale Decl. at ¶ 5 (App. 002-03); 06/10/2016 Nightengale Decl. ¶ 17 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4).) References in the activity notes to "verifications" that concern such procedures indicate that the customer confirmed his or her contact information is correct. (06/10/2016 Nightengale Decl. ¶ 18 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4). *See e.g.*, SCUSA/B 00033(App. 124)(on August 12, 2009, "VERIFICATIONS WERE REQUIRED FOR FAYE LEVINS AND WERE COMPLETED") There are instances, however, in which the word "verification" appears in the activity notes but not in reference to a verification performed in accordance with these

procedures, such as, for example, when the notes indicate that a "verification" was *not* required. (Nerios Dep. at 46:1-16 (*Espejo* Dkt. 191-9, *Bonner* Dkt. 119-9); SCUSA/B 00034 (App. 125). *See e.g.*, on March 27, 2009, "NO VERIFICATIONS WERE REQUIRED FOR FAYE LEVINS")

6.      In the five-month period following her initial call to Santander, Levins received 19 calls from Santander on the -6074 number without her permission. (SCUSA/B 00033 (Def.'s App. 124).) The first of these calls to the -6074 number was placed on June 20, 2009. (*Id.*) The call logs do not denote that any "verifications" were performed during this time period.

**RESPONSE:** Santander objects the phrase "without her permission," and word "received," the which renders the asserted statement of fact false. The evidence cited does not support this assertion and, therefore, no response is required. *Shelton v. Wright*, No. 09-CV-6413, 2013 WL 212910, at *2 (N.D. Ill. Jan. 18, 2013) ("To the extent that Plaintiff fails to cite record evidence in support of her assertions, the Court disregards those responses as noncompliant with the Local Rules and deems Defendants' facts admitted.").

Levins seeks the inference that the absence of "verifications" indicates lack of consent, but she has not presented any evidence from which the Court could draw that conclusion. Further, it is undisputed that Santander has various other ways to demonstrate consent to call a customer on his or her cell phone besides a "verification" of that number. (*See, e.g.,* 06/10/16 Nightengale Decl. at ¶ 19 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4); 04/21/16 Nightengale Decl. at ¶ 17 (App. 006); 10/29/14 Nightengale Decl. at ¶ 18 (*Espejo* Dkt. 117 at 32.)

Santander does not dispute that: Santander made 19 calls to the 6074 number after March 27, 2009 and before August 11, 2009; the first call after March 27, 2009 to the 6074 number was on June 20, 2009; and the Levins' activity notes for that time period do not contain the word

"verification(s)." The activity notes for this period indicate that Levins did not answer any calls made to the 6074 number during this period.

      7.     On August 12, 2009, the activity notes indicate that "verifications were required for Faye Levins and were completed[,]" with respect to the -6074 number. (SCUSA/B 00033 (Def.'s App. 124).)

      **RESPONSE:** Undisputed.

      8.     On May 4, 2012, Santander placed its first phone call to Levins' cellular telephone number ending -9678. (SCUSA/B 00003 (Def.'s App. 094).) Santander called this number again on May 7, May 10, and May 14, 2012. (SCUSA/B 00002 (Def.'s App. 093).) The activity notes for these four calls do not indicate that this number was marked "IVR" or that any "verifications" were performed. (SCUSA/B 00002-00003 (Def.'s App. 093-94).) To the contrary, the activity notes for the May 7, 2012 call state that Levins "kept hollering" and hung up on a Santander agent. (SCUSA/B 00002 (Def.'s App. 093).) The activity notes for a May 10, 2012 call reflect that Levins was "upset because she keeps getting calls . . . and states this is harassing." (*Id.*)

      **RESPONSE:** Santander objects the phrase "[t]o the contrary," which renders the asserted statement of fact misleading, ambiguous, and argumentative. Further state that note for May 7, 2012 was as follows:

| Date | Time | Activity Code | Handled By | Shaw ID | Note |
|---|---|---|---|---|---|
| 5/7/2012 | 14:24 | POFF | Agent | BKEE | QUOTEDTONAME: FAYE LEVINS, QUOTEDTOTYPE: , QUOTEDTOPHONE: 2055869678, QUOTEDAMOUNT: $12,453.58, TOTAL INTERESTQUOTEGOODUNTIL: 5/21/2012 |
| 5/7/2012 | 14:24 | SYSF | Agent | BKEE | QUOTED TO      (1017) FAYE LEVINSBPM PROCESS     (0027) R |

| 5/7/2012 | 14:27 | OONR | Agent | BKEE | OB OTHER NO RESOLUTION DPD:53 MANUAL CALL OUTGOINGCALL TO (205) 586-9678 (FAYE LEVINS'S OTHER). SPOKE WITH FAYE LEVINS. ADVISED CUSTOMER OF NEXT DUEDATE DELINQUENCY REASON: CUSTOMER REFUSED INTENTION TO PAY:  OTHER FUTURE PAYMENT ARRANGEMENTS: NODEFINITE DATE RECORDING ID: 67327440  REVIEW DATE:5/10/2012 COLLECTOR NOTE CST KEPT HOLLERING, KEPT CUTTING ME OFF, SD GIVE HER TIME AND SHE WILL PAY OFF AND KEPT HOLLERING AND H/U |
|---|---|---|---|---|---|

(SCUSA/B 00002 (App. 093).) The note does not say anything "contrary" to Santander obtaining

consent (*e.g.*, note does not contain a do not call note). Subject to and without waiving the

objection, Santander does not otherwise dispute that statement of fact.

9.      The auto loan that Maria Espejo obtained was subject to an interest rate of 8.33%.

(Santander 0420 (Def.'s App. 214).)

**RESPONSE:** Undisputed.

10.      Medical expenses made it difficult for Maria Espejo to keep current on her loan.

(Maria Espejo Deposition Transcript ("Maria Dep."), Pls.' Exhibit 4, at 53:14-54:5.)

**RESPONSE:** Undisputed that Maria Espejo testified at her deposition that medical

expenses resulted in her being unable to make payments on her loan.

11.      On September 9, 2009, an inbound call was placed to Santander from the -1411

telephone number. (SCUSA/E 0801 (Def.'s App. 090).) The activity notes for this call show that

a Santander agent designated the -1411 number "IVR1's Home" and that "verifications were

required for Maria Espejo and were completed."

**RESPONSE:** Undisputed.

12.      However, Maria Espejo testified that the -1411 telephone number is not her

"home" number and that she never verified the -1411 number as an appropriate number at which

to contact her. (*See* Maria Dep., Pls.' Exhibit 4, at 29:22-30:6 (confirming number ending in -0537 as home telephone number), *id*. at 65:7-12 (identifying number ending in -1411 as belonging to husband Henry Espejo), *id*. at 59:7-18 ("Q: Do you recall that they also asked you if the [-1411] number was a good number to contact you at? A: They never asked me. Q: They never asked you once whether that was a good contact number? A: Right. Q: I should say, they never asked you at any time that that was a good contact number the [-1411] number; is that right? A: They never asked me if that was a good phone number.").)

      **RESPONSE:** Santander does not dispute that Maria Espejo testified as quoted.

      13.    Henry Espejo, the subscriber for the -1411 cellular telephone number and Maria Espejo's husband, never authorized Maria Espejo to use his cellular telephone or the -1411 number assigned to it. (*See* Henry Espejo Deposition Transcript, ("Henry Dep."), Pls.' Exhibit 5, at 66:5-7 (stating that Maria Espejo was not authorized to use -1411 number); 68:25-70:3 (identifying -1411 number as cellular telephone number for which he was sole customer).)

      **RESPONSE:** The evidence cited does not support the asserted statement of fact and, therefore, no response is required. *Blackhawk Molding Co. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 957 n.5 (N.D. Ill. 2006) ("Because [defendant] has failed to identify any contradictory evidence, the court strike's [defendant's] response and deems admitted the facts asserted" by plaintiff). Mr. Espejo answered "No" to the question "[h]ad you ever <u>allowed</u> your wife to use your cell phone." (H. Espejo Dep. at 66:5-7 (Pls.' Exhibit 5) (emphasis added).) He did not say she was not "authorized" to use the phone associated with the 1411 number.

      Further, Plaintiffs have stated it is "undisputed" that Maria Espejo used the 1411 number to call Santander on June 26, 2009, September 9, 2009, and October 27, 2009. (Pls.' Resp. to Def. Santander's Local Rule 56.1 Stmt. of Material Facts ("Pls.' Resp. to SOF") at 9, 10, and 12

(*Espejo* Dkt. 196, *Bonner* Dkt. 124).) Plaintiffs also assert that Maria Espejo answered a call by

Santander to the 1411 number on March 8, 2010, a call on which Henry Espejo undisputedly

talked with a Santander associate. (Pls.' Resp. to SOF at 20 (*Espejo* Dkt. 196, *Bonner* Dkt. 124).)

Such admissions cannot be reconciled with Mr. Espejo's claim to have not "allowed" his wife to

use the 1411 phone. *Mc. Flower v. Jiamet*, 349 F.3d 436, 454 (7th Cir. 2003) ("Belated

assertion[s]" irreconcilable with the facts do not create inconsistencies that require adjudication

by the trier of fact); *Stevenson v. Dart*, No. 09 C 2698, 2012 WL 987275, at *2 n.2 (N.D. Ill.

Mar. 22, 2012) (holding that "a party cannot create questions of fact . . . by belatedly issuing

contradictory statements that ameliorate or contradict prior sworn statements"). Additionally,

that Mr. Espejo claims he is the customer for the 1411 number does not mean his wife is not

authorized to use the phone. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110,

1123 (11th Cir. 2014) (holding wife's disclosure of husband's cell phone number on hospital

admission form was prior express consent to receive debt collection calls); *Gutierrez v. Barclays

Grp.*, No. 10CV1012 DMS (BGS), 2011 WL 579238, at *3 (S.D. Cal. Feb. 9, 2011) (holding

husband had "common authority" over his spouse's cellular telephone that enabled him to give

the credit card company prior express consent under the TCPA).

      14.    On November 4, 2009, during an inbound call to Santander placed from the -1411

number, Henry Espejo spoke to a Santander agent about his wife's loan for the first time.

(SCUSA/E 0800 (Def.'s App. 089) ("spoke with Henry" noted in activity notes).)

      **RESPONSE:** Santander objects the phrase "for the first time." The evidence cited does

not support the asserted statement of fact and, therefore, no response is required. *Ashland

Products, Inc.*, 2002 WL 31819027, at *2 n.1. The activity notes reflect that Henry Espejo spoke

to a Santander associate on October 27, 2009. (SCUSA/E 0800 (App. 089).) Undisputed that on

November 4, 2009, during an inbound call to Santander placed from the -1411 number, Henry

Espejo spoke to a Santander associate about his wife's loan. Further, the activity notes for the

November 4, 2009 call include an "OKTT HENRY ESPEJO" note, meaning Maria Espejo

authorized Santander to talk to "Henry Espejo" about her debt on that call. (04/21/16

Nightengale Decl. at ¶ 15 (App. 005).) The full set activity notes related to the November 4,

2009 call are as follows:

| Date | Time | Activity Code | Handled By | Shaw ID | Note |
|------|------|---------------|------------|---------|------|
| 11/4/2009 | 10:00 | SYSF | Agent | RSAM | PERMANENT NOTE (0109) OKTT HENRY ESPEJO |
| 11/4/2009 | 10:01 | SYSF | Agent | RSAM | MOBILE PHONE - APP (0582) xxxxxx1411BPM PROCESS (0027) R |
| 11/4/2009 | 10:01 | MOBL | Agent | RSAM | UPDATE CELL PHONE OR PAGE |
| 11/4/2009 | 10:04 | ICCS | Agent | RSAM | IB CUSTOMER SERVICE DPD:39 INCOMING CALL FROM (xxx) xxx-1411 (IVR1'S HOME) SPOKE WITH HENRY, SD BANKOF AMERICA HASNT COME OUT YET, ADV HIM TO CANCELTHAT BILL PAY AND MAKE PAYMENT VIA PHONE REVIEW DATE:11/6/2009 |

(SCUSA/E 0799-0800 (App. 088-089).)

15.     As Maria Espejo fell further behind on her payments, Santander began calling the

-1411 number on a regular basis, sometimes multiple times per day. (*See, e.g.*, SCUSA/E 0764

(Def.'s App. 053 (showing five calls placed to -1411 number on May 18 and 19, 2011);

SCUSA/E 0732 (showing four calls placed to -1411 number on March 26, 2012); SCUSA/E

0783 (Def.'s App. 072) (showing four calls placed to -1411 number on Aug. 30, 2010);

SCUSA/E 0798 (Def.'s App. 087) (showing two calls placed to -1411 number on Nov. 21,

2009).)

        **RESPONSE:** Undisputed.

16.     From 2009 through 2012, Henry Espejo received hundreds of calls from Santander on the -1411 telephone number. (SCUSA/E 0722-0802 (Def.'s App. 011-91).)

**RESPONSE:** Santander objects the word "received" which renders the asserted statement of fact misleading. The evidence cited does not support the asserted statement of fact and, therefore, no response is required. *Shelton*, 2013 WL 212910, at *2. Plaintiffs do not dispute that the cited activity notes for Maria Espejo reflect that Henry Espejo answered or spoke on only four calls from Santander to the 1411 number during the time period. (Pls.' Resp. to SOF at 20 (*Espejo* Dkt. 196, *Bonner* Dkt. 124).)

17.     Henry Espejo did not consent to receive calls at the -1411 number on November 4, 2009.  On an unknown date, Henry Espejo answered "yes" to the question "Is this a good number for you . . .?" (Henry Dep., Pls.' Exhibit 5, at 74:5-12.). In doing so, however, he only affirmed that the -1411 number was his phone number-not that Santander could call him on it:

> Q:     Do you remember counsel asking you a question about whether someone from Santander had said, Can we contact you on that number? Do you remember him asking you that?
> A:     Yes.
> Q:     Do you remember what you said to that?
> A:     No, they can't contact me on that number.  Two different questions.
>
> . . .
>
> Q:     When they asked you, Can we contact you on this number, did you say "yes"?
> A:     No.
> Q:     Would you have said "yes"?
> A:     No.
> Q:     Did you ever want Santander to contact you on that phone number?
> A:     No.

(*Id*. at 137:15-23, 138:6-13.) Furthermore, he testified that he repeatedly told Santander he did not want to be called at the -1411 number. (*Id.* at 97:11-18; 143:22-144:25.)

- 11 -

**RESPONSE:** The evidence cited does not support the asserted statement of fact that Henry Espejo did not consent to receive calls at the 1411 number on November 4, 2009, and, therefore, no response is required. *Portola Packaging, Inc.*, 422 F. Supp. 2d at 957 n.5. At his deposition, Mr. Espejo testified in no uncertain terms that "[Santander associates] would ask me, can we call you on this number?" – to which he replied "yes." (SCUSA/E 0800 (App. 089); H. Espejo Dep. at 74:5-12 (App. 151).) Further, Mr. Espejo fails to provide any evidence that on the November 4, 2009 call, Santander did not follow its policy of asking for the caller's agreement that Santander could contact the caller on the phone number used to place the call to Santander. (*See* 04/21/16 Nightengale Decl. at ¶ 5 (App. 003).) It is undisputed that after taking a break with his lawyer, Mr. Espejo testified at his deposition that he said "No" when Santander associates asked if they could contact him at that number and but then further indicated that Santander should have understood his "yes" to mean "no," and that in saying "yes" to whether this was a good contact number he only meant to confirm the 1411 cell phone number was his phone number – not to indicate that Santander could use call him on it. (H. Espejo Dep. at 136:23 to 138:10 (Pls.' Exhibit 5).) At his lawyer's prompting, Mr. Espejo further claimed to have "always" said in his calls with Santander, "don't call me." (H. Espejo Dep. at 135:22 to 136:20 (Supp. App. 009-010).) Mr. Espejo then conceded, however, that such requests purportedly occurred only on the calls made to him – *i.e.*, on the four calls from Santander in which he spoke to an associate and not on the 25 calls he and his wife made to Santander seeking payment accommodations. (H. Espejo Dep. at 97:11-18, 144:13-145:23 (App. 152-54).) The November 4, 2009 was an inbound call from the 1411 number to Santander and thus not one of the calls in which Mr. Espejo purportedly asked Santander not to call him. (04/21/16 Nightengale Decl. at ¶ 15 (App. 005).) Moreover, Santander's policies require associates to record "do not call"

requests. (04/21/16 Nightengale Decl. ¶ 6 (App. 003).) Santander's records, however, do not

show a "do not call" request related to any call with Mr. Espejo, including the November 4, 2009

call. (04/21/16 Nightengale Decl. ¶ 20 (App. 006).) *Jiamet*, 349 F.3d at 454; *Stevenson*, 2012

WL 987275, at *2 n.2 .

18.     Santander's Aspect dialer-which was used to place all the calls at issue in this

lawsuit-is a "predictive dialer system that dials numbers automatically and predicts when an

agent will be available to take calls." (Santander TCPA Compliance Manual, Pls.' Exhibit 6,

SCUSA/E 11032; Aspect Manual, SCUSA/E 0202 (Def.'s App. 221).)

**RESPONSE:** The evidence cited does not support the asserted statement of fact that the

Aspect dialer was used to make *all* calls at issue, and, therefore, no response is required. *Ashland

Products, Inc.*, 2002 WL 31819027, at *2 n.1. Further, the evidence cited does not support the

suggestion that Santander's Aspect system has the current capacity to store or produce telephone

numbers to be called using a random or sequential number generator and to dial such numbers.

(07/03/14 Nightengale Decl. at ¶ 8 (Supp. App. 002).) Santander does not dispute that Plaintiffs

accurately quote the Aspect Manual. Plaintiffs have not provided any support for the statement

that the Aspect dialer was used to place all calls at issue in this lawsuit.

19.     Aspect can place calls in one of several modes, including "predictive," "preview,"

or "manual." (Joseph Burda Deposition Transcript ("Burda Dep."), Pls.' Exhibit 7, at 58:22-59:1;

Santander TCPA Compliance Manual, Pls.' Exhibit 6, SCUSA/E 11032; Aspect Manual,

SCUSA/E 0202 (Def.'s App. 221).) Regardless of the mode in which calls are placed, however,

the same Aspect hardware and software is always used to place any call. (Burda Dep., Pls.'

Exhibit 7, at 102:21-103:18 (noting that calls using all three dialing modes utilized the same

- 13 -

hardware and software), Nightengale Dep., Pls.' Exhibit 2, at 42:8-18 (stating that the Aspect dialer consists of both the hardware and software used for inbound and outbound calls).)

**RESPONSE:** Undisputed. However, the evidence cited does not support the suggestion that Santander's Aspect system has the current capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers. (07/03/14 Nightengale Decl. at ¶ 8 (Supp. App. 002).)

20. Santander admits to making a large number of phone calls in predictive mode. (Burda Dep., Pls.' Exhibit 7, at 56:4-7, 67:14-25, 68:7-9, 99:3-6; Nightengale Dep., Pls.' Exhibit 2, at 44:22-45:2.)

**RESPONSE:** Undisputed.

21. In predictive mode, Aspect dials lists of telephone numbers at once. (See TCPA Compliance Manual, Pls.' Exhibit 6, SCUSA/E 11032 (explaining that in predictive mode, "a call campaign is created to select a pre-determined set of phone numbers automatically. Once the customer answers the phone, the call is routed directly to an agent and then the call begins."); Nightengale Dep., Pls.' Exhibit 2, at 58:25-59:5; Burda Dep., Pls.' Exhibit 7, at 40:20-41:15).)

**RESPONSE:** The evidence cited does not support the asserted statement of fact that Aspect "dials lists of telephone numbers at once," and, therefore, no response is required. *Shelton*, 2013 WL 212910, at *2.

22. Each day, a criteria-generated list of numbers for Aspect to dial is created as an unprocessed ".raw." file. (See Nightengale Dep., Pls.' Exhibit 2, at 63:2-5.) In order for Aspect to upload the file, it is placed into a share location where Aspect can access and process the numbers to be dialed, and load them into a database. (*Id*.; Burda Dep., Pls.' Exhibit 7, at 41:21-42:1 (explaining that the list file is placed in a share location, "[a]nd then we have a-within the

Aspect system-we have a process where we actually import the file and it loads that file into the database").) It takes approximately an hour and a half for Aspect to complete the upload process. (Burda Dep., Pls.' Exhibit 7, at 43:16-18.)

**RESPONSE:** Undisputed.

23.     In predictive mode, Aspect works its way through the call list by automatically dialing thousands of telephone numbers at once, setting the pace of outbound calls using "an algorithm to predict when an agent is available to handle the next call," and then "dial[ing] based on these assumptions." (*See* Aspect Manual, SCUSA/E 0202, 0698 (Def.'s App. 221, 223); *see also* Nightengale Dep., Pls.' Exhibit 2, at 44:18-21 (explaining that as a predictive dialer, "Aspect has an algorithm that helps maintain efficiency on inbound and outbound phone calls."); Burda Dep., Pls.' Exhibit 7, at 48:22-49:2 (noting that "predictive algorithm" determines the number of calls placed at any given time).)

**RESPONSE:** The evidence cited does not support the asserted statement of fact that the Aspect system "automatically dial[s] thousands of telephone numbers at once" and, therefore, no response is required. *Portola Packaging, Inc.*, 422 F. Supp. 2d at 957 n.5. Santander further objects to the phrase "works its way through the call list by automatically dialing," which is ambiguous and misleading. The dialer feature of the Aspect system as used by Santander involves human intervention at multiple stages in the process. A human being first manually uploads the list of numbers to be called each morning. (Burda Dep. at 114:22-115:1 (Pls. Exhibit 7).) Associates then take multiple steps to launch calls using the Aspect "predictive dialer" function. (*Id.* at 111:15-112:7.) For the calls to start, an associate must first log into the system with a password and validation code and then press a button indicating that he or she is in "idle status," meaning the associate is ready to place and receive a call. (*Id.* at 111:23-112:10;

Nightengale Dep. at 67:25 to 69:22 (Pls.' Exhibit 2), 71:23 to 72:20 (Supp. App. 026-027);

07/03/14 Nightengale Decl. at ¶ 5 (Supp. App. 002).) Further, to keep the dialer going,

employees must continue to manually press buttons to signal the need for another call. (07/03/14

Nightengale Decl. at ¶ 6 (Supp. App. 002).) In response to associates pressing the "get next"

button, the dialer uses an algorithm that attempts to match the available associates to answered

calls in an efficient manner. (Nightengale Dep. at 44:10-45:2 (Pls.' Exhibit 2), 74:2-7 (*Espejo*

Dkt. 191-10, *Bonner* Dkt. 119-10.) Once an associate dispositions a call made through the dialer

– *i.e.,* enters an activity note indicating what happened on the phone call – the associate must

then hit a "Done" button to submit the note into the system. (Burda Dep. at 113:3 to 114:10

(App. 148-49); Nightengale Dep. at 74:2-15 (*Espejo* Dkt. 191-10, *Bonner* Dkt. 119-10.)

Thereafter, the associate must press another button called "Get Next" to indicate that he or she is

ready for the next call. (Burda Dep. at 114:10-16 (App. 149).) This series of manual entries –

disposition the call, press "Done" and then press "Get Next" – must be made after each and

every phone call, and the dialer system does not try to dial additional phone numbers until that

agent indicates that he or she is in "idle" mode and ready to take the next call. (*Id.* at 113:22-

114:21; Nightengale Dep. at 73:19 to 74:7 (Supp. App. 028-029).) The agent also has various

"not ready" codes (e.g., "go into a meeting," "personal time,") that he or she can press at any

time to hold off taking the next call and thereby prevent the dialer from calling additional

customers. (Burda Dep. at 112:7-21 (App. 147).) In this way, the dialer system will not dial

numbers without being triggered by human intervention; if no associates indicate their

availability to take calls, then the system ultimately will stop dialing.

24.     Aspect begins dialing as soon as a single agent is logged in, placing calls pursuant

to a pacing algorithm that determines the number of calls to be made at any given time. (*See*

Aspect Manual, SCUSA/E 0202 (Def.'s App. 221); TCPA Compliance Manual, Pls.' Exhibit 6, SCUSA/E 11032 ("Once the customer answers the phone, the call is routed directly to an agent . . ."); Nightengale Dep., Pls.' Exhibit 2, at 67:7-68:16; Burda Dep., Pls.' Exhibit 7, at 46:18-49:8).) Although the pace of calls automatically adjusts based on the number of agents available, Aspect "dials numbers automatically and predicts when an agent will be available to take calls." (Santander TCPA Compliance Manual, Pls.' Exhibit 6, SCUSA/E 11032; *see also* Burda Dep., Pls.' Exhibit 7, at 48:22-49:2 (explaining that the number of calls placed at any given time is based on the predictive dialer's algorithm). As Aspect keeps dialing, consumers who have answered their phones are placed in a wait queue until a Santander agent identifies him or herself as available, and the call is then automatically routed to that agent. (Burda Dep., Pls.' Ex. 7, at 116:17-119:15.)

**RESPONSE:** The evidence cited does not support the asserted statement of fact that "Aspect begins dialing as soon as a single agent is logged in," and, therefore, no response is required. *Ashland Products, Inc.*, 2002 WL 31819027, at *2 n.1. To begin dialing, a human being must first upload the list of numbers to be called each day. (Burda Dep. at 114:22-115:1 (Supp. App. 006-007).) Associates then take multiple steps to launch calls using the Aspect "predictive dialer" function. (*Id.* at 111:15-112:7 (Pls. Exhibit 7).) For the calls to start, an associate must first log into the system with a password and validation code and then press a button indicating that he or she is in "idle status," meaning the associate is ready to place and receive a call. (*Id.* at 111:23-112:10; Nightengale Dep. at 67:25 to 69:22 (Pls.' Exhibit 2), 71:23-72:20 (Supp. App. 026-027).); 07/03/14 Nightengale Decl. at ¶ 5 (Supp. App. 002).) Further, to keep the dialer going, employees must continue to manually press buttons to signal the need for another call. (07/03/14 Nightengale Decl. at ¶ 6 (Supp. App. 002).) It is undisputed that the pace

of the calls will change depending on the number of associates who have indicated an availability to take a call, or that the Aspect Manual states that Aspect "dials numbers automatically and predicts when an agent will be available to take calls." As Santander employs the Aspect system, the dialer feature dials numbers in response to associates pressing buttons indicating they are ready to receive additional calls, employing an algorithm to efficiently provide answered calls to the associates requesting another call. (Nightengale Dep. at 44:10-25 (App. 198), 72:1-20 (Supp. App. 027).)

The evidence cited also does not support the statement that the dialer feature of the Aspect System as employed by Santander will keep dialing and queue calls in which a person has answered until a Santander associate identifies him or herself as available. For a small percentage of calls, an agent will not be available when a caller answers and such a call will be abandoned. At that point, however, the dialer will be restricted and calls will slow down to match the requests for calls from the associates. (Burda Dep. 82:17-83:21 (Supp. App. 004-005).)

25.     When Aspect is operating in "predictive" mode, Santander agents do not dial calls.  Instead, once the call list is uploaded, "agents log into the system and . . . put themselves in a status to be available to take phone calls," while Aspect dials. (Burda Dep., Pls.' Exhibit 7, at 46:21-47:2.)

**RESPONSE:** Undisputed.

26.     While Aspect works its way through the list automatically, Santander agents need only click buttons to show they are "ready to take a phone call" and "identify them[selves] as available resources," so that Aspect may automatically dial a list of telephone numbers at a rate "based on agents that are available at that time to take calls." (*Id*. at 111:23-112:10, 113:3-17, 114:14-21.)

**RESPONSE**: Santander objects to the phrase "[w]hile Aspect works its way through the list automatically," which is ambiguous and misleading. The evidence cited does not support this statement and, therefore, no response is required. *Shelton*, 2013 WL 212910, at *2. It is undisputed that Aspect begins to work when associates ask for calls by pressing buttons indicating they are ready to take a call and that the dialer feature of the Aspect system dials from a list of numbers based on the number of associates who have indicated an ability to take calls. If associates stop pressing buttons, the dialer will stop making calls. To keep the dialer going, employees must continue to manually press buttons to signal the need for another call. (Burda Dep. at 113:18-114:21 (App. 148-49); Nightengale Dep. at 73:19-74:7 (Supp. App. 028-029).)

27.     By using an algorithm to match available agents to consumers, while dialing continuously in the background, Santander maximizes the efficiency of its debt collection operation. (Nightengale Dep., Pls.' Exhibit 2, at 44:20-45:2.)

**RESPONSE:** The evidence cited does not support the statement of fact that the dialer feature of the Aspect system employs an algorithm to "dial[]continuously in the background" and, therefore, no response is required. *Portola Packaging, Inc.*, 422 F. Supp. 2d at 957 n.5. The dialer feature of the Aspect system will not dial numbers without being triggered by human intervention; if no associates indicate their availability to take calls, then the system ultimately will stop dialing. (Burda Dep. at 113:22-114:21 (App. 148-49); Nightengale Dep. at 73:19-74:7 (Supp. App. 028-029).)

28.     When Mark Nerios-the site director of Santander's Colorado office-was asked what question Santander agents asked to determine whether a number was a "good contact number," his attorney objected that such a line of questioning was "beyond the 30(b)(6) and plus was the subject of the deposition of Mr. Nightengale four or five months ago." (Nerios Dep.,

Pls.' Exhibit 3, at 5:11-13; 51:7-12; 51:25-52:5.) Matters of TCPA consent or compliance are not included as a topic on Nerios' notice of deposition, (Nerios Notice of Deposition, Pls.' Exhibit 8), and Nerios admittedly lacks personal knowledge about what the designation "IVR1 Home" in the activity notes actually means. (See Nerios Dep., Pls.' Exhibit 3, at 51:18-20 ("There's no way from looking at the notes I could tell how the conversation went.").)

**RESPONSE:** The evidence cited does not support the statement of fact that "Nerios admittedly lacks personal knowledge about what the designation 'IVR1 Home' in the activity notes actually means," and, therefore, no response is required. *Ashland Products, Inc.*, 2002 WL 31819027, at *2 n.1. Nerios provided a basis for his testimony (Nerios Dep. at 11:22-13:5 (Supp. App. 021-023), 51:7-16 (App. 193)) and never admitted to a lack of personal knowledge. (*Id.* at 37:22 to 40:6; 51-21-24 (App. 189-93).) Further, Nerios clearly explained the meaning of "IVR1's Home" as reflected in Levins' activity notes as follows:

Q. … Based on your review of the notes and any other knowledge you have, are you able to tell me how Santander obtained that telephone number?

A. Yes, sir. ... If you look at the first time the phone number appears in the notes, looks like it's 3-27-2009. ... You see the incoming call from xxx-xxx-6074 … Next to that it shows IVR1's home. … So that's when the number would have been updated at that time.

Q. ... And can you explain to me what IVR1's home means?

A. I can. IVR1's home is -- well, IVR stands for interactive voice response. …The fact that it shows home means that an associate had to designate a field for that phone number. So this is the contact here so, I mean, that would have been the phone call where this phone number was updated by the customer.

Q. … Do you know whether based on that account note the agent on the telephone had to ask the person on the other end for that telephone number?

A. Yes, sir.

Q. … And how do you know that?

A. Because it's listed as IVR1 home.

Q.    … And can you just generally for me describe how that sort of conversation would take place?

A.    On -- in this particular situation, the customer would have called prior when maybe the office was closed or something in order to have their phone number loaded as IVR. … So when they call in this time, it would come up as IVR1. … So when they're talking to the associate and when the phone number comes up, they say, hey, this number that you're calling in from, what type of phone number is this.

…

Q.    … So then based on that call, what's noted as Miss Levins called in after having previously called and the agent asked what type -- I see -- would they say something like I see you're calling from 6074? … What type of telephone number is that?

A.    What type of telephone number. … Is this a good number to contact you at.

(Nerios Dep. 38:8 to 39:24 (App. 189-91).) Plaintiffs also do not rebut Nerios testimony with evidence. Nerios' testimony, moreover, is corroborated by the declaration of Wayne Nightengale, Santander's Executive Vice President of Servicing. (06/10/2016 Nightengale Decl. ¶¶ 27-30 (*Espejo* Dkt. 191-4, *Bonner* Dkt. 119-4).)

Dated: July 11, 2016

**SANTANDER CONSUMER USA INC.,**
*Defendant*

By: _/s/ James A. Rolfes_____
One of Its Attorneys

| | | |
|---|---|---|
| James A. Rolfes | Abraham J. Colman | Marc A. Lackner |
| (Bar No. 6200271) | *pro hac vice* | *pro hac vice* |
| *jrolfes@reedsmith.com* | *acolman@reedsmith.com* | *mlackner@mcguirewoods.com* |
| Henry Pietrkowski | REED SMITH LLP | David S. Reidy |
| (Bar No. 6230048) | 355 South Grand Avenue | *dreidy@mcguirewoods.com* |
| *hpietrkowski@reedsmith.com* | Los Angeles, CA 90071 | MCGUIRE WOODS LLP |
| REED SMITH LLP | (213) 457-8000 | 505 Sansome Street, Suite 700 |
| 10 South Wacker Drive | | San Francisco, CA 94111 |
| Chicago, IL 60606 | | (415) 844-1974 |
| (312) 207-1000 | | |

*Attorneys for Defendant Santander Consumer USA, Inc.*

## CERTIFICATE OF SERVICE

I, James A. Rolfes, state that on July 11, 2016, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification to all parties.

_/s/ James A. Rolfes_